STEVEN A. LERMAN, S.B.N. 055839
NICHOLAS LERMAN, S.B.N. 292656
**STEVEN A. LERMAN & ASSOCIATES, INC.**
6033 West Century Boulevard, Suite 740
Los Angeles, California 90045
Telephone (310) 659-8166
Facsimile  (310) 285-0779
Email: nmlerman0@yahoo.com

**LAW OFFICE OF GREGORY PEACOCK**
Gregory Peacock, ESQ. (SBN. 277669)
4425 Jamboree Road
Suite 130
Newport Beach, CA 92660
Telephone: (949) 292-7478
Email: gregorypeacockesq@gmail.com

Attorneys for Plaintiffs, SARAH CRUZ REAZA, individually and as Successor-in-Interest of Decedent Fernando Cruz, FERNANDO BAEZA, individually and as Successor-in-Interest of Decedent Fernando Cruz, FERNANDO CRUZ, JR., individually and as Successor-in-Interest of Decedent Fernando Cruz, FRANK FIDEL CRUZ, individually and as Successor-in-Interest of Decedent Fernando Cruz, CELESTE MARIE CRUZ, individually and as Successor-in-Interest of Decedent Fernando Cruz, RAELENE MARIE CRUZ, individually and as Successor-in-Interest of Decedent Fernando Cruz, J.A., by and through his guardian, JOANNE ALBIDREZ, I.C., by and through his guardian, JOANNE ALBIDREZ, L.M.C., by and through her guardian, JOANNE ALBIDREZ,

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

1

**DECLARATION OF GREGORY PEACOCK IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE CERTAIN OPINIONS OF PLAINTIFFS' EXPERT MARVIN PIETRUSZKA**

SARAH CRUZ REAZA, individually and as Successor-in-Interest of Decedent Fernando Cruz, FERNANDO BAEZA, individually and as Successor-in-Interest of Decedent Fernando Cruz, FERNANDO CRUZ, JR., individually and as Successor-in-Interest of Decedent Fernando Cruz, FRANK FIDEL CRUZ, individually and as Successor-in-Interest of Decedent Fernando Cruz, CELESTE MARIE CRUZ, individually and as Successor-in-Interest of Decedent Fernando Cruz, RAELENE MARIE CRUZ, individually and as Successor-in-Interest of Decedent Fernando Cruz, J.A., by and through his guardian, JOANNE ALBIDREZ, I.C., by and through his guardian, JOANNE ALBIDREZ, L.M.C., by and through her guardian, JOANNE ALBIDREZ,

   Plaintiffs,

  vs.

COUNTY OF RIVERSIDE; ROBERT ROACH; ANDREW LUCIFORA; GEOFFREY GILLISON; TODD HALBEISEN; and DOES 1 through 20, Inclusive,

   Defendants.

Case No.: 5:20-cv-01188-MEMF-SP

**DECLARATION OF GREGORY PEACOCK IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE CERTAIN OPINIONS OF PLAINTIFFS' EXPERT MARVIN PIETRUSZKA**

DATE: AUGUST 4, 2022
TIME: 10:00 A.M.
COURTROOM:8B

## DECLARATION OF GREGORY PEACOCK

 I, Gregory Peacock, do state and declare as follows:

 1) I am an attorney at law licensed to practice before this court and attorney of record for Plaintiffs. I have person knowledge of the following facts and, if called as a witness,

2

**DECLARATION OF GREGORY PEACOCK IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE CERTAIN OPINIONS OF PLAINTIFFS' EXPERT MARVIN PIETRUSZKA**

2)  Attached hereto as Exhibit "A" is a true and correct copy of Dr. Marvin Pietruszka's Initial Expert Report.

2)  Attached hereto as Exhibit "B" is a true and correct copy of deposition excerpts from the Deposition of Dr. Marvin Pietruszka.

I declare under the penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed this 14th Day of July, 2022, in Los Angeles, California.


By: */S/ Gregory Peacock*_____
Gregory Peacock, Esq.
Attorney for Plaintiff

3

**DECLARATION OF GREGORY PEACOCK IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE CERTAIN OPINIONS OF PLAINTIFFS' EXPERT MARVIN PIETRUSZKA**

# EXHIBIT "A"

# Marvin Pietruszka, M.D., M.Sc., F.C.A.P.
### Board Certified, Anatomic and Clinical Pathology (ABP)
### Board Certified, Occupational Medicine (ABPM)
### Board Certified, Forensic Toxicology (ABFT)
Del Carmen Medical Center
19234 Vanowen Street   Reseda, California 91335
(818) 705-1157/Fax (818) 705-4273

March 29, 2022

Steven Lerman, Esq.
Steven Lerman & Associates
6033 W. Century Blvd, Suite 740
Los Angeles, CA 90045

      Re:  Cruz vs. Riverside
      Coroner Case #: 2019-11976

Dear Mr. Lerman,

Thank you for referring the above referenced case to me for review.  The opinions set forth below are stated to a reasonable degree medical probability based on my review of the provided materials, as well as my education, training, knowledge and experience.  My opinions are subject to modification in the event that I am made aware of additional information regarding this case in the future.

## Background and Qualifications:

I am a physician licensed by the States of California (A30858); 1977 Pennsylvania (036075, 1975) and Texas (P1130, 2011).  I am certified in Anatomic and Clinical Pathology by the American Board of Pathology (1977). I am also certified in Occupational Medicine by the American Board of Preventative Medicine (2006) and in Forensic Toxicology by the American Board of Forensic Toxicology (2008).  I hold the position of Clinical Assistant Professor of Pathology at USC Keck School of Medicine.  During the course of my career as a practicing physician, in addition to my pathology practice, I have also worked as a family physician/internist.  As part of my clinical work and as a forensic toxicologist, I have had the opportunity to treat patients who have been substance abusers and to evaluate cases of chemical and drug toxicity.  My education, training, work experience, appointments and positions, professional activities, professional memberships, research and publications are set forth in my Curriculum Vitae attached here.

Re:  Cruz vs. Riverside
March 29, 2022
Page 2 of 8


**Materials Reviewed**

In formulating my opinions in this case, I have reviewed the following documents:

1. Riverside County Sheriff-Coroner Investigation and Autopsy Report
2. BioTox Laboratories Toxicology Reports
3. Expert Report of Jeffrey J. Noble
4. Joint Case Management Statement dated 01/07/2021
5. Deposition of Geoffrey Gillison
6. Deposition of Deputy Andrew Lucifora
7. Deposition of Todd Halbeisen
8. Deposition of Deputy Robert Roach
9. Document entitled Deposition Questions, Cruz vs. Riverside
10. Deposition of Jolie Rodriguez, M.D.
11. Autopsy photographs
12. Multiple photographs
13. Multiple Incident Reports
14. Multiple Reports of Interviews with Deputies
15. Report of Interview with Sarah Reaza
16. AMR and First Responder Reports

**History of the Incident:**

This case deals with Mr. Fernando Cruz, a 39-year-old male who weighed 196 pounds and measured 5'6". On October 7, 2019, at 0345 hours, Mr. Cruz' mother, Sarah Reaza, called the Riverside County Sheriff's Department to report that her son had been using methamphetamine, was punching walls, and was out of control. Mr. Cruz had a prior diagnosis of a mental disorder, substance abuse disorder and a respiratory disorder and had been using a Ventolin inhaler for his respiratory condition. She advised the dispatch center that she had observed her son smoking methamphetamine out of a pipe in the kitchen sometime prior to the call. The coroner's investigator report indicates that police officers had been to the residence in the past and noted that Mr. Cruz had previously resisted arrest. At 0422 hours, two Jurupa Valley deputies arrived at the residence and were advised that Ms. Reaza wanted her son out of the house because of his use of methamphetamine. The deputies initially approached Mr. Cruz at the front door of a trailer. As Mr. Cruz turned to go into the trailer, he tripped and fell. Deputies attempted to handcuff him, but Mr. Cruz resisted. At 0428 hours, he began to fight with deputies. Mr. Cruz was ultimately handcuffed and placed in custody, but was still attempting to fight with deputies. A hobble restraint was then applied. At 0443 hours, Mr. Cruz stopped fighting and became unresponsive. Cardiopulmonary resuscitation efforts were instituted and at 0516 hours, Mr. Cruz was transported via ambulance to Riverside Community Hospital emergency room. He arrived at the hospital at 0528 hours where the emergency

Re:  Cruz vs. Riverside
March 29, 2022
Page 3 of 8

room staff continued CPR.  His treatment included the placement of bilateral chest tubes and an intravenous line.  Mr. Cruz did not respond to the medical treatment and was pronounced dead on October 7, 2019, at 0614 hours.

### Report of Jeffrey J. Noble:

Mr. Jeffrey J. Noble, a former deputy chief of police with the Irvine Police Department noted in his report that in an attempt to detain Mr. Cruz, Deputy Roach placed his knee on Mr. Cruz' chest.  Deputy Gillison used the end of a collapsible baton to apply a compliance pressure point to Mr. Cruz' upper back and, in addition, punched Mr. Cruz in the side of the head with a closed fist.  He notes that the deputies applied a hobble restraint to control Mr. Cruz' legs.  His report notes that after applying the restraint, within minutes, the deputies discovered that Mr. Cruz was not breathing.  The cardiorespiratory arrest occurred within 7 minutes of the deputy's attempts to restrain Mr. Cruz.  His report also states that after back up deputies arrived, one of the officer's (a black deputy) punched Mr. Cruz in the head four to five times when Mr. Cruz was face down on the ground.  Mr. Cruz appeared to pass out and paramedics began to give Mr. Cruz chest compressions.  The report states that Deputy Gillison also struck Mr. Cruz on the right side of the head three to four times and that he also delivered a single closed fist strike to the upper back.  The report indicates that Deputy Roach mounted Mr. Cruz as Mr. Cruz was laying on his back and that he placed his knee against Mr. Cruz' chest while holding both of his hands.  The report also indicates that Deputy Gillison's right knee had been placed on Mr. Cruz' shoulder, as well as his back for short periods of time of up to 5 seconds.  The report also indicates that Deputy Gillison stated that his knee was on Mr. Cruz for a total of 2 minutes.  The overall report indicates that in an attempt to restrain Mr. Cruz, deputies initially handcuffed Mr. Cruz.  He was then placed in a supine position and he was finally placed in a hobble position.  During the time it took to restrain Mr. Cruz and to place him in a hobble position, Mr. Cruz sustained various forms of inflicted trauma in the form of punches to the head and pressure to his chest and extremities.  After being placed in a hobble position, he suffered a cardiorespiratory arrest and then expired.

### Autopsy Report:

An autopsy was performed by the Riverside County Sheriff's Department Coroner on March 27, 2020.  The autopsy performed by Jolie Rodriguez, M.D., listed a final diagnosis of few hemorrhagic foci involving the neck, back and lateral edge of the tongue.  Additionally, there were diffuse adhesions involving the abdomen and right pleural cavity and no significant natural disease was identified.  The cause of death was listed as acute methamphetamine intoxication.  Under other significant conditions is listed "physical confrontation with law enforcement".  The coroner investigation report attributes the cause of

Re:   Cruz vs. Riverside
March 29, 2022
Page 4 of 8

death to acute methamphetamine intoxication.  The manner of death is classified
as homicide.  The mode of death was determined to be due to overdose of an
illicit drug while being taken into custody by law enforcement.  Physical
confrontation with law enforcement is listed under other significant conditions
contributing to death, but not related to cause given.

Pertinent autopsy findings include the presence of conjunctival congestion
without petechiae.  There was soft tissue hemorrhage on the right side of the
neck.  The previously placed chest tubes were identified.  There was 450 cc
blood within the left pleural cavity.  There was a red-brown, dry abrasion over the
sternum, at the left of the nipples.  There were fractures of anterolateral right ribs
(#2 and 3) and the left 2nd rib at its anterolateral aspect.  The fractures were
associated with a small amount of soft tissue hemorrhage.  There were
abrasions/contusions in an approximate 7 cm area involving the left lateral and
inferolateral periorbital tissue.  There was a 5 cm, red, dry abrasion over the
submental area.  There was focal hemorrhage of the right temporalis muscle,
both superficially and deep.  An examination of the strap muscles of the anterior
neck demonstrated focal hemorrhage at the lateral edges of the right and left
sternocleidomastoid muscles.  On the lateral edge of the left side of the tongue,
there were two small hemorrhagic foci.

On the trunk within a 10 x 4 cm area of the upper left shoulder, there were
multiple red, dry, linear abrasions and contusions with a vague patterned
appearance.  There were several abrasions/contusions over the left chest and
abdominal area.  The examination of the back revealed few, scattered
hemorrhagic foci of the subcutaneous adipose tissue.

Examination of the extremities revealed the presence of circumferential, red
contusions and abrasions of the right and left wrists measuring up to 5 cm in
width.  There are several red, punctate foci over the posterior left hand and in a 9
x 7 cm area of the left knee dry abrasions were identified.  There were multiple
abrasions of the right knee as well.  There were multiple contusions over the right
lower leg and ankles.

A systemic examination revealed no significant findings except for the presence
of dense fibrous adhesions within the right pleural cavity.  The heart weighed 380
gm.  The lungs weighed 440 gm and 320 gm respectively on the right and left.
The pulmonary parenchyma was described as maroon, rubbery and airless.  The
liver weighed 1,430 gm.  The right and left kidneys weighed 150 gm each.  The
hyoid bone and thyroid cartilage were intact.  There were no scalp or subgaleal
hemorrhages.  The cerebral parenchyma was described to be without evidence
of hemorrhage, infection, tumor or trauma.  Skull fractures were not identified.
The overall systemic examination was unremarkable.

Re:   Cruz vs. Riverside
March 29, 2022
Page 5 of 8

## Postmortem Toxicologic Studies:

A hospital blood sample drawn at 0608 hours on October 7, 2019, detected the presence of amphetamines.  A plasma sample drawn at 0608 hours revealed the presence of methamphetamine at a concentration of 0.291 mg/L and amphetamine at a concentration of 0.039 mg/L.  A urine sample collected on October 8, 2019, revealed the presence of methamphetamine at a concentration of 29.000 mg/L and amphetamine at a concentration of 3.220 mg/L.  All quantitative studies were performed by LC/MS/MS.  The urine sample detected Albuterol by the LC/MS/MS method.  A vitreous sample detected the presence of amphetamines.  The quantitative study revealed methamphetamine at .347 mg/L and amphetamine at a concentration 0.060 mg/L.  The study was performed by LC/MS/MS.  A vitreous sample was tested for electrolytes, glucose and creatinine.  The study identified potassium at a concentration of 15 mmol/L (elevated) and glucose at 36.0 mg/dL (decreased).

## Analysis of Autopsy Findings:

The autopsy findings demonstrate the presence of conjunctival congestion and the presence of soft tissue hemorrhage reflecting contusions and abrasions to the neck, sternum and left periorbital tissues.  There is evidence of a contusion of the right temporalis muscle, as well as contusions of the sternocleidomastoid muscles bilaterally.  The tongue demonstrated two small areas of hemorrhage. There were areas of contusions and abrasions involving the trunk, primarily involving the left side of the chest and also the abdomen.  Contusions of the back were also identified by the presence of hemorrhage within subcutaneous adipose tissue.  Finally, there were contusions and abrasions of both wrists resulting from Mr. Cruz' extremity movements while being handcuffed.  Abrasions of the knees were also identified, as well as the presence of contusions of the right lower extremity and also the left ankle.  The significant internal findings include the presence of fibrous adhesions involving the right pleural cavity.  The absence of air within the lungs suggests that the lungs were not being inflated and that they had become congested.  There were no fractures of the hyoid bone or thyroid cartilage and there was no evidence of internal cranial hemorrhage.

## Analysis of Toxicologic Studies:

The immunoassay of a blood sample taken at 0608 hours revealed the presence of the amphetamine class of drugs in a hospital blood sample.  Confirmatory testing at BioTox Laboratories revealed methamphetamine at 0.291 mg/L and 0.039 mg/L amphetamine.  The urine revealed a concentration of 29.0 mg/L and amphetamine at 3.220 mg/L.  Albuterol was detected in a urine sample.  The vitreous sample detected the presence of amphetamines.  Specifically, methamphetamine was detected at .347 mg/L and amphetamine was detected at

Re:   Cruz vs. Riverside
March 29, 2022
Page 6 of 8

0.060 mg/L.   Electrolyte and glucose studies revealed an elevated potassium level of 15 mmol/L and a decrease glucose of 36.0 mg/dL.

The abovementioned studies indicate that Mr. Cruz had consumed methamphetamine within the prior 24 hours.  The methamphetamine levels are low and fall within the borderline low toxic range.  The amphetamine level is within the non-toxic range.  The urine amphetamine measurements are consistent with the prior use of methamphetamine within a 24 hour period.  The vitreous study confirms the prior finding of methamphetamine and amphetamine and demonstrates methamphetamine in a low toxic range.  Symptoms of methamphetamine  usage include dizziness, faintness, rapid heartbeat, headaches, sweating, nervousness, agitation, blurred vision, confusion, lightheadedness, unsteadiness, tremor, incoordination, dilated pupils, muscle cramps, sleepiness, depression, heartburn, uncontrolled eye movements, memory problems, vertigo, seizures, hyperactivity and in rare instances symptoms of psychosis.  Mr. Cruz had a known history of a mental disorder.  He was also a longstanding substance abuser.  He had been using a Ventolin inhaler, a medication typically used for an asthma condition.  Mr. Cruz did not demonstrate any of the abovementioned symptoms of methamphetamine toxicity.  His mother reported to the police that he was out of control and punching walls.  Mr. Cruz' behavior could have been related to his mental disorder.  The blood test results indicate that Mr. Cruz had consumed methamphetamine; however, the methamphetamine levels are no greater than borderline-low toxic range.  Such measurements are frequently encountered in chronic methamphetamine users.  Methamphetamine users typically develop tolerance to the adverse effects of the drug.  Methamphetamine can cause tachycardia and hyperexcitability of the electrical system heart.  However, there is no indication that this was occurring in Mr. Cruz.  Mr. Cruz' cardiorespiratory arrest occurred after he was subjected to generalized trauma and the restriction of respiration after the application of a hobble restraint.

## Physiological Analysis of Restraint Attempts:

As noted above, Mr. Cruz suffered trauma affecting the torso and extremities in an attempt to restrain him.  His prior treatment with a Ventolin inhaler suggests the presence of a preexisting asthmatic condition.  Mounting Mr. Cruz by the police officer would have restricted his respirations and would have compromised his respiratory disorder.  The pulmonary adhesions on the right were a preexisting condition that would have also restricted his respirations; however, they would not have caused his demise.  It was the placement of Mr. Cruz in the hobble position which ultimately caused a significant reduction in Mr. Cruz' ability to breath.  The breathing mechanism requires the use of both intercostal muscles and abdominal muscles for adequate oxygenation to occur.  Direct chest pressure applied by either a knee or by lying prone, especially because of Mr.

Re:  Cruz vs. Riverside
March 29, 2022
Page 7 of 8

Cruz' overweight condition would have further restricted his breathing.  With a restriction of respiration, there would have been reduced oxygenation and the limitation of oxygenated blood arriving to Mr. Cruz' heart muscle.  This would have resulted in a fatal cardiac arrhythmia as demonstrated by the cardiac arrest that he sustained within a period of 7 minutes of an attempt to restrain him.

**Facts Considered in Forming Opinions:**

1. Mr. Cruz was an otherwise healthy 39-year-old male with a preexisting respiratory disorder and a longstanding history of substance abuse
2. Mr. Cruz would have been tolerant to the effects of methamphetamine in his system
3. The presence of right pleural effusions suggests that Mr. Cruz had suffered a prior inflammation of the right lung which would have restricted, to some extent, right lung movement.
4. The methamphetamine levels are low and are consistent with the prior use of methamphetamine within a 24 hour period.  The methamphetamine level is in the borderline to very low toxic range
5. Multiple abrasions and contusions are consistent with the trauma inflicted upon Mr. Cruz as described by the police officers.
6. Direct body pressure from either or a knee or the weight of a deputy would have significantly restricted Mr. Cruz' respirations.
7. The placement of Mr. Cruz in a hobble position markedly restricted his respirations.
8. The psychological stress of being restrained and being subjected to trauma to multiple body parts would have resulted in the occurrence of a tachycardia which would have caused the development of a fatal cardiac arrhythmia in a setting of mechanical asphyxia.
9. The measured methamphetamine levels would not have caused Mr. Cruz' demise had he not been subjected to the multiple episodes of trauma and the hobble restraint as applied by the police officers.
10. Repeated episodes of head trauma could reasonably have caused Mr. Cruz to develop cerebral anoxia, a condition likely to cause a fatal cardiorespiratory arrest.

**Opinion:**

It is my opinion to a reasonable degree of medical and scientific probability that Mr. Fernando Cruz suffered a fatal cardiopulmonary arrest as a result of mechanical asphyxia during the police attempts to restrain him.

Re:  Cruz vs. Riverside
March 29, 2022
Page 8 of 8

Thank you for giving me the opportunity to review this case.  Should I be asked to testify in this matter, I will testify truthfully to the information I have described in this report.

Sincerely,

Marvin Pietruszka, M.D., M.Sc., F.C.A.P.
Clinical Associate Professor of Pathology
University of Southern California
Keck School of Medicine

## LIST OF TRIAL AND DEPOSITION CASES
## FOR DR. MARVIN PIETRUSZKA

People vs. Stanley Park,    Case No.: NA080541
People vs. Frank Hogan
In re Anastacio Rojas Hernandez
Huffer v. Toyota Motor Sales, U.S.A., Inc., et al.
Lee vs. Witzling
Fernando Cortez, III and Rudy Cortez, minors vs. County of LA, et. al.
People vs. Sean Schuck, Case No: NAO078839
People vs. David Figueroa
People vs. Aubrey Berry
People vs. Santiago Gerardo Sencion, Case No.: LA 058186
People vs. Hugo Zuniga, Case No.: TA099466
People vs. Maribel Ramos
Berry vs. City of Antioch, Case No.: A121130
Dean vs. Vedanta, B204227
Kun Lee vs. James Jung, Case No.: B206683
People vs. Gokhale, Case No.: E035938
Badajoz vs. ABC Unified School District, Case No.: B171324
Mc Daniel vs. Murotani  et. al
Juanita Anderson (Deposition)
Bernshtein v. LACMTA
Wendy Stone McEntyre v. Rick E. Schoonover, et. al. (Deposition)
Flores v. Dederer, et. al. (Deposition)
People vs. Miguel Alvarez, Case No.: 10HF0476
Tri-State Employment Services/OSHA Citations, Case 12-R6D2-0378
Julian Harris, Minor, Dependency CK 79766, CK 79765
Isaiah Baker, Dependency CK 84560
Mya Chadwick, Dependency Case No: CK88779
Tyisha Player vs. County of Los Angeles, et. al. (Deposition)
Dorota S. Elbert vs. Farhad Khossoussi, M.D., et. al. (Deposition)
Lynn vs. Dewey Services (Deposition)
Adrian Mulligan, Dependency Case No.: CK97161
Damian Luna Gonzalez, Dependency Case No.:  CK89495
Bagato vs. International Speedway Corporation, et. al. (Deposition)
Arturo Espinoza, Dependency Case No.: CK87451
Fernandez-Burner, Benjamin, Dependency Case
Santana Aguinaga, Dependency Case No.: CK76571
People vs. Miguel Alvarez, Case No.: 10HF0476
People vs. Jon McKinney, Case No. 09CF1955
Heirs of Varuzh Suleymanyan vs. Glendale Memorial Hospital and
    Andrew S. Hurwitz, M.D.
People vs. Donald McCardell, Case #: YA086684
Brian Khan vs. Dewey Pest Control
Keisha Lamons vs. Walmart, Riverside

People vs. Kristy Bash, Case #: 3JB08399
Austin Michael Peebles, 02255911, Case #: CK87407
Dylan Peebles, 02255910, Case #: CK87407
People vs. Sherri Wilkins, Case #: YA086025
McCabe vs. Sharma, Case #: KC965365
People vs. Santos (Children's Court), Case #: 2013-06529
People vs. Quadre Jackson, Case #: SWF1203158
People vs. Gerone Anitone, Case #: 4MP00713
People vs. Anthony West, Case #: 3EA02093
People vs. Derome Harper, Case #: NA095460-01
People vs. Jesus Vega Estrada, Case #: KA103873
Bracamonte vs. Valenzuela, Case #: RIC 1217377
Frank Yarborough vs. Ralphs Grocery Co
People vs. Rafael Chavez, FV1 1403282
People vs. Frederick Freeman
People vs. Eduardo Rodriguez, Case #: RIF1505036
People vs. Charles Berry, Jr., Case #: 7PC02070
Estate of Anastacio Hernandez-Rojas vs.US, Case #: 11CV00522 L (DHB)
People vs. Michael Garcia, Case #: 7AN00756
People vs. Timothy Fields, Case #: 2014025285
Oscar Nunez vs. Searles Valley Minerals, Case #: CIVDS 1314851
People vs. Mark Fitzpatrick, Case #: BA445022
Donahue vs. Solis, Case #: BD603270
People vs. Javian Fowler, Case #: 091893-01
People vs. Sharon Hood, Case #: KA112500
People vs. Lorenzo Guerrero Rodriguez, Case #: 8MN01049
People vs. Jose Contreras, 7MN05109
Adolfo Valero Death Case, Case #: 20437633
People vs. Rickey Smith, Case #: BCD367
People vs. Morecel Forman, Case #: MA073877
US vs. Lazo, Case #: CR 16-390(A)-VAP-1
People vs. Henry Frizzell Meriweather, Jr., Case #: 9MN02787
People vs. Francis Okacha, Case #: YA097989
People vs. Desire'e Doherty, Case #: 18HM08269
People vs. Tirso Gonzalez, Case #: LA089966
People vs. Mark Merchain, Case #: 0WC03071, LASC

**MARVIN PIETRUSZKA, M.D., J.D.**
**Forensic Pathology**
**Forensic Toxicology**

324 S. Beverly Drive, #389
Beverly Hills, CA 90212
(310) 779-3279
pathtoxMD@yahoo.com
pathologymd@aol.com

## CURRICULUM VITAE

## EDUCATION AND TRAINING:

Undergraduate – Hunter College, City University of N.Y. Bachelor of Arts, 1969.
Graduate – Autonomous University of Guadalajara Doctor of Medicine, 1972.
Postgraduate –
1. Rotating Internship – Univ. of Puerto Rico, Mayaguez Medical Center, 1973.
2. Pathology Residency – Univ. of Pittsburgh, School of Medicine, 1973 - 1976.
3. Clinical Immunopathology Fellow – U of Pittsburgh, Dept. of Pathology, 1977.
4. Juris Doctor Degree – Abraham Lincoln University, School of Law, 1997-2001.
5. University of Florida, Forensic Toxicology Masters Degree, 2004.
6. RMIT University, Melbourne, Australia, Graduate Diploma in Toxicology, 2005.
7. Master's in Applied Toxicology, 2009.
8. RMIT University, Melbourne, Australia, Master's in Applied Toxicology, 2009
9. University California Los Angeles, Molecular Science, 2009-2010.
10. University of Edinburgh, Graduate Diploma, Translational Medicine, 2012 to 2014

## CERTIFICATION, LICENSURE AND FELLOWSHIP:

American Board of Pathology (Anatomic and Clinical) 1977
American Board of Preventive Medicine (Occupational Medicine) 2006
American Board of Forensic Toxicology 2008
Medical Licenses: Pennsylvania, 1975 No. 036075; California, 1977 No. A30858
Texas, 2011 No., P1130
Civil Surgeon's Identification Number (CSID #), U.S. Citizenship and Immigration
Services 102502

## APPOINTMENTS AND POSITIONS:

1978-1979    Co-Director, Upjohn Laboratory Procedures, Inc.
1978-1987    Director, Diagnostic Pathology Associates
1980-present    Medical Director at Del Carmen Medical Center
1980-present    Valley Presbyterian Hospital, Providence-Tarzana Medical Center
1987-present    Medical Director of KedPlasma, a Plasmapheresis Center
1997-present    Pathologist, Forensic Autopsy Services
1999-present    Clinical Associate Professor of Pathology, University of
                Southern California, Keck School of Medicine (Voluntary)
2001-present    Director – Psychemedics Inc. Toxicology Laboratory
2001-present    Director – H.I.B.M. Genetics Research Laboratory

## HONORS:

Scholarship – Autonomous University of Guadalajara
Fellow of the American Cancer Society
Fellow of the College of American Pathologists
Award Mayor Bradley for Senior Health Care Program
Centro de Amistad Award for donated services to Latino Community
County of L.A. Supervisor Mike Antonovich award for public service
City Attorney Office Award for Services to Victims of Crime
Keck USC School of Medicine, Professor of the Year (2002, 2004)

## PROFESSIONAL ACTIVITIES:

Teaching Fellow, School of Cytotechnology of the University Health Center of Pittsburgh, 1974 to 1977.
Associate Laboratory Instructor, University of Pittsburgh School of Medicine, Department of Pathology, 1974 to 1977.
Guest Lecturer, California State University – Advanced Immunology Review, August 1978.
Regular Lecturer, University of Southern California, School of Medicine, 1983-1984.
Postgraduate Fellowship Training, Olive View Medical Center Department of Obstetrics and Gynecology, 1988-1989.
Career Consultant, California State University at Northridge, 1989-present.
Centro de Amistad Physician Consultant for abused women and children, 1986-present.
Lecturer Valley Presbyterian Hospital – Health Education Center – Hispanic Prenatal Care Program, 1993.
Human Resource Center, Inc. – President – a non-profit community clinic serving the indigent and elderly, 1984-1996.
Chabad of the Valley – A non-profit organization – volunteer staff physician serving indigent community members , 1981-present.
Los Angeles Regional Food Bank – local director of distribution center – San Fernando Valley, 1995.
Consultant – Contributing Forces for Battered Women, 1995-1997.

## RESEARCH:

| | |
|---|---|
| 1971 | Intestinal Transit Time and Its Relationship to Dietary Fiber. |
| 1976 | Review of Sarcomas of the Breast – University of Pittsburgh, Health Center Hospitals. |
| 1989 | Hyperimmunization of Blood Donors for the Production of Anti-Rh (D) Gammaglobulin  (Immunization Research). |
| 1993 | Vaccine Induction of Antibodies to Hepatitis B Vaccine (Immunization Research). |
| 2000 | Clinical Investigator for Quintiles Laboratories/GlaxoWellcome Study of Females with Irritable Bowel Syndrome. |

| 2001 | Clinical Investigator for Bayer Pharmaceuticals Study on Community Acquired Pneumonia. |
|---|---|
| 2002 | Liver Cell Transplantation Using a Mouse Model of Wilson's Disease – Professor Paul Wright, Mentor, RMIT University. |
| 2006 | Clinical Investigator for study of Polymerase Chain Reaction Testing for Hepatitis B Virus in Pooled Samples from Source Plasma Donors – Protocol NGI 99-01/BB-IND 8629 – Baxter Study |
| 2007 | Merck Diabetes Clinical Research Study (Protocol # MK-0431A-079) |
| 2007 | Merck Diabetes Clinical Research Study (Protocol # MK-0431-064) |
| 2007 | Merck Renal Insufficiency Research Study (Protocol # MK-0431-063) |
| 2008 | Merck Diabetes Clinical Research Study (Protocol # MK-0431-061) |
| 2008 | Pfizer GI Reasons Clinical Research Study |
| 2008 | SeraCare Hepatitis A Clinical Research Study |
| 2008 | SeraCare Rubella Clinical Research Study |
| 2009 | Pfizer GI Reasons Clinical Research Study (Protocol # A3191331) |
| 2009 | Pfizer GI Reasons Clinical Research Study (Protocol # A4091016) |
| 2009 | Pfizer GI Reasons Clinical Research Study (Protocol # A4091018) |
| 2009 | Targeted Medical Pharma Research Study (Protocol # SentraPM 102) |
| 2009 | Merck Asthma Clinical Research Study (Protocol # MK-0633-007) |
| 2010 | Merck Gardasil Vaccine Research Study (Protocol # V503-002) |
| 2010 | Merck Diabetes Clinical Research Study (Protocol # MK-0431-061) |
| 2012 | Ventrus Biosciences, Symptomatic Internal Hemorrhoids (VEN309-Hem) |

## MEMBERSHIP IN PROFESSIONAL AND SCIENTIFIC SOCIETIES:

College of American Pathologists, Diplomate
Interamerican College of Physicians and Surgeons
American Academy of Clinical Toxicology
American Board of Forensic Toxicology, Diplomate

## PUBLICATIONS:

1. Pietruszka, M., Rabin, B.S., and Strodes, C.: Multiple Myeloma in a Husband and Wife. Lancet 1:314, 1976.
2. Barnes, E.L., and Pietruszka, M.: Stromal Sarcomas of the Breast: A Clinicopathologic Analysis of 10 Cases. Cancer 40: 1577-1977.
3. Pietruszka, M., and Barnes, E.L.: Cystosarcoma Phyllodes: A Clinicipathologic Analysis of 42 Cases. Cancer 41: 1974-1983, 1978.
4. Pietruszka, M., Salazar, H., Pena, C.: Malignant Meningioma – Ultra Structure and Observations on Histogenesis. Journal of Pathology 10: 169-173, 1978.
5. Myerowitz, R.L., Pietruszka, M., Barnes, E.L.: Hemangiosarcoma of the Breast. Jama 239:403, 1978.
6. Barnes, E.L., and Pietruszka, M.: Rhabdomyosarcoma Arising with a Cystosarcoma Phyllodes. Case Report & Review of the Literature. American Journal of Surgical Pathology @: 423-429, 1978.
7. Pietruszka, M., and Kessler, F.: Schweppner's Gland – Recent Advances. Journal of Irreproducible Results. 1978

8. Pietruszka, M. And Rabin, BS. : Abnormality of Spontaneous Lymphokine Synthesis by Lymphocytes of Patients with Connective Tissue Disorder. Immunological Communications, 1979; 8(2):203-211.

9. Pietruszka, M.: A Medical Guide for Travelers. The Immunization Center, Tarzana, California. 1982.

10. Pietruszka, M., and Lambert, P.: The Trimetric Secret: The Complete Program for Permanent Weight Loss and a Healthier Lifestyle. 1986

11. Pietruszka, M., and Lambert, P.: EL Secreto Trimetrico (Spanish Translation of Above Text) 1989.

12. Pietruszka, M.: Cuidados Durante El Embarazo, La Infancia y La Ninez. Quail Valley Publications, 1991.

13. Pietruszka, M. Medical/Health Concerns of the Hispanic published in "The Hispanic Childbearing Family: Culture and Language" Presbyterian Hospital, 1993.

14. Pietruszka, M.: Guia Sobre El Control De Peso. Quail Valley Publications, 1996.

15. Pietruszka, M.: Nuevos Conceptos Sobre La Nutricion. Quail Valley Publications, 1996.

16. Pietruszka, M.: Trim Naturally: A Complete Guide for Permanent Weight Loss. Quail Valley Publications, 1997.

17. Naiem S, Huo YK, Darvish BK, Pietruszka M, Darvish Daniel. Genotype-Phenotype Correlation of Autosomal Recessive Inclusion Body Myopathy (IBM2) (Abstract Poster Session) 53rd Annual Meeting of the American Society of Human Genetics, Nov 2003, Los Angeles.

18. Pietruszka M. Biochemical Mechanisms in Toxic Cell Injury (Thesis), University of Florida, July 2004.

19. Pietruszka M, Schaffer M, Chao O, Hill V. Measurement of Nicotine and Cotinine in Hair of Children and Adults by GC/MS/MS. Society of Forensic Toxicologist Annual Meeting, October 2005 Nashville, Tennessee (Abstract)

20. Pietruszka M, Valles-Ayoub Y, Saechao C, Haghighatgoo A, Neshat MS, Darvish D. Validation of GNE:p.M712T Identification by Melting Curve Analysis. Genet Test. 2008 Spring; 12(1): 101-9. PMID: 18373408

21. Haghighatgoo A, Valles-Ayoub Y, Saechao C, Esfandiarifard S, Martinez S, Pietruszka M, Darvish D. Prevalence of the MTHFR C677T Polymorphism in patients of Middle Eastern descent (ASHG conference, Philadelphia, 2008).

22. Pietruszka M. Measurements of Nicotine and Cotinine by GC/MS/MS in Hair of Adults and Children with Respiratory Disease Thesis, Royal Melbourne Institute of Technology, School of Medicine, December 2008.

23. Valles-Ayoub Y, Martinez S, Haghighatgoo A, Shah I, Saechao C, Khokher, S. Esfandiarifard S, Riley CJ, Pietruszka M, Darvish D. Development and functional analysis of wildtype and R266Q GNE expression plasmids (12th Annual American Society of Gene Therapy Conference, San Diego,CA 05/09)

24. Haghighatgoo A, Valles-Ayoub Y, Saechao C, Esfandiarifard S, Martinez S, Pietruszka M, Darvish D. MTHFR C677T Genotype Frequency in Patients of Middle Eastern Descent as Determined by Real-Time PCR and Melting Curve Analysis. Genet Test Mol Biomarkers. 2009 Jul 13.

25. Pietruszka M, Valles-Ayoub Y, Saechao C, Khoker Z, No D, Shook S, Haghighatgoo A, Jay C, Darvish D.  Novel GNE Mutations in Hereditary Inclusion Body Myopathy Patients of Non-Middle Eastern Descent. Mol Biomarkers.  2010 Jan 10.

26. Pietruszka M,  Valles-Ayoub Y, Esfandiarifard S, Sinai P, Carbajo R, Khoker Z, No D., Darvish B., Kakkis E, Darvish D.  Serum Neural Cell Adhesion Molecule (NCAM) is Hyposialylated in Hereditary Inclusion Body Myopathy (HIBM); ASGCT – Gene & Cell Therapy Conference, 2011.

27. Pietruszka M, Daldalyan K, Schaffer M, Hill V, Measurements of nicotine and cotinine by GC/MS/MS in hair of adults and children (submitted for publication)

28. Pietruszka M, Valles-Ayoub Y, Daldalyan K, Journal of Genetics and Cell Biology, Impact of CYP2D6 Ultra Rapid Metabolism on therapeutic drug efficacy in Type 2 Diabetic Patients, pg 174-179, Published August 19, 2020

29. Pietruszka M, Y Valles-Ayoub, et. al., A Novel Variation in the BSCL-2 Gene in Congenital Lipodystrophy

## PRESENTATIONS:

1. Valles-Ayoub Y, Saechao C, Haghighatgoo A, Neshat MS, Pietruszka M, Darvish D. Validation of GNE:pM712T Identification by Melting Curve Analysis. Poster #126. American Society of Human Genetics (ASHG), 2007 Annual Meeting, San Diego, CA.

2. Haghighatgoo A, Valles-Ayoub Y, Saechao C, Esfandiarifard S, Martinez S, Pietruszka M, Darvish D. Prevalence of the MTHFR C677T polymorphism in patients of Middle Eastern descent. (1579) (10:30AM – 12:30PM on Fri). American Society of Human Genetics, 58th Annual Meeting, Philadelphia, PA, Nov 11-15, 2008.

3. Pietruszka M, Saechao C, Valles-Ayoub Y, Haghighatgoo A, Esfandiarifard S, Martinez S, Darvish D.  Novel GNE mutations in patients of non-Middle Eastern descent with autosomal recessive hereditary inclusion body myopathy. (1457) (4:30PM-6:30PM on Wed). American Society of Human Genetics, 58th Annual Meeting, Philadelphia, PA, Nov 11-15, 2008.

4. Valles-Ayoub Y, Saechao C, Haghighatgoo A, Khokher Z, No D, Martinez SL, Shah I, Esfandiarifard S, Riley-Portuges AC, Jay C, Pietruszka M, Darvish D. Development and functional analysis of wildtype and R266Q GNE expression plasmids.(545) (1:00PM-2:00PM on Wed).  American Society of Human Genetics, 59th Annual Meeting, Honolulu, HI, Oct 20-24, 2009.

5. Valles-Ayoub Y, Saechao C, Haghighatgoo A, Khokher Z, No D, Martinez SL, Shah I, Esfandiarifard S, Riley-Portuges AC, Jay C, Pietruszka M, Darvish D. Improved colorimetric (TBA) sialic acid assay validated by GNE transduction of Gne-null Lec3 CHO cells. (360) (2:00PM-3:00PM on Wed).  American Society of Human Genetics, 59th Annual Meeting, Honolulu, HI, Oct 20-24, 2009.

6. Valles-Ayoub Y, Saechao C, Haghighatgoo A, Khokher Z, No D, Martinez SL, Shah I, Esfandiarifard S, Riley-Portuges AC, Jay C, Pietruszka M, Darvish D. Improved Colorimetric (TBA) Sialic Acid Assay Validated by GNE Transduction of Gne-null Lec3 CHO cells. Glyco 2009 Session: Glycobiology

of Disease – Poster Session I-F. San Diego, CA, Nov 12-15, 2009.

7. Carbajo R, Valles-Ayoub Y, No D, Khokher Z, Sandoval L, Sagoo S, Darvish B, Pietruszka M, Darvish D.  Novel GNE Mutations in Patients with Autosomal Recessive Hereditary Inclusion Body Myopathy, American Society of Gene and Cell Therapy, Philadelphia May 2012.

8. No D, Valles-Ayoub Y...Darvish B, Pietruszka M, Genetic Testing and Molecular Biomarkers, Novel GNE Mutations in Autosomal Recessive Hereditary Inclusion Body Myopathy Patients, Vol. 17, pgs 376-82, May 2013

## USC KECK SCHOOL OF MEDICINE
## 2006/2007/2008/2009/2010 TEACHING SCHEDULE:

| | |
|---|---|
| December 2005: | Laboratory Manifestations of Cancer; Parathyroid and Bone Pathology, Ovary, Testis, Uterine tumors |
| January 2006: | Disease of the Breast |
| February 2006: | Colon Cancer & Inflammatory Bowel Disease, Diseases of the Liver |
| August 2006: | Diseases of the Endocardium and Cardiac Valves |
| | Diseases of Myocardium and Pericardium |
| September 2006: | Nephrotic/Nephritic Syndrome |
| October 2006: | Obstructive Uropathy and Cystic Disease |
| | Neoplasms of the Urinary Tract |
| | Respiratory/ Infections of the Lung |
| | Respiratory/AIDS |
| November 2006: | Interstitial Lung Disease |
| | Abnormalities of Blood Supply |
| | Neoplasia |
| December 2006: | Pathology of the Adrenal Gland |
| | Pathology of the Thyroid Gland |
| February 2007: | Inflammatory Bowel Disease |
| May 2007: | Non-Neoplastic Disease of Bones and Joints |
| | Tumors of Mesenchymal Origin |
| August 2007: | Diseases of the Endocardium and Cardiac Valves |
| October 2007: | Chronic Obstructive Pulmonary Disease |
| | Introduction to Pathology |
| November 2007: | Tissue Injury and Inflammation |
| | Inflammation and Healing |
| | Laboratory Manifestations of Cancer |
| December 2007 through October 2008:  Research | |
| November 2008: | Pathology of the Pancreas |
| | Pathology of the Adrenal Gland |
| November 2009: | Islets of Langerhans |
| | Pathology of the Adrenal Gland |
| December 2009: | Pathology of the Pituitary Gland |
| May 2010: | Tumors of Mesenchymal Origin |
| | Non-Neoplastic Diseases of Bone and Joints |
| September 2010: | Nephrotic & Nephritic Syndromes |

October 2010:        Cancer of the Lung
November 2010:       Infections of the Lung
February 2011:       Diseases of the Exocrine Pancreas
September 2011:      Nephrotic/Nephritic Syndrome
                     Obstructive Uropathy/Tubulointerstitial Diseases
December 2011:       Laboratory Manifestations of Cancer
May 2012:            Tumors and Mesenchymal Origin
                     Non-neoplastic Diseases of Bone and Joints
August 2012:         Diseases of Myocardium and Pericardium
October 2012:        Pathology of Obstructive Uropathy & Cystic Disease
October 2012:        Clinical/Path Features of Neoplasms of Urinary Tract System
October 2012:        Chronic Obstructive Pulmonary Disease
November 2012:       Neoplasia
November 2012:       Islets of Langerhans
October 2013:        Chronic Obstructive Lung Disease
October 2013:        Interstitial Lung Disease
October 2013:        Lung Cancer
October 2013:        Infections of the Lung
November 2013:       ENT Pathology
November 2013:       Neoplasia
February 2014:       Pathology of the Esophagus & Stomach
March 2014:          Pathology of the Exocrine Pancreas
May 2014:            Musculoskeletal Tumors of Mesenchymal Origin
May 2014:            Non-Neoplastic Diseases of Bones, Joints and Connective
                     Tissue
August 2014:         Disease of Blood Vessels
August 2014:         Diseases of Endocardium and Cardiac Valves
October 2014:        Interstitial Lung Disease
October 2014:        Pathology of Chronic Obstructive Pulmonary Disease
November 2014:       Infections of the Lung
November 2014:       Ear, Nose and Throat Pathology I
December 2014:       Pathology of the Pituitary
January 2015:        Pathology of the Exocrine Pancreas
August 2015:         Disease of the Endocardiac and Cardiac Valves
October 2015:        Interstitial Lung Disease
October 2015:        Infections of the Lungs
December 2015:       Non-neoplastic Disease of Bones and Joints
January 2016:        Pathology of the Exocrine Pancreas
February 2016:       Adrenal Pathology
November 2016:       Sections of the Lung
November 2016:       Interstitial Lung Disease
November 2016:       Ear, Nose, and Throat Pathology
December 2016:       Mesenchymal Tumors

December 2016:   Non-Neoplastic Diseases of Bones, Joints and Connective Tissue
January 2017:    Inflammatory Bowel Disease
January 2017:    Pathology of Exocrine Pancreas
October 2017:    Interstitial Lung Disease
October 2017:    Infections of the Lungs
October 2017:    Lung Cancer
October 2018:    Pathology of the Ear, Oral, Cavity and Nose
October 2018:    Pathology of the Larynx and Salivary Glands
November 2018:   The Abnormalities of Blood Supply
October 2019:    Ear, Oral Cavity and Throat Pathology I & II
October 2019:    Pathology of Salivary Gland

# Marvin Pietruszka, M.D., F.C.A.P.

324 S. Beverly Drive, #389
Beverly Hills, CA 90212
(310) 779-3279
TIN:  47-2808595
pathtoxMD@yahoo.com


**Case Name:** _____


### Expert Witness Fee Schedule for 2022


| | | |
|---|---|---|
| Review of Records/Research | | $   650/hour |
| Deposition | | $ 1,500 /hour |
| Trial or Arbitration | half day | $ 6,000 |
| Trial or Arbitration | full day | $12,000 |
| Travel/Expenses | | please inquire |
| Autopsy | | To be discussed |
| Autopsy Assistant Fee | | $   750 |
| Retainer – Expert | | $5,000 |

The undersigned accepts the foregoing rates and agrees to pay said rates upon the engagement of the services of Marvin Pietruszka, M.D. as set forth herein.


_____
Printed name


_____
Signed


_____
Dated


*ALL PAYMENTS SHOULD BE MADE PAYABLE AND MAILED TO:*

Medicus Consultant Group, Inc.
324 S. Beverly Drive, #389
Beverly Hills, CA 90212
Tax ID #: 47-2808595

# EXHIBIT B

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

SARAH REAZA CRUZ,            )
individually and as         )
Successor-in-Interest of    )
Decedent Fernando Cruz,     )
et al.,                     )
                            )
          Plaintiff,        )
                            )          Case No.
vs.                         )
                            )          5:20-CV-01188-MEMF-SP
COUNTY OF RIVERSIDE, et al., )
                            )
          Defendants.       )
_____)

DEPOSITION OF MARVIN PIETRUSZKA, M.D.

Taken on

Wednesday, May 18, 2022

TAMARA D. WICKHAM
CSR NO. 4117, RMR, CRR

1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3

4

5

6    SARAH REAZA CRUZ,            )
     individually and as         )
7    Successor-in-Interest of    )
     Decedent Fernando Cruz,     )
8    et al.,                     )
                                 )
9           Plaintiff,           )
                                 )          Case No.
10   vs.                         )
                                 )     5:20-CV-01188-MEMF-SP
11   COUNTY OF RIVERSIDE,        )
     et al.,                     )
12                               )
            Defendants.          )
13   _____)

14

15

16          DEPOSITION OF MARVIN PIETRUSZKA, M.D., taken on

17   behalf of the, defendants, taken at 633 West Fifth

18   Street, Suite 4000, Los Angeles, California, commencing

19   at 12:55 o'clock p.m. on Wednesday, May 18, 2022, before

20   TAMARA D. WICKHAM, CSR No. 4117, RMR, CRR, pursuant to

21   Notice.

22                          --oOo--

23

24

25

1    APPEARANCES OF COUNSEL

2

3    For the Plaintiff:

4            NICHOLAS A. LERMAN
             Attorney at Law
5            6033 West Century Boulevard
             Suite 740
6            Los Angeles, California 90045
             (310) 659-8166
7            Nmlerman0@yahoo.com

8

     For the Defendants COUNTY OF RIVERSIDE, ROBERT ROACH,
9    ANDREW LUCIFORA, GEOFFREY GILLISON, and TODD HALBEISEN:

10           LEWIS, BRISBOIS, BISGAARD & SMITH
             BY:  TONY M. SAIN, ESQ.
11           633 West Fifth Street
             Suite 4000
12           Los Angeles, California 90071
             (213) 250-1800
13           Tony.sain@lewisbrisbois.com

14

     Also Present:

15           STEVEN A. LERMAN, Of Counsel for Plaintiff

16

17

18

19

20

21

22

23

24

25

```
 1                    I N D E X

 2   WITNESS

 3   MARVIN PIETRUSZKA, M.D.

 4

 5   EXAMINATION BY                                    PAGE

 6        Mr. Sain                                       5

 7

 8

 9

10                    E X H I B I T S

11   DEFENDANT'S                                        PAGE

12   Exhibit 1    Amended Notice of Deposition, etc.     5

13   Exhibit 2    Curriculum Vitae of Dr. Pietruszka     8

14   Exhibit 3    Report of Dr. Pietruszka dated 3/29/22 10

15   Exhibit 4    Expert Witness Fee Schedule for 2022   11

16   Exhibit 5    8 articles produced by Dr. Pietruszka  43

17   Exhibit 6    Autopsy Report prepared by
                  Dr. Pietruszka dated 12/9/2020          60
18

19

20

21

22

23

24

25
```

1    Calls for speculation.  Assumes facts not in evidence.

2    Incomplete hypothetical.

3                    THE WITNESS:  Well, the answer requires an

4    explanation, if I can give you an explanation.

5    BY MR. SAIN:

6       Q.  Sure, but first I'd like a yes or no, then we'll

7    deal with the explanation, so...

8       A.  All right then.

9       Q.  Do you want the question again?

10      A.  I heard the question, and it doesn't have a

11   simple answer.

12      Q.  So --

13      A.  It doesn't have a yes or no answer.

14      Q.  In general, isn't it possible that if

15   0.100 milligrams per liter is the low end of the toxic

16   range for methamphetamine, doesn't that mean that a

17   person -- it is possible for a person to die solely as a

18   result of methamphetamine if they have 0.100 milligrams

19   per liter or above in their system?

20           Isn't that possible?

21                    MR. NICHOLAS LERMAN:  Objection.  Incomplete

22   hypothetical.  Compound.  Assumes facts not in evidence.

23   Vague and ambiguous.

24                    THE WITNESS:  The answer is that

25   methamphetamine users have tolerance, they develop

1    tolerance to the usage of the drug.  This gentleman was

2    a chronic user of methamphetamine.

3           Individuals who are tolerant do not

4    necessarily suffer the adverse effects of the drug,

5    especially at the lowest levels of toxicity.  Toxicity

6    does not necessarily mean that it's a lethal dose, it

7    doesn't necessarily have to be a lethal dose.

8           The literature is not very clear on the

9    subject, mainly because the studies combine just about

10   anybody who dies who happens to have a level of

11   methamphetamine, even at .1.

12          So the answer is not a simple answer.  My,

13   my opinion is that an individual with a .1 most likely

14   is not going to die from that dosage because of the

15   scientific principle of tolerance.

16          MR. SAIN:  So move to strike as

17   nonresponsive.

18          I wasn't talking about whether or not that's

19   always a fatal level, and I wasn't talking about this

20   case yet and I haven't reached your opinions, I will,

21   don't worry.  My question was a little broader.

22          THE WITNESS:  Okay.

23          MR. SAIN:  Because so far what you've told

24   me is that according to the medical literature that you

25   are familiar with, the low end of the toxic range for

1    case.

2         You and I have done this before.  I have no

3    particular preference in how you do it, if you want to

4    summarize, if you want to read key quotes, if you

5    want -- however you want to do that, but what I'm

6    looking for is the complete list of opinions that you've

7    formed in this case.

8         Do you understand me, Doc?

9    A.  Yes.

10   Q.  So please tell me now, please list all the

11   opinions you've formed in connection with this case.

12   A.  Basically we have an individual, Mr.,

13   Mr. Fernando Cruz, 39 years old, has a long-standing

14   history of bronchial asthma.  He has -- suffers from

15   schizophrenia.  He takes a number of medications for his

16   mental condition.  He's also a chronic user of

17   methamphetamine.

18        He is in his home.  Does not appear to be in any

19   state of delirium.  He's able to answer questions when

20   police officers come.  He speaks coherently.  He's

21   conscious; he's oriented; his perception may be, may be

22   not a hundred percent complete.  He has fears.

23        Not possible to differentiate entirely between

24   his preexisting psychiatric condition and, and the

25   specific effects of methamphetamine as they contribute

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

SARAH REAZA CRUZ,              )
individually and as           )
Successor-in-Interest of      )
Decedent Fernando Cruz,       )
et al.,                       )
                              )
          Plaintiff,          )
                              )         Case No.
vs.                           )
                              )         5:20-CV-01188-MEMF-SP
COUNTY OF RIVERSIDE, et al.,  )
                              )
          Defendants.         )
_____)

DEPOSITION OF MARVIN PIETRUSZKA, M.D.

Taken on

Wednesday, May 18, 2022

TAMARA D. WICKHAM
CSR NO. 4117, RMR, CRR

1                    UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3

4

5

6   SARAH REAZA CRUZ,          )
    individually and as        )
7   Successor-in-Interest of   )
    Decedent Fernando Cruz,    )
8   et al.,                     )
                                )
9         Plaintiff,            )
                                )              Case No.
10  vs.                         )
                                )       5:20-CV-01188-MEMF-SP
11  COUNTY OF RIVERSIDE,        )
    et al.,                     )
12                              )
          Defendants.           )
13  _____)

14

15

16        DEPOSITION OF MARVIN PIETRUSZKA, M.D., taken on

17  behalf of the, defendants, taken at 633 West Fifth

18  Street, Suite 4000, Los Angeles, California, commencing

19  at 12:55 o'clock p.m. on Wednesday, May 18, 2022, before

20  TAMARA D. WICKHAM, CSR No. 4117, RMR, CRR, pursuant to

21  Notice.

22                         --o0o--

23

24

25

```
 1   APPEARANCES OF COUNSEL

 2

 3   For the Plaintiff:

 4         NICHOLAS A. LERMAN
           Attorney at Law
 5         6033 West Century Boulevard
           Suite 740
 6         Los Angeles, California 90045
           (310) 659-8166
 7         Nmlerman0@yahoo.com

 8

     For the Defendants COUNTY OF RIVERSIDE, ROBERT ROACH,
 9   ANDREW LUCIFORA, GEOFFREY GILLISON, and TODD HALBEISEN:

10         LEWIS, BRISBOIS, BISGAARD & SMITH
           BY:  TONY M. SAIN, ESQ.
11         633 West Fifth Street
           Suite 4000
12         Los Angeles, California 90071
           (213) 250-1800
13         Tony.sain@lewisbrisbois.com

14

     Also Present:
15
           STEVEN A. LERMAN, Of Counsel for Plaintiff
16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2  WITNESS

 3  MARVIN PIETRUSZKA, M.D.

 4

 5  EXAMINATION BY                                PAGE

 6       Mr. Sain                                   5

 7

 8

 9

10                  E X H I B I T S

11  DEFENDANT'S                                    PAGE

12  Exhibit 1   Amended Notice of Deposition, etc.    5

13  Exhibit 2   Curriculum Vitae of Dr. Pietruszka     8

14  Exhibit 3   Report of Dr. Pietruszka dated 3/29/22  10

15  Exhibit 4   Expert Witness Fee Schedule for 2022   11

16  Exhibit 5   8 articles produced by Dr. Pietruszka  43

17  Exhibit 6   Autopsy Report prepared by
18              Dr. Pietruszka dated 12/9/2020         60

19

20

21

22

23

24

25
```

```
 1              Los Angeles, California; Wednesday, May 18, 2022
 2                      At 12:55 o'clock p.m.
 3                            --o0o--
 4
 5
 6                  MARVIN PIETRUSZKA, M.D.,
 7              having been first duly placed under oath
 8               by the Certified Shorthand Reporter,
 9               was examined and testified as follows:
10
11                           EXAMINATION
12  BY MR. SAIN:
13      Q.  Sir, would you please spell your full name?
14      A.  Marvin Pietruszka, M-A-R-V-I-N,
15  P-I-E-T-R-U-S-Z-K-A.
16          MR. SAIN:  As a preliminary matter, I'll be
17  attaching as Exhibit 1 the deposition notice for the
18  service for this witness.
19          (Deposition Exhibit 1 was marked.)
20  BY MR. SAIN:
21      Q.  Sir, you've been deposed many times as an expert
22  witness; true?
23      A.  That is correct.
24      Q.  In fact, you've been deposed by me; correct?
25      A.  I think so, yeah.
```

1    Q.   Yes.  We've actually been to trial together.  Do

2    you remember that?

3    A.   No.  No, I don't remember that.  I don't actually

4    remember it but hopefully it was a good, good

5    experience.

6    Q.   Wonderful.

7         So even though you've done this lots of times,

8    I'm sure you feel comfortable waiving the customary

9    admonitions.  There are a few that I'm going to give you

10    anyway so that we're operating on the same playbook.

11    A.   Sure.

12    Q.   The first is that as you understand, it is

13    important that only one of us speak at a time.  There

14    will be times where you think you know where my question

15    is going, you're going to want to jump in with your

16    answer.  I'm going to ask you not to do that.  Just wait

17    until my mouth actually stops moving before you jump in

18    with your answer.

19         And, similarly, I'm going to do my best not to

20    interrupt any of your answers with a new question unless

21    we're going way off topic.

22         Does that sound fair; correct?

23    A.   That is correct.

24    Q.   If for any reason you don't understand any of my

25    questions, please let me know immediately.  I will do my

1    best to rephrase it until you do understand the

2    question.

3        However, for each and every question that you

4    answer without immediately saying that you did not

5    understand the question, everyone is going to presume

6    that you understood that question.  Agreed?

7    A.  Yes.

8    Q.  It's important that you understand that although

9    I will be asking you questions about things such as what

10   you're basing your opinion on, the extent of your

11   knowledge, the extent of your expertise and so forth, my

12   questions are not criticisms.  They're simply designed

13   to separate what it is that you know from what it is

14   that you don't know, what it is that you reviewed from

15   what you did not review, what it is you have an opinion

16   on in this case versus what you don't, and so forth.

17       So I'd please ask your patience when I'm asking

18   questions.  Please understand that they are not meant to

19   attack or criticize you; they're just designed to create

20   a clear record.

21       Does that sound fair?

22   A.  Yes.

23   Q.  Occasionally I may ask you questions where the

24   answer to you seems obvious.  I am not doing this to

25   mess with you, I'm doing this to make sure that the

1   record is clear.

2        I would ask that you go ahead and answer the

3   obvious questions even if the answer seems like

4   something you already said, because I'm trying to make

5   sure the record is clear.

6        Similarly, I would ask that if I ask you a

7   question that calls for a yes or no, that you actually

8   answer "yes" or "no" before proceeding with any

9   explanation.

10       Does that sound fair?

11   A.  Yes.

12   Q.  Finally, you would agree that I am entitled to

13   straightforward, non-evasive answers to my questions;

14   correct?

15   A.  Yes.

16   Q.  So, for example, if I ask you what is the color

17   of the sun, that is not an invitation to get into a

18   ten-minute discussion about how nuclear physics works;

19   correct?

20   A.  Yes.

21            (Deposition Exhibit 2 was marked.)

22   BY MR. SAIN:

23   Q.  Okay.

24       So, in front of you, you should see a copy of

25   this document, your curriculum vitae.  Is this a true

1    and authentic copy of your complete CV in this case?

2        A.   It's somewhat outdated.  I believe I brought a

3    newer version.

4        Q.   Okay.  Do you have that with you?

5        A.   What did I do with it?  I guess not.

6        Q.   Okay.  But this is a true and authentic copy of

7    your CV?

8        A.   It's a, it's a true copy of a CV that dates back

9    to 2016.  I can tell you what the differences are.

10       Q.   Sure.

11       A.   The differences are that the genetics laboratory

12   has closed.  I'm no longer -- let's see -- I was

13   performing QME work; I am no longer performing QME work.

14   I'm not sure if it says so here somewhere.

15            The last class I taught was in 2019, right before

16   COVID.  They were similar classes to those that I taught

17   in prior years.

18            And that's it pretty much.

19       Q.   Fair enough.

20            So other than what you just stated, is this a

21   true, authentic and complete account of your

22   professional experience on your CV?

23       A.   Yes.

24       Q.   Okay.

25            Just to hit the highlights, you have your medical

```
 1   license from the State of California since 1977,

 2   No. 8300855; correct?

 3       A.  Correct.

 4       Q.  You are board certified by the American Board of

 5   Forensic Toxicology since 2008; correct?

 6       A.  Correct.

 7       Q.  You are board certified by the American Board

 8   of -- excuse me -- the American Board of Preventative

 9   Medicine, or Occupational Medicine, since 2006; correct?

10       A.  Correct.

11       Q.  You are board certified by the American Board of

12   Anthropology in anatomic and clinical pathology since

13   1977; correct?

14       A.  Yes.

15       Q.  And that is the full extent of the board

16   certifications that you have pertaining to medicine;

17   correct?

18       A.  Yes.

19               (Deposition Exhibit 3 was marked.)

20   BY MR. SAIN:

21       Q.  Showing you Exhibit 3, do you recognize that

22   document?

23       A.  Yes.

24       Q.  What do you recognize it to be?

25       A.  This is the Rule 26 letter that I wrote on
```

1    March 29th of this year.

2        Q.  Okay.  And is this a true, authentic and complete

3    copy of the report that you prepared in this case?

4        A.  Yes.

5                (Deposition Exhibit 4 was marked.)

6    BY MR. SAIN:

7        Q.  Finally, Exhibit 4, would you agree that this is

8    a copy of your fee sheet and testimony list that was

9    produced in this case?

10       A.  Yes.

11       Q.  And is that a true and authentic copy of the fee

12   sheet and testimony list that you produced in this case?

13       A.  Yes.  Yes.

14       Q.  Thank you, sir.

15           How much do you charge for providing your expert

16   testimony in a civil case?

17       A.  650 per hour.

18       Q.  And back in 2015, you were earning approximately

19   $250,000 a year for providing expert testimony services;

20   is that correct?

21       A.  Yes.

22               MR. NICHOLAS LERMAN:  Object.  Lacks

23   foundation.  Assumes facts not in evidence.

24               THE WITNESS:  That was probably accurate.

25   ///

```
 1  BY MR. SAIN:

 2     Q.  Same was true in 2016?

 3            MR. NICHOLAS LERMAN:  Same objection.

 4            THE WITNESS:  I don't recall.  Maybe.

 5  BY MR. SAIN:

 6     Q.  How about in 2020?  About how much were you

 7  earning in expert testimony fees?

 8     A.  I don't know specifically.  It was during COVID,

 9  I think, and business was slow.

10     Q.  What's your best estimate?

11     A.  It may be somewhere in the range of 200,000 or

12  less.

13     Q.  Same in 2021?

14     A.  It increased, probably, probably 250, 300.

15     Q.  Any reason to believe that 2022 will be of any

16  significant variance from your earnings in 2021?

17     A.  No.  I don't believe there's any change.

18     Q.  Now, few years back when I deposed you, you

19  testified that you have testified over 200 times in

20  civil cases, either at deposition or trial, as an expert

21  on medical issues.

22          Has that number changed since last time we

23  talked?

24     A.  I don't know specifically how many civil cases,

25  but I've testified on close to 300 cases by now, which
```

1    would include criminal cases.

2        Q.   As an expert on medical issues?

3        A.   Yes.

4        Q.   And do you recall testifying that for the civil

5    cases, just focusing on civil, where you've testified as

6    an expert on medical issues, at least 80 percent of the

7    time you were testifying for plaintiffs?

8        A.   At that time.  What year was that?

9        Q.   2016.

10       A.   The percentage has changed.  I believe it's

11   closer to 60 percent plaintiff, 40 percent defense.

12       Q.   So back in 2016 it was 80/20 in favor of

13   plaintiffs, yes?

14       A.   Correct.

15       Q.   And now you're saying it's 60/40 in favor of

16   plaintiffs?

17       A.   Correct.

18       Q.   Thank you.

19            As part of your work as a medical doctor, have

20   you ever treated any living patients?

21       A.   Yes.

22       Q.   About how many living patients would you say

23   you've treated?

24       A.   140,000.

25       Q.   Directly, personally?

1    A.  Yes.

2    Q.  And in your medical career, approximately how

3 many autopsies have you yourself personally performed,

4 hands-on autopsies?

5    A.  Approximately 600.

6    Q.  When was the last time you yourself performed a

7 hands-on autopsy?

8    A.  Approximately two weeks ago.

9    Q.  Are you familiar with the board certification

10 of -- from the American Board of Pathology for forensic

11 pathology?

12    A.  Yes.

13    Q.  And are you board certified by the American Board

14 of Pathology in forensic pathology?

15    A.  No.

16    Q.  Have you ever been board certified in forensic

17 pathology?

18    A.  No.

19    Q.  Forensic pathology, you would agree, is the

20 medicolegal science involving the determination of the

21 cause of death; correct?

22    A.  Yes.

23    Q.  Back when we talked last time, you testified that

24 you'd never done an autopsy where you determined the

25 manner of death for a person.

1          Do you recall that?

2              MR. NICHOLAS LERMAN:  Objection.  Calls

3     for -- lacks foundation.  Assumes facts not in evidence.

4              THE WITNESS:  That is correct.

5     BY MR. SAIN:

6     Q.  So, just briefly for the record, what's the

7     difference between manner of death and cause of death?

8     A.  The cause of death would be the pathologic or

9     pathophysiologic basis for the death itself.  The manner

10    of death could either be accidental, natural death,

11    suicide death, undetermined death, or homicide.

12    Q.  I knew you'd get there.

13        So in all the autopsies that you've performed,

14    have you determined a cause of death?

15    A.  Yes.

16    Q.  You previously testified that if the pathologist

17    who did an autopsy, the one who actually physically

18    examined the dead person's body, if that person did not

19    document certain injuries to exist, you would agree that

20    if the pathologist is honest, then those injuries in

21    question were not there.

22        Do you remember that?

23             MR. NICHOLAS LERMAN:  Objection.  Calls --

24    lacks foundation.  Assumes facts not in evidence.

25    Compound.  May call for speculation.

1              THE WITNESS:  I may have said that, yes.

2    BY MR. SAIN:

3        Q.  Do you still agree that that's true?

4        A.  Yes.

5        Q.  If memory serves, you yourself have never been a

6    patrol officer; correct?

7        A.  Correct.

8        Q.  You yourself have never made an arrest; correct?

9        A.  Correct.

10       Q.  You yourself have never used force on a subject;

11   correct?

12       A.  Correct.

13       Q.  And you agree that you are not an expert in

14   police practices, policies, tactics, or procedures;

15   true?

16       A.  True.

17       Q.  Even though you obtained your Juris Doctor or

18   J.D. degree, you have never been a licensed attorney;

19   true?

20       A.  True.

21       Q.  In terms of the three board certifications we

22   listed, none of them is a board certification for

23   cardiology; true?

24       A.  True.

25       Q.  None of your board certifications are in

1  pulmonology; true?

2      A.  True.

3      Q.  You are not a board certified neurologist; true?

4      A.  True.

5      Q.  You're not a board certified neuropathologist;

6  true?

7      A.  True.

8      Q.  But you are a board certified toxicologist; is

9  that correct?

10     A.  Correct.

11     Q.  What does a toxicologist do?

12     A.  Toxicologist is involved in either testing,

13  clinical testing, forensic testing, or operation of a

14  laboratory that performs such testing, and/or the

15  determination of toxicity in a subject.

16     Q.  Have you ever been a board certified psychiatrist

17  or psychologist?

18     A.  No.

19     Q.  Are you familiar with the term biomechanics?

20     A.  Yes.

21     Q.  Are you an expert in biomechanics?

22     A.  No.

23     Q.  Do you consider yourself to be an expert in the

24  study or understanding of the limits of human mobility

25  or movement?

1          MR. NICHOLAS LERMAN:  Just going to object,

2    overbroad, may call for speculation.

3          THE WITNESS:  To the -- to the extent that a

4    physician or a pathologist would know that information,

5    yes.

6    BY MR. SAIN:

7      Q.  Fair enough.

8          Are you familiar with the term crime scene

9    analysis, or forensic incident reconstruction?

10     A.  Yes.

11     Q.  Are you an expert in crime scene analysis or

12    forensic incident reconstruction?

13     A.  No.

14     Q.  Are you an expert in police control holds?

15     A.  No.

16     Q.  Have you ever done any peer -- strike that.

17         What does peer-reviewed mean?

18     A.  Peer review with respect to research or articles

19    written deal with research materials or articles that

20    are reviewed by individuals in the same specialty or

21    same field.  Could also have to do with treatment.

22     Q.  Have you ever done any peer-reviewed medical

23    studies of the effects of restraint or prone positioning

24    on subjects?

25     A.  No.

1     Q.   Have you done any peer-reviewed medical studies

2  associated with asphyxia?

3     A.   No.

4     Q.   Based on your medical knowledge and

5  understanding, are you able to list or identify the

6  signs or symptoms associated with an asphyxial death?

7     A.   Yes.

8     Q.   What are those signs or symptoms?

9     A.   An individual who is undergoing symptoms of

10  asphyxia would have difficulty breathing; would have a

11  facial appearance of, of a fear; he may be holding his

12  chest; he may become cyanotic, with bluing of the

13  fingernails or the mucosa of the mouth or the gums, the

14  eyes; and in severe cases you may collapse, become

15  stuporous and collapse, become unconscious.

16     Q.   Anything else?

17     A.   May die.

18     Q.   Would you agree -- strike that.

19          Are you familiar with the phrase petechiae?

20     A.   Yes.

21     Q.   What are petechiae?

22     A.   Petechiae are tiny pinpoint hemorrhages.

23     Q.   Would you agree that petechiae are a common

24  indicator that someone has suffered an asphyxial death?

25     A.   It has been identified in cases of asphyxia.

1      Q.  So petechiae, you would agree, are a sign or

2   symptom that someone has suffered an asphyxial death?

3      A.  Yes.

4      Q.  Are you familiar with the term positional

5   asphyxia?

6      A.  Yes.

7      Q.  What is positional asphyxia?

8      A.  Well, positional asphyxia is a term that's

9   related to an individual who either suffers from

10  asphyxia or dies of asphyxia who has been placed in a

11  position or is in a position himself, has placed himself

12  in a position where his breathing has been compromised.

13  That's it.

14     Q.  Are you familiar with the term compression

15  asphyxia?

16     A.  Compression asphyxia?  I'm not sure if I've read

17  it in, in the literature, I may have heard of it, but I

18  believe that relates to chest pressure resulting in

19  asphyxia or causing some degree of asphyxia, or

20  respiratory difficulty.

21     Q.  Are you familiar with the term restraint

22  asphyxia?

23     A.  Yes.

24     Q.  What's that mean?

25     A.  Once again, restraint asphyxia has been described

1    in the literature.  It's described in conjunction with

2    individuals who are sometimes being restrained by

3    police, and it deals with a restriction of respirations

4    at the time of an attempt to restrain an individual.

5        Q.  Have you yourself conducted or participated in

6    any peer-reviewed medical studies on positional

7    asphyxia?

8        A.  No.

9        Q.  Have you yourself conducted or participated in

10   any peer-reviewed medical studies associated with

11   compression asphyxia?

12       A.  No.

13       Q.  Have you yourself participated in or conducted

14   any peer-reviewed medical studies associated with

15   restraint asphyxia?

16       A.  No.

17       Q.  According to your medical understanding, is there

18   a range of time that a person has to suffer a complete

19   deprivation of oxygen intake before they will die as a

20   result of asphyxia?

21              MR. NICHOLAS LERMAN:  Objection.  Incomplete

22   hypothetical.  Assumes facts not in evidence.

23              THE WITNESS:  Death from asphyxia can occur

24   with the absence of respirations for a period of four to

25   six minutes.  During that time, the individual can

1    become stuporous and then unconscious, and then death

2    can occur.

3    BY MR. SAIN:

4      Q.   So if a person -- if I understand your answer

5    correctly, in order for a person to die as a result of

6    asphyxia, there would have to be a complete lack of

7    oxygen intake, a complete lack of respiration, for

8    between four and six minutes.  Correct?

9      A.   Correct.

10     Q.   Sorry?

11     A.   Yes.

12     Q.   How many -- I'll let you drink your water.

13     A.   That's fine, go ahead.

14     Q.   How many autopsies have you either performed or

15   reviewed where you have relied on the toxicology results

16   collected by others in order to evaluate cause of death?

17     A.   I would say probably less than 30 cases where

18   there's actually been death.  I reviewed many cases of

19   individuals who have survived accidents but they

20   didn't -- have not necessarily died.

21     Q.   According to your medical understanding, is there

22   a toxic range for methamphetamine?

23     A.   Yes.

24     Q.   What is it?

25     A.   Well, it varies from the literature.  The

1    textbook by Molina, I believe I brought a copy of it,

2    textbook by Molina talks about a range of .1 to 100 to

3    9500 nanograms per ML.  That's Molina.

4          This reference here, Clinical Laboratory

5    Reference, an online and published journal with ranges

6    of toxicity which comes out on a yearly basis, it gives

7    a range for methamphetamine of anything greater than

8    500 nanograms per ML, which is .5, would be toxic, but

9    they don't give the number of it.

10          It varies, it varies from textbook to textbook.

11    Q.  According to the Molina text you cited, you used

12    the unit of nanograms per milliliter.  So would

13    100 nanograms per milliliter be equivalent to

14    0.100 milligrams per liter?

15    A.  Correct.

16    Q.  So according to the medical research you're

17    familiar with, the low end of the toxic range for

18    methamphetamine ingestion is 0.100 milligrams per liter;

19    correct?

20    A.  Yes.

21    Q.  According to the medical research that you're

22    familiar with, it is possible for a person who has had

23    0.100 milligrams per liter or more of methamphetamine to

24    die solely as a result of that methamphetamine; true?

25          MR. NICHOLAS LERMAN:  I'll just object.

1    Calls for speculation.  Assumes facts not in evidence.

2    Incomplete hypothetical.

3                THE WITNESS:  Well, the answer requires an

4    explanation, if I can give you an explanation.

5    BY MR. SAIN:

6      Q.  Sure, but first I'd like a yes or no, then we'll

7    deal with the explanation, so...

8      A.  All right then.

9      Q.  Do you want the question again?

10     A.  I heard the question, and it doesn't have a

11   simple answer.

12     Q.  So --

13     A.  It doesn't have a yes or no answer.

14     Q.  In general, isn't it possible that if

15   0.100 milligrams per liter is the low end of the toxic

16   range for methamphetamine, doesn't that mean that a

17   person -- it is possible for a person to die solely as a

18   result of methamphetamine if they have 0.100 milligrams

19   per liter or above in their system?

20         Isn't that possible?

21              MR. NICHOLAS LERMAN:  Objection.  Incomplete

22   hypothetical.  Compound.  Assumes facts not in evidence.

23   Vague and ambiguous.

24              THE WITNESS:  The answer is that

25   methamphetamine users have tolerance, they develop

```
 1   tolerance to the usage of the drug.  This gentleman was
 2   a chronic user of methamphetamine.
 3              Individuals who are tolerant do not
 4   necessarily suffer the adverse effects of the drug,
 5   especially at the lowest levels of toxicity.  Toxicity
 6   does not necessarily mean that it's a lethal dose, it
 7   doesn't necessarily have to be a lethal dose.
 8              The literature is not very clear on the
 9   subject, mainly because the studies combine just about
10   anybody who dies who happens to have a level of
11   methamphetamine, even at .1.
12              So the answer is not a simple answer.  My,
13   my opinion is that an individual with a .1 most likely
14   is not going to die from that dosage because of the
15   scientific principle of tolerance.
16              MR. SAIN:  So move to strike as
17   nonresponsive.
18              I wasn't talking about whether or not that's
19   always a fatal level, and I wasn't talking about this
20   case yet and I haven't reached your opinions, I will,
21   don't worry.  My question was a little broader.
22              THE WITNESS:  Okay.
23              MR. SAIN:  Because so far what you've told
24   me is that according to the medical literature that you
25   are familiar with, the low end of the toxic range for
```

1   meth is 0.100 milligrams per liter.

2            So what I'm trying to make sure I understand

3   correctly is that means that it is possible for a person

4   who has 0.100 milligrams per liter to die as a result of

5   methamphetamine by itself.

6            MR. NICHOLAS LERMAN:  Same objections as

7   stated before.

8            THE WITNESS:  I, I don't believe that to be

9   true.  It may be identified in the literature, but I'm

10  not in agreement with that statement.

11  BY MR. SAIN:

12    Q.  So, according to the literature, then, that

13  you're familiar with, 0.100 milligrams per liter being

14  the low end of the toxic range for meth means that a

15  person who has at least 0.100 milligrams per liter of

16  methamphetamine in their system, that that person can

17  die as a result of that meth by itself?

18            That's what the medical literature teaches;

19  correct?

20            MR. NICHOLAS LERMAN:  The state of the

21  medical literature speaks for itself.

22            THE WITNESS:  You have to interpret the

23  literature based on the specific article.  I'm not in

24  agreement with that, that statement.

25            MR. SAIN:  I understand you may disagree

1    with the medical literature but that's not my question.

2              Can I have my question read back, please?

3                 (The record was read.)

4              THE WITNESS:  I'll have to agree that Molina

5    states that, yes.

6    BY MR. SAIN:

7       Q.  Thank you.

8              At any time on the instant date of October 7,

9    2019, were you ever physically present during any

10   interaction between Fernando Cruz and any law

11   enforcement officers at the Riverside County Sheriff's

12   Department?

13      A.  No.

14      Q.  Did you yourself ever conduct any site

15   inspections of that incident location?

16      A.  No.

17      Q.  Did you yourself interview any witnesses to the

18   incident?

19      A.  No.  Not at that time.

20      Q.  I'm sorry, I don't understand your answer.

21   You're saying that after the incident you have

22   interviewed or you're saying you've never interviewed

23   people?

24      A.  I have had an opportunity earlier today to speak

25   with the mother.

1    Q.  I see.  Okay.  And when you spoke to -- strike

2    that.

3        Other than speaking to Sarah Cruz Reaza today,

4    have you yourself conducted any interviews of any

5    incident witnesses?

6    A.  No.

7    Q.  And when you -- strike that.

8        Before today, had you reviewed the deposition

9    testimony of Sarah Cruz Reaza?

10   A.  I believe so.  I've looked at many depositions,

11   yes.

12   Q.  When you conducted your interview of her today,

13   did she provide any incident details that were

14   materially different from the testimony she gave at her

15   deposition?

16   A.  I don't believe that the topic was discussed.

17   Today I spoke about medications and, and a clinical

18   condition related to her son.

19   Q.  I see.

20       So you've never interviewed anybody about what

21   actually happened during the incident; is that true?

22   A.  True.

23   Q.  Would it be accurate to say that, setting aside

24   what you may have reviewed in records or recordings,

25   would it be accurate to say that you have no personal

1    knowledge about what happened during the incident?

2        A.  Correct.

3        Q.  You were not an incident witness; true?

4        A.  True.

5        Q.  Let's get into some forensic pathology terms.

6            You'd listed the five manners of death:

7    Accident, suicide, natural causes, undetermined, and

8    homicide.

9            What does homicide mean in the -- in your

10   professional field?

11       A.  Homicide is death at the hands of another.

12       Q.  According to your understanding of the term

13   homicide in the medical field, does that mean that

14   somebody was murdered?

15       A.  I believe so.

16       Q.  According to your understanding of the term

17   homicide in the medical field, are you aware that there

18   is a division in forensic pathology as to whether that

19   term should be applied when the cause of death was

20   not -- had nothing to do with people who were present at

21   the scene?

22           MR. NICHOLAS LERMAN:  Objection.  Vague and

23   ambiguous.  Assumes facts not in evidence.  May call for

24   speculation.

25           THE WITNESS:  I'm not sure if I understand

1    the question.

2              MR. SAIN:   That's a great answer.

3    BY MR. SAIN:

4      Q.   So, are you aware that there is a division

5    amongst forensic pathologies as to whether or not the

6    term homicide should be applied to deaths like a drug

7    overdose, where somebody else who was present at the

8    scene did not actually cause or contribute to that

9    death?

10     A.   I see.

11          I can't answer that.  I don't know enough about

12   that topic.

13     Q.   Fair enough.   That's perfectly fair.

14          The term causal factor, what does that mean to

15   you?

16     A.   Causal factor is a necessary factor that results

17   in an effect, whether it's harm or death or illness

18   or...

19     Q.   In your understanding of medical terminology, is

20   causal factor different than a contributory factor?

21     A.   A contributory factor is a factor that

22   contributes; a causal factor in itself can cause the

23   effect.   The contributory factor is an additional

24   factor.

25     Q.   An additional factor that --

1    A.  Or an accessory factor that contributes, if I can

2    use the same word, to, to the effect.

3    Q.  To distinguish causal factor and contributory

4    factor, would you agree that a causal factor is

5    necessary to the outcome whereas a contributory factor

6    may exacerbate or hasten the outcome but by itself would

7    not have caused the outcome?

8            MR. NICHOLAS LERMAN:  Just object.

9    Incomplete hypothetical.  Assumes facts not in evidence.

10   Lacks foundation.

11           THE WITNESS:  That sounds correct.

12   BY MR. SAIN:

13   Q.  In your profession, what does the term exclude or

14   rule out mean when it comes to cause of death?

15   A.  Exclude or rule out reflects what the physicians

16   perform in considering a differential diagnosis.  They

17   rule out all of the other diagnoses or conditions that

18   may simulate or be similar to what happened but are

19   different cause of the end result.

20   Q.  So you would agree that the phrase "exclude" or

21   "rule out" means that a physician has determined that

22   some factor was not a factor in causing a certain

23   outcome?

24   A.  Yes.

25   Q.  You're familiar with the phrase reasonable degree

1  of medical probability; correct?

2      A.  Yes.

3      Q.  What's that mean to you?

4      A.  A reasonable degree of medical probability is a

5  term utilized to explain in the civil arena that a cause

6  of an event is at least 51 percent responsible for the

7  ultimate effect.

8      Q.  You've testified in a prior case with me that you

9  believe that anyone offering a medical opinion should

10  offer that opinion to a reasonable degree of medical

11  certainty if they're trying to state a probable

12  diagnosis or probable cause of an event like death;

13  correct?

14      A.  I don't recall.  If I said that I probably

15  misstated the word.  The correct, the correct

16  terminology I believe is reasonable probability.

17  Medical certainty is I believe less, less specific and

18  perhaps confusing, more confusing.

19      Q.  Fair enough, Doctor.

20          Do you agree that in order to state a medical

21  opinion, that the medical professional should be able to

22  offer that opinion to a reasonable degree of medical

23  probability?

24      A.  Yes.

25      Q.  In general, as a consulting pathologist, what is

1    your process when you get a case for evaluating things

2    like cause of death, contributing factors toward a

3    death?

4        A.  Are you speaking about an autopsy or --

5        Q.  I mean for you, when you get a new case, whether

6    you're doing an autopsy or not in that case, when you've

7    been asked to evaluate cause of death in a case, what is

8    you, Mr. Pietruszka's process for doing that?

9        A.  Well, optimally, if information is available, if

10   there's adequate information or ready -- or medical

11   records are readily accessible, comprehensive review of

12   medical records; discussion with family for best

13   possible history, it is a good starting point.

14         After a review of whatever the documents are or

15   review of an autopsy, those specific findings then have

16   to be related to a differential diagnosis.  Differential

17   diagnosis should be as broad as possible, and all other

18   diagnoses that, that did not relate should be excluded,

19   and any diagnosis that could potentially relate should

20   be studied in detail to determine whether it's a

21   contributing factor or whether it's an actual cause and

22   not the cause that maybe -- may have been the final

23   cause.

24         (Interruption in the proceedings.)

25         MR. SAIN:  Off record for one second.

```
 1              (Discussion held off the record.)

 2              MR. SAIN:  Back on record.

 3  BY MR. SAIN:

 4     Q.  Was that the end of your answer or did you have

 5  more?

 6     A.  I believe that's it.

 7     Q.  Okay.  And is that the process you followed for

 8  this case?

 9     A.  I generally tried to follow a fairly thorough --

10  thorough evaluation, and sometimes all the information

11  is not readily available and sometimes it becomes

12  available late in the day, but eventually I have an

13  opinion that's based on as much information and as

14  thorough a job as I can complete.

15     Q.  The report you prepared in this case, you

16  prepared it on March 29th, 2022?

17     A.  Yes.

18     Q.  So that was before you had your interview with

19  Sarah Cruz?

20     A.  Yes.

21     Q.  Okay.  And is there anything that you learned

22  from Sarah Cruz that would materially change any of the

23  opinions you've stated in your expert report, Exhibit 3?

24     A.  I believe that there is one, one important fact

25  that was related to me by Mrs. Cruz that impacts
```

1  significantly on this case, yes.

2     Q.  Which is?

3     A.  If I can just find my notes.

4        So, are we going to be on opinions at this point

5  or --

6     Q.  No.  Right now I'm just asking if -- I'm going to

7  get there, though, don't worry.

8        I'm asking if there's anything that you learned

9  in your interview of Sarah Cruz that materially changed

10 any of the opinions that you've formed as stated in your

11 report, Exhibit 3.

12    A.  Okay.

13       She gave me some contributory information.

14 Basically she spoke about Mr., Mr. Cruz's long-standing

15 history of asthma.

16    Q.  When she explained the long-standing history for

17 Mr. Cruz of asthma, what details did she provide you?

18    A.  So the -- his history of asthma, and I'll give

19 you a little bit of a narrative if that's okay?

20    Q.  Sure, as short as you can, though, because we are

21 going to dive into your opinions in a little bit.

22    A.  Okay.

23       His history of asthma goes back to the age of 10

24 or 11.  It was significant.  He always used an inhaler.

25 He had to go to hospitals many times.  He was

1   hospitalized for asthma.  He went to emergency rooms on

2   a number of occasions, and asthma was a significant

3   problem for him.

4       Q.  Do you know -- this is a do you know question so

5   it's a yes or a no -- do you know whether or not any

6   medical records indicating that history of asthma were

7   produced by plaintiffs in this case to defendants?

8       A.  No, I did not have any records.  The only

9   information that I know of is a list of, of medications,

10  one of which is an inhaler for asthma.  Albuterol was

11  identified at the time of autopsy, which indicates that

12  he was on another inhaler at some point, and the history

13  that I -- I can give you.

14      Q.  The history that you obtained verbally from Sarah

15  Cruz?

16      A.  Correct.

17      Q.  So would it be accurate to say that you have

18  never seen any medical records documenting Mr. Cruz as

19  having a history of asthma; is that correct?

20      A.  Correct.

21      Q.  Turning your attention back to the report,

22  Exhibit 3, page 2 of your report?

23      A.  Sure.

24      Q.  Okay.  So showing you page 2 of your report, it

25  lists Materials Reviewed and then there's 16 items under

1  that header; correct?

2      A.  Yes.

3      Q.  So it lists the coroner's investigation and

4  autopsy report as No. 1; No. 2, BioTox Lab toxicology

5  report; No. 3, the expert report of Jeffrey Noble,

6  that's plaintiff's police expert, yes?

7      A.  Yes.

8      Q.  No. 4, the Joint Case Management Statement dated

9  January 7, 2021; No. 5, the deposition of Deputy

10 Gillison; No. 6, the deposition of Deputy Lucifora;

11 No. 7, the deposition of Deputy Halbeisen; No. 8, the

12 deposition of Deputy Roach?

13     A.  Yes.

14     Q.  No. 9 it says:  "Document entitled deposition

15 questions, Cruz v. Riverside."

16         What is that?

17     A.  I believe that I created some, some questions

18 for, for Mr. Lerman so that he could depose either the

19 pathologist or someone else.

20     Q.  Are you saying that item 9 of materials you

21 reviewed are questions that you prepared for plaintiff's

22 counsel to ask of the autopsy examiner?

23     A.  Yes.  They're part of my file.

24     Q.  Okay.

25         Item No. 10 on your Materials Reviewed,

1  deposition of Jolie Rodriguez, that would be the medical

2  examiner who conducted the autopsy.  Yes?

3      A.  Yes.

4      Q.  Item 11, the autopsy photographs for this case,

5  yes?

6      A.  Yes.

7      Q.  No. 12, it says multiple photographs.  What does

8  that mean?

9      A.  There were photographs of the scene.  There were

10  photographs of the home, the location of the incident.

11      Q.  Fair enough.

12          Item 13, multiple incident reports.  What does

13  that mean?

14      A.  There were a number of incident reports, and --

15      Q.  From?

16      A.  They were prepared by police.  They all look like

17  this form here that I'm showing you.

18      Q.  So when you reference multiple incident reports,

19  you mean the Riverside County Sheriff's Department

20  reports associated with this incident?

21      A.  Yes.

22      Q.  Item 14:  Multiple reports of interviews with

23  deputies.  These would be interviews that the deputies I

24  listed before, Gillison, Lucifora, Halbeisen and Roach,

25  provided to Riverside County Sheriff's Department;

1   correct?

2     A.  Yes, and I believe that there are -- attached to

3   these incident reports, there are some narratives,

4   narrative summaries.

5     Q.  Fair enough.

6     Item 15, reports of interview of Sarah Reaza.

7   That would be Sarah Cruz Reaza, the plaintiff, yes?

8     A.  Yes.

9     Q.  Item 16, AMR and first responder reports;

10   correct?

11     A.  Yes.

12     Q.  All right.

13     Other than those 16 items and other than your

14   verbal interview with Sarah Cruz Reaza, are there any

15   other records or materials that you have reviewed in

16   preparation for your deposition today or otherwise to

17   support the opinions you formed in this case?

18     A.  Yes.  Actually, I have a thumb drive that was

19   delivered to me a couple of days ago, and I left it in

20   my computer, but that, that thumb drive has every record

21   that I believe was produced, it's got everything on it,

22   some of these and, and expert, a number of documents

23   that come from this office, your office, your expert --

24   your own expert report.  Just about every expert's

25   reports.  Everything is on that.

1          And, I'm sorry, I forgot to put it out of the

2     computer when I left.

3     Q.  Other than items 1 through 16 on your page 2

4     under Materials Reviewed that we've identified on the

5     record, other than the verbal interview you conducted

6     today with Sarah Cruz, other than the USB with all the

7     records produced in this case, including the defense

8     expert reports, are there any other materials or records

9     that you have reviewed and relied upon in formation of

10    your opinions in this case?

11    A.  Yes.  There are two articles that were sent to me

12    by Mr. Lerman.  Those articles, one deals with

13    positional asphyxia; another article -- let's see --

14    Q.  By "articles" are you referring to news articles,

15    medical articles?

16    A.  General medical articles.

17               MR. NICHOLAS LERMAN:  Perhaps I can assist.

18    There was just the article written by Dr. Graham.  "The

19    Acute Forces Required For Fatal Compression Asphyxia:  A

20    Biomechanical Model and Historical Comparisons,"

21    authored by Michael Graham and various other doctors.

22               MR. SAIN:  And the other one?

23               MR. NICHOLAS LERMAN:  The other one was the

24    article written by defense expert Theodore Chan titled

25    "Restraint Position and Positional Asphyxia."

BY MR. SAIN:

 Q.  Were those the two articles that you recall reviewing?

 A.  Yes.  Yes.

 Q.  All right.

 Other than items 1 through 16 that we've identified here on the record today as being listed on your report, page 2, Exhibit 3, under Materials Reviewed, other than the verbal interview of Sarah Cruz Reaza, other than the USB of the records produced in this case, including the defense expert reports and other than the two medical articles you just stated and identified from Dr. Chan and Dr. Graham, are there any other records or recordings that you've reviewed in -- and/or relied upon in the formation of your opinions in this case?

 A.  I did my own review of some articles.  I brought some abstracts with me.  I have them here.

 Is this mine?

 MR. NICHOLAS LERMAN:  This is the copies of the exhibits.

 THE WITNESS:  Are these the ones that I brought or --

 MR. NICHOLAS LERMAN:  No, these were provided by Mr. Sain.

1           THE WITNESS:  Well, here's a couple.  Let me

2    find my copies.  I hope I didn't run out of the office

3    without them.

4           MR. NICHOLAS LERMAN:  This is yours.

5           THE WITNESS:  Oh, there they are.  That's

6    all mine.

7           So I brought a few articles with me.

8    BY MR. SAIN:

9    Q.  These are articles you relied upon in the

10   formation --

11   A.  Yes.

12   Q.  Hold on.  Wait for the question.

13        These are articles you relied upon in the

14   formation of your opinions in this case?

15   A.  Yes.

16   Q.  Okay.  And how many are there?  These additional

17   articles that we haven't already discussed?

18   A.  I have one, two, five, seven, eight, what's this

19   one, 8.  About eight.

20   Q.  Okay.

21        So other than eight articles that you looked up

22   on your own, other than those two articles we've

23   identified, other than the defendant's expert reports

24   and the materials produced in this case on the USB,

25   other than the verbal interview of Sarah Cruz Reaza, and

1    other than items 1 through 16 on your materials reviewed

2    list on your expert report at page 2 of Exhibit 3, are

3    there any other records or recordings that you relied

4    upon in the formation of your opinions in this case?

5        A.  No.

6              MR. SAIN:  We've hit the one-hour mark.

7    Does anyone need a break?

8              MR. NICHOLAS LERMAN:  No thank you.

9              MR. SAIN:  Are you sure?

10             THE WITNESS:  Sure.

11             MR. SAIN:  Okay.

12             THE WITNESS:  Maybe one second.

13                (Discussion held off the record.)

14   BY MR. SAIN:

15       Q.  So, Doc, you're giving us a copy of the eight

16   articles that you relied on in formation of your

17   opinions, yes?

18       A.  Yes.

19             MR. SAIN:  We'll mark these collectively as

20   Exhibit 5.

21                (Deposition Exhibit 5 was marked.)

22   BY MR. SAIN:

23       Q.  All right.

24             At this time, I'm going to be asking you to

25   itemize essentially the opinions you've formed in this

1   case.

2        You and I have done this before.  I have no

3   particular preference in how you do it, if you want to

4   summarize, if you want to read key quotes, if you

5   want -- however you want to do that, but what I'm

6   looking for is the complete list of opinions that you've

7   formed in this case.

8        Do you understand me, Doc?

9   A.   Yes.

10  Q.   So please tell me now, please list all the

11  opinions you've formed in connection with this case.

12  A.   Basically we have an individual, Mr.,

13  Mr. Fernando Cruz, 39 years old, has a long-standing

14  history of bronchial asthma.  He has -- suffers from

15  schizophrenia.  He takes a number of medications for his

16  mental condition.  He's also a chronic user of

17  methamphetamine.

18       He is in his home.  Does not appear to be in any

19  state of delirium.  He's able to answer questions when

20  police officers come.  He speaks coherently.  He's

21  conscious; he's oriented; his perception may be, may be

22  not a hundred percent complete.  He has fears.

23       Not possible to differentiate entirely between

24  his preexisting psychiatric condition and, and the

25  specific effects of methamphetamine as they contribute

1    to his demeanor.

2         I do not believe that Mr. Cruz was even

3    significantly intoxicated by methamphetamine.

4    Methamphetamine was encountered in his blood at a level

5    that is not unusual for chronic users of

6    methamphetamine.  The level was low, and it was at the

7    lowest -- close to the lowest limit of, of toxicity.

8         However, I don't believe that he was exhibiting

9    symptoms of toxicity.  Individuals who are

10   methamphetamine users frequently demonstrate symptoms of

11   hyperactivity; violence; teeth grinding; sweating;

12   muscle tremors; bizarre behavior; paranoia; seizures;

13   unconsciousness.

14        From the description of the police officers as

15   they arrived, it did not appear that he was having

16   symptoms of methamphetamine toxicity.  His response to

17   the police officers could reasonably be consistent with

18   his preexisting mental disorder.  He suffers from

19   schizophrenia, and when he was approached by police

20   officers, he demonstrated symptoms of paranoia.

21        His response to police officers was not, not

22   unusual for an individual with a serious mental

23   condition.  I believe that police officers described him

24   as not being combative or, or aggressive towards,

25   towards them, but that he ran away.  He was able to

1   answer their questions and continued to speak in a

2   coherent way, at least for an individual with his

3   medical condition.

4         So, number one, I believe he has a serious mental

5   condition that, perhaps with, with the concern about,

6   about the risks of intoxication, risks, the medical

7   risks related to potential intoxication which police

8   officers were aware of, perhaps a 5150 hold should have

9   been requested.

10        If that had been requested, appropriate medical

11  personnel could have come to the home and dealt with him

12  in a different way, avoiding -- avoiding the struggle

13  and ultimate death.

14        The second opinion deals with the methamphetamine

15  level itself.  Methamphetamine is the most commonly used

16  drug today.  It is not uncommon to find such levels as

17  we find in this case in an individual who is alive, even

18  driving a vehicle, and an individual who does not

19  demonstrate any of the most common symptoms of, of

20  methamphetamine toxicity.

21        I don't believe that the level of methamphetamine

22  in his blood is unusual.  Most certainly I do not

23  believe that this level of methamphetamine would have

24  caused him to die.

25        Nevertheless, methamphetamine was in his system,

1   and, and if it did exert any, any effect, the effect of

2   the methamphetamine would have been impacted by the

3   struggle and by the psychological stress that he was

4   under after an attempt was made to restrain him.

5        In determining methamphetamine toxicity, I

6   believe that it is important to make the determination

7   based on clinical symptoms and the appearance and the

8   demeanor and the overall objective symptoms of the

9   individual.  One cannot make a determination of toxicity

10  or lethal effect of a drug based on a number.

11       There are interindividual differences to

12  metabolism; some people metabolize faster than others;

13  some people have a greater effect; new users have severe

14  effects; chronic users may be tolerant.

15       I don't believe that the methamphetamine was, was

16  the cause of his -- cause of his death.

17       With respect to what is mentioned about excited

18  delirium, I'm not in agreement with, with this

19  diagnosis.  This diagnosis entails an appearance of the

20  individual to be disoriented, memory dysfunction,

21  thought dysfunction, perception dysfunction, abnormal

22  behavior, altered state of consciousness.  The

23  individual with excited delirium frequently has high

24  temperature, and it can result in death.

25       The condition is not, not totally agreed upon by

1  the medical community as an actual medical condition.

2  It's probably rare.  I don't believe that he had this

3  condition.

4      The third -- next opinion is that Mr. Cruz had a

5  preexisting problem with asthma, which was brought to my

6  attention, the seriousness was brought to my attention

7  only this morning.

8      I didn't -- I didn't take into consideration the,

9  the ventilant that was identified in the blood tests

10 until only, only in the last few days, when I was

11 reviewing the file.  I thought perhaps there was a

12 medicine that was given to him at the hospital when,

13 when they were trying to resuscitate him and try to help

14 him breathe.

15     So I considered a diagnosis, a preexisting

16 diagnosis of asthma, only because in reviewing my

17 autopsy, I found that there was emphysema in his lungs.

18 It turns out that Mr. Cruz had severe asthma.  He had,

19 at least when he was a child, he had a condition called

20 exercise induced asthma, based on the description by the

21 mom.

22     The mother described Mr. Cruz to have frequent

23 episodes of asthma when he was a child; when he was

24 playing baseball, after playing baseball he would have

25 asthma attacks.  He would go to the community hospital

1    emergency room at the age of 11.  He always carried an

2    inhaler.  At the age of 15 he was hospitalized for

3    asthma.

4         He has had an asthma attack while at a

5    girlfriend's house.  He was taken to the hospital in

6    Moreno Valley when he was in his thirties, so maybe

7    within a period of the last nine years of his life.

8         He always had the inhaler with him.  He went to a

9    doctor in Riverside who prescribed the inhaler with --

10   he used a ventilant inhaler, and then he was also given

11   some stronger inhaler, and I noticed that the list of

12   medications that was given to me shows a Pulmicort

13   inhaler, which is also an albuterol type inhaler with

14   cortisone.

15        His mother saw him use the inhaler often.  He

16   would get short of breath when he would get upset

17   sometimes.  She could hear him wheezing.

18        Two to three years ago -- two to three years

19   prior to his death he was taken by ambulance to a

20   hospital for asthma treatment.

21        She would take him for breathing treatments when

22   he was younger.  He was never a smoker.  He had to stop

23   working at a job on 3rd Street where he was exposed to

24   cement because it was affecting his breathing.

25        He was always wheezing and always carried the

1    inhaler, as I said.

2          So, with that history, and the information that I

3    found in my own autopsy that I performed, the second

4    autopsy, I identified evidence of emphysema in his lung.

5    So that combination of bronchial asthma and emphysema,

6    and emphysema is, is on a spectrum with asthma, if

7    bronchitis is the earliest part of the spectrum and

8    asthma is somewhere in the middle of the spectrum,

9    emphysema is the end of the spectrum.

10          He had lung disease resulting from his asthma.

11    Asthmatics develop emphysema over time.

12          So the next opinion is that this struggle, this

13    struggle caused -- and placing him in the prone position

14    and, and just all of the trauma to his body that's

15    evidenced by bruises and, and pressure on his chest and

16    lying on his abdomen, especially with his weight, I

17    believe that the weight actually might be wrong.  I saw

18    in one place his weight was close to 249 pounds.  He

19    appears from the photographs to be a lot, a lot heavier

20    than, than the 198 or so pounds that, that was listed.

21          Lying on the ground, just lying on the ground

22    makes it difficult to breathe.  With someone pressing on

23    your chest with a knee, that makes it even harder.

24          I believe that his overall respiratory capacity

25    was diminished because of his asthma.  The struggle, the

1    positioning, the pressure on, on his thorax, keeping him

2    in a down position, and all -- and the -- the struggle

3    itself, would have aggravated his asthma.  Because of,

4    of the type of asthma that he had, exercise would worsen

5    his asthma, ultimately resulting in asphyxia and an

6    asphyxial type death.

7           This opinion opposes the opinion of the coroner,

8    who believes it was methamphetamine.  However, the next

9    opinion I have is that coroners frequently list

10   methamphetamine toxicity as a cause of death.  I believe

11   it's because it's -- it is the intention of the coroner

12   to expedite the release of the body, and this is a

13   simple way to expedite the release of the body.  They

14   find methamphetamine, they assume that methamphetamine

15   had played some role.

16          Most certainly the coroner did not have access to

17   hardly any information when, when she was completing the

18   autopsy.  There was much more information, she didn't

19   have access to it, and definitely she didn't realize

20   that there was a history of asthma dating back to

21   childhood and ongoing for all those years.

22          The literature that I brought with me supports my

23   opinions, if I can look at that again.  Is that okay?

24      Q.  Sure, but right now I'm just trying to get the

25   list of the opinions so --

1    A.   Okay.

2    Q.   -- are there more?

3    A.   I have some more opinions, because they --

4    Q.   Go right ahead.

5    A.   Essentially, the, the -- to shorten it, the

6    opinion is that the various literatures describe

7    spirometry testing.  With respect to, to restraining

8    subjects, even healthy subjects, if you restrain a

9    healthy subject, according to the literature, you have

10   reductions of forced expiratory volume in one second,

11   and forced vital capacity, and you have also --

12        Here's the one article by Vilke.  Parks also

13   supports that opinion.

14        And maximal voluntary ventilation is decreased

15   during aggressive physical restraint by 44 percent.

16        The restriction in, in vital capacity is down to

17   about average of 25 percent, and any, any restriction of

18   25 to 40 percent with an individual with severe

19   bronchial asthma could be, could be potentially fatal.

20        Whether, whether methamphetamine played a role, I

21   can't be a hundred percent sure.  I'm not sure.

22   Methamphetamine was in his bloodstream.  Methamphetamine

23   does have an effect on the heart.  It causes

24   hyperexcitability of the conduction system.

25        When the heart was subject to hypoxia, low oxygen

1    levels, it is reasonable to believe that his myocardium,

2    the heart, would have developed a cardiac arrythmia, not

3    only because of the hypoxia but also because of the

4    presence of methamphetamine in his bloodstream, even the

5    small amount, which would be close to nontoxic or

6    therapeutic levels, or in the low toxic range, that

7    amount of methamphetamine could have caused

8    hyperexcitability on the heart, causing ventricular

9    fibrillation and death, as we saw on the EKGs that they

10   obtained.

11        Let's see.  One second.

12        There's a report here by Dr. Graham.  I'm not

13   sure what he means by reasonable medical certainty.  I

14   don't know if he means reasonable medical probability in

15   his opinion, but he believes that it's due to -- his

16   death was due to catecholamine or methamphetamine

17   toxicity, and, and I believe that he... I don't think he

18   has a full picture of the, of the subject matter when

19   making his opinion.

20        There was a few other files here.  I have another

21   expert or so that I looked at.  I had Chan's and -- who

22   is this?  This is Clark.  Okay.

23        So I looked at the report of Richard Clark,

24   Dr. Clark, who is a toxicologist physician?  And he

25   believes that the concentration of methamphetamine was

1    the reason for his behavior.

2         I'm not in agreement with that opinion, mainly

3    because of his prior psychiatric diagnosis, which could

4    reasonably explain his, his behavior.  I'm not in

5    agreement with that.

6         Dr. Chan, let's see.

7         Dr. Chan talks about positional asphyxia.  I

8    believe I've issued my opinions on positional asphyxia

9    in this case.

10        I believe that for the general population, I

11   believe that the restraint would not cause any serious

12   problems.  This is a different type of a case where

13   there are underlying medical conditions.

14        And one of the experts for the defense did

15   mention that there are other, other, other potential

16   reasons why people who are restrained can, can die, and

17   perhaps in this case we're dealing with preexisting

18   condition of bronchial asthma and emphysema as a

19   potential cause of death, aggravated by restraint.

20        Those are my opinions.

21   Q.  Anything else?

22   A.  No.

23   Q.  Is there any medical record that you reviewed

24   that documented that Fernando Cruz was suffering from

25   schizophrenia?

1    A.  This was told to me by the mom.

2    Q.  Move to strike as nonresponsive.

3        My question was --

4    A.  No, no, there were not.

5    Q.  So let's get a clean record, please.

6        Is there any medical record that you reviewed

7  that documented that Fernando Cruz was suffering from

8  schizophrenia?

9    A.  No.

10   Q.  Was there any medical record that you reviewed

11  that documented that Fernando Cruz was suffering from

12  paranoia?

13   A.  No.

14   Q.  You used the term "hyperactivity."  What does

15  that mean to you?

16   A.  Hyperactivity, pacing about; moving his arms

17  about; speaking rapidly.  That's it essentially.

18   Q.  Thank you.

19       And your opinion was in part based on your

20  observation or your review of the records and

21  recordings; you did not perceive Fernando Cruz's

22  experiencing or exhibiting any hyperactivity; is that

23  correct?

24   A.  No.  Prior to the struggle, I did not gather that

25  he was having any symptoms of hyperactivity.

1    Q.  After the struggle began, though, was he?

2    A.  Yes.  Yeah, after the struggle he's most

3  certainly exhibiting many symptoms of, of hyperactivity

4  related to the struggle.

5    Q.  You said that part of the reason for your belief

6  that meth -- strike that.

7        You said that part of the reason for your belief

8  that Mr. Cruz was not significantly intoxicated by meth

9  is that he was not exhibiting any signs of violence.

10       Do you remember saying that?

11    A.  Yes.

12    Q.  And are you referring to any signs of violence

13  before the restraint began, after, or at some other

14  point?

15    A.  Before.

16    Q.  So after the restraint began, would you agree

17  that Mr. Cruz was exhibiting signs of violence?

18    A.  No, because his, his, his demeanor was one, one

19  of a subject that was, for lack of a better word, being

20  attacked.  He was, he was basically under, under

21  pressure of first two, then four, and ultimately six

22  deputies, so he felt like he was being attacked.

23    Q.  You're not an expert on psychology or psychiatry;

24  true?

25    A.  I'm not.

1      Q.   And you have no way of knowing what Mr. Cruz was

2  thinking or feeling during the incident; true?

3      A.   Again, I can explain it based on my experience in

4  dealing with patients with mental illness.

5      Q.   I'm asking if you have any way of knowing what

6  Mr. Cruz was thinking or feeling during this incident.

7      A.   Again, I can't tell you a hundred percent, but

8  based on my experience in treating patients who have had

9  psychosis, schizophrenia, paranoia, I believe that he

10  felt that he was attacked.

11      Q.   But there's no direct evidence of that; true?

12      A.   True.

13      Q.   And would you consider a subject who is trying to

14  pull free of an officer's grasp to be an act of

15  violence?

16          MR. NICHOLAS LERMAN:  Objection.  Vague and

17  ambiguous as to "act of violence."  Assumes facts not in

18  evidence.  Incomplete hypothetical.

19          MR. SAIN:  He's the one who used violence.

20  I'm trying to get the definition.

21  BY MR. SAIN:

22      Q.   Would you consider a subject who's trying to pull

23  free of an officer's grasp an act of violence?

24          MR. NICHOLAS LERMAN:  Same objections.

25          THE WITNESS:  I -- I -- if there's a

1  definition that could help me, that would be fine, I

2  would appreciate it.

3           I don't believe that it was an act of

4  violence.  He was trying to get away from police

5  officers.  He was avoiding police officers by running

6  away from them.

7  BY MR. SAIN:

8    Q.  Fair answer.

9        One of your opinions was that a 5150 hold should

10 have been requested so as to avoid the struggle that you

11 believe led to Mr. Cruz's death.

12       Do you remember saying that?

13   A.  Yes.

14   Q.  And you are not an expert in police practices;

15 true?

16   A.  True.

17           MR. NICHOLAS LERMAN:  Objection.  Asked and

18 answered.

19 BY MR. SAIN:

20   Q.  And you are not an expert in 5150 holds; true?

21   A.  I'm a physician.  I've called for a 5150 on

22 several occasions in my practice over the years.

23   Q.  And in that experience, the people who perform

24 5150 holds are police officers; true?

25   A.  Frequently a nurse or a doctor might even show

1   up, depending on the situation.

2      Q.  So if I were to tell you that according to

3   standard police practices, until a subject is fully

4   secure, even for a 5150 hold, that the only personnel

5   present will be law enforcement, not medical, do you

6   have any basis in your expertise to dispute that

7   statement?

8      A.  No.  I would agree.

9      Q.  In your medical experience, would you agree that

10  a subject is not fully secured if, while people are

11  trying to restrain him, he is still resisting that

12  restraint?

13         MR. NICHOLAS LERMAN:  Objection.  Vague and

14  ambiguous as to "resisting," assumes facts not in

15  evidence, lacks foundation, incomplete hypothetical.

16         THE WITNESS:  The answer may be yes.

17         MR. SAIN:  Thank you.

18  BY MR. SAIN:

19     Q.  I thought you said something, and maybe I

20  misunderstood you.  Did you say that you performed an

21  autopsy on Mr. Cruz?

22     A.  Yes.

23     Q.  So you had his body and conducted a physical exam

24  of him?

25     A.  Yes.

```
 1      Q.  When was that?

 2      A.  I have an autopsy report here.  I think I just

 3  saw it here.

 4      Q.  Doctor, anywhere --

 5      A.  Here it is, here it is.

 6              MR. SAIN:  Counsel, why wasn't this produced

 7  to us?

 8              MR. NICHOLAS LERMAN:  I thought it would

 9  have been a part of his report but I guess that was not.

10              MR. SAIN:  This was not.

11  BY MR. SAIN:

12      Q.  How did you obtain access to Mr. Cruz's body for

13  your physical autopsy?

14      A.  A driver was sent down there, probably to the

15  funeral home or the county, picked up, and delivered to

16  our facility.

17              MR. SAIN:  We'll mark this report as

18  Exhibit 6.

19              (Deposition Exhibit 6 was marked.)

20  BY MR. SAIN:

21      Q.  When did you conduct this autopsy?

22      A.  The date is on the first page.

23      Q.  November 26, 2019?

24      A.  Yes.

25      Q.  Is there any testimony or report from the medical
```

1  examiner, Jolie Rodriguez, that indicates that she

2  expedited her findings in order to release the body

3  sooner?

4      A.  I don't know.

5      Q.  You said, not too long ago today, that

6  methamphetamine could have caused ventricular

7  fibrillation for Mr. Cruz and death.

8          Do you remember saying that?

9      A.  Yes.

10     Q.  And that's true?

11     A.  Yeah, could have caused.

12     Q.  I wasn't sure about something you just said

13  toward the end of your opinion list, and I want to make

14  sure I did understand it.

15         Did you say that one of the articles that you

16  relied upon to support your opinion that prone restraint

17  can reduce the respiratory intake for the restrained

18  person, that one of the articles you relied upon in

19  support of that was an article by Dr. Gary Vilke,

20  V-I-L-K-E?

21     A.  I believe that I have Vilke's article.

22     Q.  So is that correct, what I said?

23     A.  Yeah.  If I -- if it's here.  Let's see.  I'm not

24  sure if it's Vilke's article.  I did look at his

25  article.  Vilke.

1          Yeah.  Yeah, it's basically the last paragraph.

2     I've marked it.

3          Vilke's article favors the defense argument, but

4     there's a statement in Vilke's argument that's a true

5     statement that's supported by the other research.

6     Q.  So the statement you've highlighted is:

7     Ventilatory -- strike that.

8          The statement that you've highlighted in Vilke's

9     article, which is a part of Exhibit 5, the article was

10    dated, it's from The Journal of Forensic and Legal

11    Medicine, 75, from 2020.  It's titled "Restraint

12    Physiology:  A Review of the Literature," by Gary M.

13    Vilke.

14         And under Conclusion on page 5 of the article,

15    the print version, the paragraph you highlighted states:

16    "Ventilatory function was measured by FEV-1 and FVC in

17    nine studies, three of which applied weight to subjects.

18    All experiments found statistically significant

19    decreases in FEV-1 and FVC.  Despite the emergence of

20    what authors consider to be a restrictive pattern, FEV-1

21    and FVC remained within clinically normal range in all

22    studies.  Additionally, MVV was measured in five

23    studies, also with statistically but not clinically

24    relevant changes."

25    A.  Correct.

1    Q.  And that's the paragraph you're relying on from

2    Dr. Vilke to support your opinion that prone restraint

3    can cause potentially dangerous reduction in respiratory

4    intake?

5    A.  Yeah.  I think there may be a few other

6    references, yes.

7    Q.  I didn't hear your answer.

8    A.  Yes.

9    Q.  Okay.  I just wanted to make sure I understood

10   that.  Okay.  Moving on.

11   A.  By the way, I'm sorry, there's no question but I

12   forgot that I have another opinion.  I can tell you

13   later.

14   Q.  Okay.  Well, let's clarify this other one first.

15       I thought you said that when you were discussing

16   the Chan report, that you agree that in the general

17   population, that prone restraint does not cause serious

18   medical problems.

19       Is that what you said earlier?

20   A.  Yes, in the generally healthy population it would

21   not cause significant problems.

22   Q.  Okay.  And by "significant problems," that would

23   include asphyxia; correct?

24   A.  Correct.

25   Q.  Okay.  But you're saying that with someone with a

1  preexisting condition, that such prone restraint may

2  cause serious medical problems?

3      A.   Correct.

4      Q.   Potentially including asphyxia?

5      A.   Yes.

6      Q.   Okay.  I understood.

7           What's the additional opinion?

8      A.   The opinion that I have regards the restraint and

9  the use of force as it affects respirations.

10          And the opinion is that the application of force

11  to the chest, and even to the lower extremities, causing

12  restriction of movement, restricts the ability of the

13  individual to breathe based upon the individual's

14  inability to utilize abdominal muscles necessary for

15  respiration; diaphragm necessary for respiration; and

16  intercostal muscles, also necessary for respiration.

17          So you can apply force, but it will restrict the

18  movement of those muscles.

19          However, the release of, of the force does not

20  necessarily mean that the individual's respirations are

21  normal, because the application of severe force causes

22  damage to tissue, microscopic damage perhaps or even,

23  even visible damage, such as hemorrhage or bleeding,

24  which interferes with muscle function.

25          So the application of force, even if it's

1    removed, does not necessarily mean that the individual

2    can breathe normally.

3         Q.   Any other opinions, Doc, other than what you've

4    stated?

5              MR. NICHOLAS LERMAN:   Do you want to refer

6    to your --

7              THE WITNESS:   So far, no.

8              MR. NICHOLAS LERMAN:   Do you want to refer

9    to your report?

10              THE WITNESS:   Oh, thanks.

11              MR. STEVEN LERMAN:   Can we take a

12    five-minute bathroom break?

13              MR. SAIN:   Let's finish this list and then

14    we'll do that.

15              MR. STEVEN LERMAN:   Okay.

16              THE WITNESS:   Sure.  Go ahead.

17    BY MR. SAIN:

18         Q.   Other than what you've stated here on the record,

19    are there any other opinions you've formed in connection

20    with this case?

21         A.   Also, obesity affects respiration by restricting

22    movement of the diaphragm, so that would be a second

23    explanation for why restraint, chest compression,

24    abdominal compression, would restrict respirations in an

25    individual, especially an obese individual who's in a

1   prone position.

2       Q.  Any other opinions besides what you've stated on

3   the record?

4       A.  That's all.

5           MR. SAIN:  Okay.  Let's take a five-minute

6   break.

7           MR. NICHOLAS LERMAN:  Thank you.

8               (A recess was taken from

9               2:40 p.m. to 2:51 p.m.)

10  BY MR. SAIN:

11      Q.  All right.

12          Doc, in your autopsy report, you document

13  Mr. Cruz's weight as being 185 pounds; correct?

14      A.  Right.

15      Q.  Okay.  And his height was five-foot-six inches

16  tall; correct?

17      A.  Yes.

18      Q.  So is someone who's five-foot-six and 185 pounds,

19  are they obese?

20      A.  Well, I think the number is wrong.  I think the,

21  the measurement is wrong.  We may have gotten that

22  measurement from the coroner or on some other document.

23          But I saw a weight of about 249, and the

24  photographs look a lot more than 180 or whatever it

25  says.

1      Q.  So let's unpack that.

2           First, you're saying that the weight that you

3      have in your own autopsy exam, which you list as 185,

4      you're now saying that that is wrong?

5      A.  I think it's wrong.  It doesn't look like the

6      individual that I observed in the photographs.

7      Q.  And are you aware that according to the autopsy

8      performed by Dr. Rodriguez, that she measured his weight

9      as approximately 196 pounds?

10     A.  Yes.

11     Q.  So my question to you is, is a person who is --

12     regardless of what your measurement was, is a person who

13     is five-foot-six tall and between 185 and 196 pounds, is

14     that person considered obese?

15     A.  No.

16     Q.  Under Skull and Central Nervous System of your

17     autopsy report, you identify a left temporal occipital

18     hematoma, a right -- a hematoma of the right temporal

19     muscle, and a subarachnoid hemorrhage.

20          What is the medical significance of those

21     findings?

22     A.  I believe the subarachnoid hemorrhage was -- I

23     couldn't confirm it.  It looked like it could be maybe

24     it was only congestion.

25          The hematomas of the scalp and the temporal

1    muscle suggests that there was some significant trauma

2    to the head.  The only significance to the -- without

3    any brain injury that could be identified, is that the

4    head -- the head was impacted some between three to five

5    times from the records.

6         It does show, the autopsy showed abrasions of the

7    chin, indicating that his head was in a down position,

8    which would again make it difficult to breathe if your

9    head is close to the ground or close to a floor.  It's

10   kind of hard to breathe when, when you're getting hit in

11   the head a few times.

12   Q.  So your own autopsy found no evidence of any

13   brain injury for Mr. Cruz; true?

14   A.  Correct.

15   Q.  And did any of the hemorrhages, hematomas or

16   other injuries you found in your own autopsy, did any of

17   the hemorrhages, hematomas or injuries to Mr. Cruz's

18   head, did any of those cause or contribute to Mr. Cruz's

19   death?

20   A.  No.

21   Q.  According to your own autopsy, it says:  "The

22   heart is of a normal shape and size."  Correct?

23   A.  Yes.

24   Q.  It says there's a mild atherosclerosis of the

25   aorta; correct?

1    A.  Correct.

2    Q.  Atherosclerosis is?

3    A.  It's the early stage of hardening of the

4    arteries.

5    Q.  According to your autopsy report, you reviewed

6    several biological sample slides; correct?

7    A.  Yes.

8    Q.  What was the medical significance you found from

9    those slides?

10    A.  I'd have to look at the autopsy.

11        The trauma to the head was confirmed by the

12    microscopic findings.  The lungs showed mild emphysema

13    with inflammation and some anthracosis of the lung.

14    Q.  Any other medical significance to the biological

15    slides you reviewed?

16    A.  The, the other slides showed some changes but it

17    doesn't seem to affect this case.

18    Q.  And the trauma to the head that you confirmed

19    through the biological slides, none of that trauma

20    caused or contributed to Mr. Cruz's death; true?

21    A.  True.

22    Q.  Anywhere in this report do you document Mr. Cruz

23    as having any petechiae?

24    A.  I don't recall.

25    Q.  Anywhere in Dr. Rodriguez's autopsy report did

1   she document finding any petechiae?

2       A.   I don't believe so.

3       Q.   According to Dr. Rodriguez's autopsy report,

4   there was no medical evidence that she could find during

5   the autopsy that was indicative of an asphyxial death.

6   That was her finding; correct?

7              MR. NICHOLAS LERMAN:  Just object, the

8   report speaks for itself.

9              THE WITNESS:  Typically, with asphyxia,

10  there are no findings that one can identify unless it's

11  asphyxia due to strangulation or some positional change

12  that -- that is readily identifiable.

13             There are no pathologic findings that would

14  be consistent with asphyxia at autopsy.

15             MR. SAIN:  Move to strike as nonresponsive.

16  BY MR. SAIN:

17      Q.   My question was that, according to Dr. Rodriguez,

18  as a result of her autopsy, she found no medical

19  evidence that Mr. Cruz had asphyxiated.  Isn't that what

20  her finding was?

21      A.   Yes.

22      Q.   Thank you.

23             Turning back to your March 29th, your Rule 26

24  report, starting on page 2 under the header History of

25  the Incident, you have what looks like a factual

1    summary.  Agreed?

2        A.  Yes.

3        Q.  So this would be your understanding of what

4    happened during the incident; correct?

5        A.  Correct.

6        Q.  And this understanding was formed based on your

7    review of the reports and the incident related

8    recordings?

9        A.  Yes.

10       Q.  Okay.

11           So, for example, page 2 of your report, you agree

12   that Mr. Cruz had been using methamphetamine on the

13   incident date; correct?

14       A.  Well, I don't know if he took it within 24 hours,

15   18 to 24 hours.  I don't know exactly when he took it,

16   but I believe he took it within a 24-hour period.

17       Q.  Fair enough.

18           And according to your history of the incident,

19   you agree that when deputies tried to cuff Mr. Cruz, he

20   resisted the deputies; correct?

21       A.  Yes.

22       Q.  According to your history of the incident, you

23   agree that when the deputies tried to cuff Mr. Cruz, he

24   began to fight with the deputies; correct?

25       A.  Yes.

1    Q.  In fact, according to your own summary of the

2    history of the incident, you state that:  "Even after

3    Mr. Cruz was ultimately handcuffed and placed into

4    custody, he was still attempting to fight with the

5    deputies."

6        That was your evaluation of the facts of this

7    case; correct?

8    A.  Yes.

9    Q.  And it's your understanding that according to the

10   evidence in this case, after Mr. Cruz was in handcuffs,

11   after he was continuing -- continuing to attempt to

12   fight, a hobble device was applied to him; correct?

13   A.  Yes.

14   Q.  Now, are you aware that the evidence in this

15   case, the testimony from the witnesses, states that the

16   hobble was only wrapped around his legs?

17   A.  Yes.

18   Q.  Okay.  So there was never a point in time when

19   the hobble was connected to his handcuffs; correct?

20   A.  Correct.

21   Q.  According to your summary of the incident facts,

22   you state that after the hobble was applied, Cruz

23   stopped fighting and became unresponsive; correct?

24   A.  Yes.

25   Q.  And are you aware of how much time passed from

1   when Mr. Cruz had the hobble applied to him until he

2   stopped fighting?

3       A.  It was several minutes.  I don't know exactly.

4       Q.  Fair enough.

5       Are you aware that according to the incident

6   witnesses who were present at the time that the hobble

7   was applied, that once the hobble was applied, once it

8   was on, there was only one deputy who maintained

9   physical contact with Cruz; all the other deputies

10  stepped away?

11      Were you aware that that's the state of the

12  witness evidence in this case?

13          MR. NICHOLAS LERMAN:  Objection.  Assumes

14  facts not in evidence.  Lacks foundation.

15          THE WITNESS:  I'm aware that the deputies

16  stepped away.  I don't recall how many remained.  I know

17  that a number of them went away, left or moved away.

18  I'm not sure exactly what happened after that.

19  BY MR. SAIN:

20      Q.  Are you aware that in the incident video, the

21  recording, that you can see in the body-worn camera

22  video, that the time Mr. Cruz goes into cardiac arrest

23  there is exactly one person touching him:  Deputy

24  Halbeisen?

25      A.  That may be correct.

1    Q.  So are you aware that according to the witness

2    accounts of the hobbling, that once the hobbling was

3    completed, only one deputy continued to maintain

4    physical contact with Mr. Cruz?

5               MR. NICHOLAS LERMAN:  Objection.  Assumes

6    facts not in evidence.  Lacks foundation.

7               THE WITNESS:  It may be true.  I don't know.

8    BY MR. SAIN:

9    Q.  Fair enough.

10       You said that you reviewed Deputy Halbeisen's

11   deposition; correct?

12   A.  Yes.

13   Q.  Are you aware that Deputy Halbeisen has testified

14   that after the hobbling was completed, he was the only

15   deputy who maintained any physical contact with

16   Mr. Cruz?

17   A.  I can't recall that fact.  It may be true.

18   Q.  Fair enough.

19       Are you aware that Dr. Halbeisen has testified

20   that after Mr. Cruz was hobbled, the only physical

21   contact that Deputy Halbeisen maintained with Mr. Cruz

22   was holding Mr. Cruz by the hands?

23       So the deputy's hands holding Cruz's hands while

24   Cruz was rear handcuffed in a prone position.

25               MR. NICHOLAS LERMAN:  Objection.  Misstates

 1  testimony of --

 2              MR. SAIN:  No, it doesn't, but go ahead.

 3              MR. NICHOLAS LERMAN:  It misstates testimony

 4  of Dr. Halbeisen, and also misstates testimony of

 5  Dr. Roach, who testified that Deputy Halbeisen had a

 6  knee on Cruz post hobble.

 7              MR. SAIN:  That's completely incorrect but

 8  go ahead.

 9              MR. NICHOLAS LERMAN:  We can pull up the

10  testimony.

11              MR. SAIN:  You can pull up the testimony.  I

12  was there.

13              MR. NICHOLAS LERMAN:  That's fine.

14              MR. SAIN:  And I've read them.

15              MR. NICHOLAS LERMAN:  Go for it.

16  BY MR. SAIN:

17    Q.  So, are you aware that the state of the testimony

18  from Dr. Halbeisen is that after the hobbling was

19  complete, the only physical contact that that deputy

20  maintained with Mr. Cruz was the deputy's hands on

21  Mr. Cruz's rear cuffed hands?

22              MR. NICHOLAS LERMAN:  Objection.  Misstates

23  testimony as stated before.

24              THE WITNESS:  I don't recall the detail of

25  that, that part of the case.

1    BY MR. SAIN:

2       Q.  Okay.  So you don't know if that's what was said

3    or not?

4       A.  I read it but I don't remember.

5       Q.  Are you aware that the state of the evidence from

6    all four of the deputies who were present is that after

7    Mr. Cruz was in the hobble, there were no knees on his

8    body?

9                MR. NICHOLAS LERMAN:  Objection.  Misstates

10   testimony of the officers.

11               MR. SAIN:  It really doesn't but go ahead.

12               MR. NICHOLAS LERMAN:  I can pull up the

13   testimony if you'd like.

14               MR. SAIN:  You can, I've read it, I was

15   there.

16               MR. NICHOLAS LERMAN:  That's fine.  We can

17   have that quarrel, that's fine.

18               MR. SAIN:  It's not a quarrel, it's in the

19   record.

20               MR. NICHOLAS LERMAN:  It's a misstatement of

21   testimony.

22               MR. SAIN:  It really isn't.

23   BY MR. SAIN:

24      Q.  Are you aware that that's the state of the

25   testimony?

1     A.  I can't recall that specifically.

2     Q.  Are you aware that from the time that the

3   hobbling was completed, the state of the witness

4   evidence is that Mr. Cruz continued to fight while

5   hobbled and rear handcuffed for approximately three more

6   minutes while prone?

7          MR. NICHOLAS LERMAN:  Objection.  Misstates

8   testimony and also contradictory of what's seen on the

9   body-worn camera.

10         THE WITNESS:  I remember reading that he

11  continued to struggle with -- while he was in the hobble

12  and restrained.  I don't remember how many minutes that

13  continued for.

14  BY MR. SAIN:

15    Q.  Are you aware that the state of the evidence from

16  the witnesses is that when Mr. Cruz stopped fighting, it

17  was an abrupt stop as opposed to a slow fade?

18         MR. NICHOLAS LERMAN:  Objection.  It is

19  contradicted by the evidence as seen on the body-worn

20  camera.

21         MR. SAIN:  Well, now you're testifying,

22  because that's not what he said.

23         THE WITNESS:  Are you referring to when he

24  stops breathing or?

25  ///

NORMAN SCHALL & ASSOCIATES————————77
(800) 734-8838

1   BY MR. SAIN:

2       Q.  Are you aware that the state of the evidence in

3   this case, the witness testimony, is that when Mr. Cruz

4   stopped fighting, it was an abrupt stop as opposed to a

5   slow fade?

6       A.  That may be true.

7       Q.  Okay.  You have reviewed the body-worn camera

8   videos in this incident?

9       A.  Yes.

10      Q.  And isn't it true that we can hear Cruz yelling,

11  even after the hobble has been applied?

12              MR. NICHOLAS LERMAN:  I'll just object,

13  vague and ambiguous as to "yelling," and is not an

14  accurate representation of the body-worn camera.

15              MR. SAIN:  Now you're testifying.

16              THE WITNESS:  I don't recall at what point

17  he was yelling or not yelling.  I don't remember.

18  BY MR. SAIN:

19      Q.  Is it your opinion that preexisting pulmonary

20  adhesions that Mr. Cruz had would not have caused his

21  death?

22      A.  Yes.

23      Q.  The coroner who conducted the autopsy before

24  yours, Dr. Rodriguez, found that the cause of death, the

25  sole cause of death here was acute methamphetamine

1    intoxication; correct?

2        A.   Yes.

3        Q.   The hospital blood toxicology results as a result

4    of that autopsy were measured at 0.291 milligrams per

5    liter of methamphetamine in Mr. Cruz's system; correct?

6        A.   Yes.

7        Q.   Now, you just stated a few moments ago that you

8    agree that the findings indicate that Mr. Cruz had

9    ingested methamphetamine within 24 hours of his death;

10   correct?

11       A.   Yes.

12       Q.   And you've also stated that regardless of whether

13   you think it was at the low end or the high end or

14   something else, you agree that that amount of meth,

15   0.291 milligrams per liter, is a toxic range of meth;

16   correct?

17            MR. NICHOLAS LERMAN:   Objection.   Misstates

18   testimony.

19   BY MR. SAIN:

20       Q.   Correct?

21       A.   Yes.

22       Q.   Thank you.

23            You agree that methamphetamine can cause

24   tachycardia; true?

25       A.   Yes.

1     Q.   By itself, methamphetamine can cause cardiac

2   arrest; true?

3     A.   Depending on the concentration, yes.

4     Q.   You and the doctor -- you and Dr. Rodriguez agree

5   that there were no petechiae found anywhere on

6   Mr. Cruz's body; true?

7     A.   True.

8     Q.   Not in the eyes, not anywhere above the neck, not

9   anywhere; correct?

10     A.   Correct.

11     Q.   When you say "the hobble position," what does

12   that mean to you?

13     A.   The hobble position typically involves the, the

14   tying of the legs together, and typically the legs are

15   then tied to the wrists or the hands, wrists.

16         So in all of the documents, they mention the

17   hobble position, although they have not completed the

18   tie to the wrists, and I just copied what I was reading.

19     Q.   So I'm a little unclear about your answer.

20         Are you familiar with the phrase, "the hogtie

21   position"?

22     A.   Yes.

23     Q.   Is that the position where someone's legs are

24   hobbled and then that hobble is connected to rear

25   handcuffs behind the back?

1      A.   Okay.  So that's -- yeah, so hogtied, that is --

2   you're right.  That is hogtied.  So the hobble position

3   apparently means tying the legs together.

4      Q.   So in your understanding, and just so I

5   understand what language you're speaking here, in your

6   understanding, hobble position is not necessarily the

7   same as hogtie; correct?

8      A.   I, I believe so.  I, I'm not using the

9   terminology on a regular basis.  From what I understand,

10   from what all I read, when they tied the legs together,

11   they called it the hobble position.  That's my

12   understanding.

13      Q.   I know.

14         Now, in your review of the witness testimony, you

15   would agree that in terms of the portion of the incident

16   where Mr. Cruz was hobbled and until he experiences

17   cardiac arrest, the only witnesses who were present to

18   observe what was happening were the four deputies;

19   correct?

20      A.   I, I don't recall how many were there.  Maybe

21   four, you may be right.

22      Q.   But the only ones who were there were the

23   deputies at that point, yes?

24      A.   Yes.

25      Q.   Okay.

1          And are you aware that the state of the deputy

2    testimony is that at the time that the hobbling was

3    completed, no deputy was placing any weight to

4    Mr. Cruz's body?

5              MR. NICHOLAS LERMAN:  Objection.  Misstates

6    testimony.

7              THE WITNESS:  No, I don't recall exactly

8    where everybody was at the time.  I don't remember.

9    BY MR. SAIN:

10    Q.   Okay.

11    You reviewed the body-worn camera video; is that

12    correct?

13    A.   Yes.

14    Q.   Isn't it true that in the body-worn camera, we

15    can see that right before Cruz stops moving, that Mr. --

16    Deputy Halbeisen's knees are not touching Mr. Cruz?

17              MR. NICHOLAS LERMAN:  Just object.  That's

18    not what's depicted in the body-worn camera.  Much of it

19    is --

20              MR. SAIN:  Don't lead him.

21              MR. NICHOLAS LERMAN:  Much of it is not even

22    visible.

23              MR. SAIN:  Don't lead him.  He can answer

24    for himself.  Do not lead him, counsel.  Make a proper

25    objection --

1           MR. NICHOLAS LERMAN:  I can make my

2    objection.

3           MR. SAIN:  That is leading.  Don't lead him.

4           THE WITNESS:  That's okay.

5           I had trouble seeing in the video, okay?  It

6    was difficult to see.  A lot of it is dark and I

7    couldn't really see.

8           I could see areas that were lit up, I could

9    see people sitting at some point on a couch, but I

10   couldn't see everything that went on with respect to

11   Mr. Cruz.

12   BY MR. SAIN:

13     Q.  So my question is a little bit simpler than that,

14   and the possible answers are yes, no, and I don't know.

15   Okay?

16         Isn't it true that at the moment in time in the

17   video where Mr. Cruz stops moving, we can see that

18   Deputy Halbeisen is not touching Mr. Cruz with any of

19   the deputy's knees?

20           MR. NICHOLAS LERMAN:  I'm just going to

21   object.  That's not -- it's not clear from the video --

22           MR. SAIN:  You're testifying.  You're

23   testifying.

24           MR. NICHOLAS LERMAN:  -- when he actually

25   stops moving.

 1          MR. SAIN:  You're testifying, counsel.

 2    That's not a proper objection.

 3          MR. NICHOLAS LERMAN:  All right.  So vague

 4    and ambiguous as to the time when Mr. Cruz stops moving.

 5          MR. SAIN:  Now he can answer.

 6          THE WITNESS:  I couldn't see.  I could not

 7    see.  I could not see whether there is a leg there or a

 8    knee or any, any body part.  I couldn't see.

 9    BY MR. SAIN:

10      Q.  So your answer is you don't know?

11      A.  No, I don't know.

12      Q.  Okay.

13          Isn't it true that according to -- in the

14    body-worn camera video, we can see that just before CPR

15    begins with Mr. Cruz, the only part of Deputy Halbeisen

16    that is touching Mr. Cruz is Deputy Halbeisen's hands?

17      A.  I, I can't, I can't answer that.  I couldn't see,

18    and I -- and my analysis focused more on the

19    pathophysiology.  I couldn't really see very much in the

20    videos, and I don't know what to tell you.

21      Q.  So the answer to my question is you don't know?

22      A.  I don't know.

23      Q.  Fair enough.

24          In your report, at page 7, under item 1:  "Facts

25    considered in forming opinions," you say that:

1    "Mr. Cruz was an otherwise healthy 39 year-old male with

2    a preexisting respiratory disorder and a long-standing

3    history of substance abuse."

4         Correct?

5    A.   Yes.

6    Q.   What does "otherwise healthy" mean in that

7    context?

8    A.   Well, he didn't have heart disease, he didn't

9    have liver disease, didn't have any cancer, he didn't

10   have any other significant medical problems.

11        His main problem was, was the asthma and, and his

12   psychiatric condition.

13   Q.   And are you aware of any doctor besides yourself

14   having diagnosed Mr. Cruz as having a psychiatric

15   condition?

16   A.   Well, he's taking medications typically used for

17   psychosis.

18   Q.   Not my question, Doctor.

19   A.   No, I don't have any records from anyone.

20   Q.   Okay.  So you're unaware of any doctor having

21   diagnosed Mr. Cruz as having a psychiatric condition;

22   true?

23   A.   That's true.

24   Q.   And you yourself are not a psychologist or a

25   psychiatrist; true?

1      A.  Correct.

2      Q.  Other than what has been stated here on the

3  record today, other than what is included in your

4  reports attached as Exhibit 3, your Rule 26 report, and

5  Exhibit 6, your autopsy report, have you formed any

6  other opinions in connection with Mr. Cruz or this case?

7      A.  Well, another opinion would be although I did not

8  have any documents from a psychiatrist or a psychologist

9  who has treated Mr. Cruz, the fact that he's taking

10  lithium and olanzapine and quetiapine and risperidone,

11  those medications are used in the treatment of

12  psychiatric disorders and depression.

13      I would say that he does have that condition, and

14  although we don't have any documentation, the fact that

15  he has these medications prescribed to him and there are

16  bottles that, that list all these medications with his

17  name, indicates that he has this diagnosis.

18      Q.  Did you see the bottles?

19      A.  No.

20      Q.  You were told there were bottles?

21      A.  I was sent this email with a listing of the

22  medications that he has been taking.

23      Q.  The email came from Sarah Cruz; correct?

24      A.  No, it actually -- it came from Miss Cruz and it

25  went to Mr. Lerman's office and they came from

1    Mr. Lerman's office.

2       Q.  So you yourself have not seen any evidence that

3    Mr. Cruz was prescribed any of those psych medications

4    you just identified; true?

5       A.  That is true.

6       Q.  Other than what you've testified to here on the

7    record today, and other than the opinions and findings

8    documented in Exhibit 3, your Rule 26 report, and

9    Exhibit C, your autopsy report, are there any other

10   opinions that you've formed in connection with Mr. Cruz

11   or with this case?

12      A.  No.

13              MR. SAIN:  Counsel, do you have any

14   questions?

15              MR. NICHOLAS LERMAN:  No questions.

16              MR. SAIN:  Let's go off the record for one

17   second.

18              MR. NICHOLAS LERMAN:  Sure.

19                 (Discussion held off the record.)

20              MR. SAIN:  We've had an off-the-record

21   discussion, first, about the handling of the deposition

22   transcript, and second about Dr. Pietruszka's fees.

23              The defense believes that Dr. Pietruszka's

24   fees are excessive.  The defense has paid $6,000

25   according to Dr. Pietruszka's report requirement for a

1    full half day when the deposition has lasted just under

2    two and a half hours.

3              Dr. Pietruszka's stated hourly rate is

4    actually closer to I believe he said 650.

5              THE WITNESS:  1500 per hour.

6              MR. SAIN:  Well, charging us triple what

7    other people would pay on an hourly basis for deposition

8    testimony seems excessive, and defendants reserve their

9    right to bring a motion for fee reduction.

10             MR. NICHOLAS LERMAN:  I'll just add that

11   Dr. Pietruszka has been designated in the capacity of a

12   pathologist and also toxicologist.  Defense would have

13   to reasonably pay both experts if they were designated

14   individually by plaintiff.

15             The accumulation of the testimony I believe

16   warrants Dr. Pietruszka's fee of 1500 per hour, and I

17   believe it's reasonable under the circumstances.

18             Defense counsel never inquired if Pietruszka

19   would waive his flat fee.  I don't know if he would have

20   or would not have so --

21             MR. SAIN:  Will you waive it?

22             MR. NICHOLAS LERMAN:  Well, he's already

23   been paid so --

24             MR. SAIN:  We can cut him a different check.

25             Will you waive it?  Let us pay you 650 an

1  hour instead?

2          MR. NICHOLAS LERMAN:  No, not 650, 1500, but

3  you can prorate it.

4          MR. SAIN:  1500 is prohibitive already.

5          THE WITNESS:  1500 has been my fee for

6  several years now, at least three or four years, and it

7  has not been objected to by anybody.  In fact, your firm

8  probably has paid me that amount.

9          MR. SAIN:  I've paid you that amount, too.

10  I still think it's really high because it's triple what

11  other people charge, but we can agree to disagree,

12  respectfully, on that one, Doctor.

13          MR. STEVEN LERMAN:  Why don't we save this

14  whole thing for another venue?

15          THE WITNESS:  I would agree to refund the

16  monies that were not used.

17          MR. SAIN:  Okay.  So instead of four hours,

18  you would pay us back essentially an hour and a half?

19          THE WITNESS:  If that's the actual amount.

20          MR. NICHOLAS LERMAN:  So he's gone two hours

21  and 23 minutes?

22          MR. SAIN:  I'm saying he can have two and a

23  half hours and we get 90 minutes back.

24          THE WITNESS:  One hour, two to three, three

25  to 3:30.  That's fine.

1          MR. SAIN:  All right.

2          MR. NICHOLAS LERMAN:  Would you mind cutting

3   him a separate check?

4          MR. SAIN:  I have to get into it with the

5   staff, I have to deal with that.

6          MR. STEVEN LERMAN:  What about portal to

7   portal?

8          THE WITNESS:  Well, I was planning to charge

9   you.

10          MR. SAIN:  We'll figure out the mechanics of

11   this deal later.

12          MR. STEVEN LERMAN:  Charge him, he's got the

13   money.

14          MR. NICHOLAS LERMAN:  Case law does support

15   that he's entitled to charge for portal-to-portal travel

16   as well as preparation.

17          MR. SAIN:  All right.  I still -- we

18   maintain our position it's exorbitant, but I will

19   consider his offer to allow us to recover 90 minutes of

20   our time back.

21          Let's move on to the stipulation for the

22   deposition handling.

23          In light of our off-the-record discussion,

24   counsel, I propose the following stipulation:  That the

25   court reporter be relieved of her statutory duty to

1    maintain custody of the original deposition transcript;

2    that after the record is transcribed, it shall be sent

3    to counsel for the plaintiff who will in turn provide it

4    to the witness.

5              That the witness shall then have 21 days to

6    review that transcript, make any changes that he deems

7    appropriate, and return the original deposition

8    transcript with signature and errata pages to counsel

9    for plaintiff.

10             The custodial counsel for plaintiff will

11    then have 14 days to alert all other counsel of the

12    signature and changes and provide other counsel a copy

13    thereof; that custodial counsel will agree to produce

14    and lodge the original deposition transcript at the time

15    of trial or for any motion for which it may be required

16    upon reasonable request; and that parties agree that in

17    the event the original deposition transcript is not

18    reviewed, revised or signed within the time frame I've

19    just stated or if it becomes lost or otherwise

20    unavailable, a certified copy may be used for all

21    purposes as if it were a signed and revised original

22    transcript.

23             So stipulated?

24             MR. NICHOLAS LERMAN:  So stipulated.

25             MR. SAIN:  So stipulated.

1          (Whereupon the proceedings were

2     concluded at 3:25 o'clock p.m.)

3                    --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>DECLARATION OF DEPONENT</u>

I, MARVIN PIETRUSZKA, M.D., say I have read the foregoing deposition and declare under penalty of perjury under the laws of the State of California and all federal laws that my answers as indicated are true and correct.

Dated this _____ day of _____, 20___, at _____,_____.
    (CITY)             (STATE)

_____
(Signature of deponent)

<u>REPORTER'S CERTIFICATE</u>

1

2

3       I, TAMARA D. WICKHAM, Certified Shorthand

4  Reporter No. 4117, do hereby certify:

5

6       That, prior to being examined, the witness named

7  in the foregoing deposition, to wit, MARVIN PIETRUSZKA,

8  M.D., was duly sworn to testify the truth, the whole

9  truth and nothing but the truth;

10

11      That said deposition was taken down by me in

12  shorthand at the time and place therein named and

13  thereafter reduced to computer-aided transcription under

14  my direction.

15

16      That the foregoing transcript, as typed, is a

17  true record of the said proceedings.

18

19      I further certify that I am not interested in the

20  event of this action.

21

22      Executed at Los Angeles, California, this 25th

23  day of May, 2022.

24                    _Tamara D. Wickham_____
                      TAMARA D. WICKHAM, CSR No. 4117

25

1              <u>REPORTER'S CERTIFIED COPY</u>

2

3       I, TAMARA D. WICKHAM, CSR NO. 4117, a Certified

4  Shorthand Reporter, hereby certify that the attached

5  transcript is a correct copy of the original transcript

6  of the testimony of MARVIN PIETRUSZKA, M.D., taken

7  before me on the 18th day of May, 2022, as thereon

8  stated.

9       I declare under penalty of perjury that the

10  foregoing is true and correct.

11       Executed at Los Angeles, California, this 25th

12  day of May, 2022.

13                            _____
                                   *Tamara D. Wickham*
14                            TAMARA D. WICKHAM, CSR NO. 4117

15

16

17

18

19

20

21

22

23

24

25