O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SARAH CRUZ REAZA, et al.,

                    Plaintiffs,

        v.

COUNTY OF RIVERSIDE, et al.,

                    Defendants.

Case No.: 5:20-cv-01188-MEMF (SPx)

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION TO EXCLUDE EXPERT OPINION [ECF NOS. 95, 97]**

Before the Court are the Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment, and the Motion to Exclude Expert Opinion filed by Defendants County of Riverside, Robert Roach, Andrew Lucifora, Geoffrey Gillison, and Todd Halbeisen. ECF Nos. 95, 97. For the reasons that follow, the Court GRANTS IN PART and DENIES IN PART Defendants' Motion for Summary Judgment and DENIES Defendants' Motion to Exclude Expert Opinion.

/ / /

/ / /

1

**BACKGROUND**

I.    **Factual Background**

On the early morning of October 7, 2019, four Riverside County Sheriff's Department ("RCSD") deputies responded to a 911 call at Sarah Cruz Reaza's ("Reaza") home involving her son, decedent Fernando Cruz ("Cruz"). Statement of Uncontroverted Facts and Conclusions of Law in Support of Defendants' Motion for Summary Judgment or Partial Summary Judgment, ECF No. 95-1 ("Def. SUF") ¶¶ 8–9, 14. Once they arrived, and after they had placed handcuffs on Cruz, deputies used additional force against Cruz. After several minutes, Cruz stopped moving and breathing. *Id.* ¶¶ 110, 115. Paramedics tended to Cruz and transported him to Riverside Community Hospital, where he was pronounced dead later that morning. *Id.* ¶¶ 117, 120, 121.

This case concerns what the deputies did after they handcuffed Cruz, whether it violated his constitutional rights, whether it led to his death, and, if so, what consequences, if any, should flow therefrom.

II.    **Procedural History**

On June 11, 2020, Plaintiffs Sarah Cruz Reaza, Fernando Baeza, Fernando Cruz, Jr., Frank Cruz, Celeste Cruz, Raelene Cruz, and J.A. (collectively, the "Plaintiffs") filed a complaint against Defendants Roach, Lucifora, Gillison, Halbeisen, and the County of Riverside (the "County") (collectively, the "Defendants") in federal court. ECF No. 1. On January 7, 2021, Plaintiffs filed a First Amended Complaint alleging seven causes of action: (1) excessive force, 42 U.S.C. § 1983; (2) interference with familial relationship, 42 U.S.C. § 1983; (3) municipal liability for failure to train, 42 U.S.C. 1983; (4) municipal liability for unconstitutional custom, practice, or policy, 42 U.S.C. § 1983; (5) violation of the Ralph Act, CAL. CIV. CODE § 51.7; (6) violation of the Bane Act, CAL. CIV. CODE § 52.1; and (7) wrongful death negligence. First Amended Complaint, ECF No. 41 ("FAC") ¶¶ 40–86. On June 23, 2022, Defendants filed the instant Motion for Summary Judgment and Motion to Exclude Expert Opinion. ECF Nos. 95 ("Motion" or "MSJ"), 97 ("Expert Mot.").[1] On July 14, 2022, Plaintiffs filed an Opposition to both Motions. ECF Nos. 98 ("MSJ Opp'n"), 99

---

[1] For the sake of simplicity, with respect to all exhibits, the Court cites to the ECF page number found at the top of each page of the filed submission rather than any internal page numbering of the relevant documents.

("Expert Opp'n").[2] On August 4, 2022, Defendants filed a Reply to both Motions. ECF Nos. 107 ("MSJ Reply"), 108 ("Expert Reply"). The Court held oral argument September 1, 2022. ECF No. 114.

## DEFENDANTS' MOTION TO EXCLUDE EXPERT OPINIONS

### I.    Applicable Law

Under Rule 702, the court has discretion to permit testimony by experts qualified by "knowledge, skill, expertise, training, or education" to testify based on "scientific, technical, or other specialized knowledge" if that knowledge will "assist the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702; *see Daubert v. Merrell Down Pharm., Inc.*, 509 U.S. 579, 588 (1993). The party offering the expert opinion must show by a preponderance of the evidence that: (1) the expert is qualified to render their opinion, and (2) the opinion has adequate factual and scientific support. *Daubert*, 509 U.S. at 592–93.

In evaluating proffered expert testimony, the trial court is a "gatekeeper, not a fact finder," *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010), and its "inquiry into admissibility is a flexible one." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043 (9th Cir. 2014). "[T]he trial court must assure that the expert testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" *Primiano*, 598 F.3d at 564 (quoting *Daubert*, 509 U.S. at 597). "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Id.* at 565 (citations omitted). "The district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be

---

[2] Several deposition excerpts cited in Plaintiffs' Statement of Genuine Material Facts in Dispute in Opposition to Defendants' Motion for Summary Judgment, ECF No. 98-1 ("Plff. SUF Opp'n"), contained missing pages. As a result, the Court ordered Plaintiffs to refile these documents. ECF No. 109. On August 30, 2022, Plaintiffs refiled their Statement of Genuine Material Facts in Dispute in Opposition to Defendants' Motion for Summary Judgment with the updated exhibits. ECF Nos. 110 ("Declaration of Gregory Peacock"), 111 ("Second Declaration of Gregory Peacock"), 112 (Plaintiff's First Supplemental Statement of Genuine Material Facts in Dispute in Opposition to Defendants' Motion for Summary Judgment, "Plff. Supp. SUF Opp'n").

1    helpful to a jury." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969–70 (9th Cir.

2    2013).

3    **II.    <u>Discussion</u>**

4         Defendants first seek to exclude Plaintiffs' expert Marvin Pietruszka's ("Pietruszka")

5    statements regarding Cruz's cause of death and mental condition. Expert Mot. at 8–10. Specifically,

6    Defendants argue that Pietruszka is not qualified to render opinions on (1) Cruz's cause of death,

7    because Pietruszka is not certified on the American Board of Forensic Pathology; (2) Cruz's

8    psychological and/or psychiatric disorders and the certain types of behaviors associated with them,

9    because Pietruszka is not a psychiatrist or psychologist; and (3) the appropriateness of applying a

10   Section 5150 hold on Cruz, because Pietruszka has no law enforcement background. *Id.* at 10–12;

11   *see* CAL. WELF. & INST. CODE § 5150.

12        Plaintiffs concede that Pietruszka is not certified by the American Board of Forensic

13   Pathology. *See* Expert Opp'n at 6. However, Plaintiffs present evidence of Pietruszka's other

14   certifications, including the American Boards of Pathology, Preventive Medicine, and Forensic

15   Toxicology. *Id.* at 5; ECF No. 99-1, Ex. A ("Pietruszka's Initial Expert Report") at 5. Additionally,

16   Pietruszka is a clinical associate professor of medicine in the department of pathology at Keck

17   School of Medicine at the University of Southern California, operates a private autopsy facility at the

18   Del Carmen Medical Center, is the director of two clinical laboratories in the Los Angeles area,

19   authored many published articles, and conducted his own autopsy of Cruz. *Id.* at 15–19; ECF No.

20   99-1, Ex. B ("Pietruszka Dep. Tr.") at 79:15–21. Given Pietruszka's breadth of experience in

21   pathology, the Court finds that he is qualified to render opinions as to Cruz's cause of death. *See*

22   *Alves v. Riverside County*, No. EDCV 19-2083 JGB (SHKx), 2021 WL 4049360, at *6 (C.D. Cal.

23   Aug. 5, 2021) (denying defendant's motion in limine to exclude expert testimony because plaintiff

24   proffered evidence of expert's relevant qualifications despite expert's lack of forensic pathology

25   board certification).

26        Plaintiffs next contend that Pietruszka is qualified to opine on Cruz's psychological and/or

27   psychiatric disorders and the certain types of behaviors associated with them. Plaintiffs argue that

28   Pietruszka has not and will not diagnose Cruz with schizophrenia or any mental disorder. Expert

1    Opp'n at 6–7. They add that Reaza informed Pietruszka of Cruz's schizophrenia and paranoia, and

2    that Pietruszka simply opines on how schizophrenia may have played a role in Cruz's death. *Id.*

3    These facts are similar to those of *Smith*, where the Court denied defendants' motion in limine to

4    exclude Pietruszka's opinion regarding how the decedent's schizophrenia played a role in his death

5    after the decedent's mother informed Pietruszka of the decedent's mental condition. *See Smith v.*

6    *County of Riverside*, EDCV 16-00227 JGB (KKx), 2018 WL 7500278, at *4 (C.D. Cal. Nov. 14,

7    2018). There, plaintiff "highlight[ed] Dr. Pietruszka's experience treating patients with

8    schizophrenia and other mental illnesses and his reliance on scientific studies to corroborate his view

9    regarding" the decedent's death. *Id.* Although Plaintiffs' papers do not similarly highlight

10   Pietruszka's experience treating patients with schizophrenia, the Court finds the *Smith* decision

11   persuasive and relies on its findings. Accordingly, the Court finds Pietruszka qualified to opine on

12   Cruz's psychological and psychiatric disorders.

13         Plaintiffs do not address Defendants' argument that Pietruszka is not qualified to opine on the

14   appropriateness of requesting a Section 5150 hold because he is not a law enforcement expert. The

15   Court thus treats this argument as conceded.

16         Defendants next argue that Pietruszka's opinions regarding Cruz's cause of death and mental

17   condition lack evidentiary support, and thus should be excluded. Expert Mot. at 12–17. First,

18   Defendants argue that Pietruszka may not base his opinions on information from Reaza regarding

19   Cruz's history of asthma, schizophrenia, and paranoia. *Id.* at 13–14, 15–16. Rule 703 allows an

20   expert to "base an opinion on facts or data in the case that the expert has been made aware of or

21   personally observed." FED. R. EVID. 703. If this evidence is the type experts in the field "reasonably

22   rely on," then the evidence "need not be admissible for the opinion to be admitted." *Id.* The

23   Advisory Committee's note on the Rule then provides general examples of reasonably reliable

24   evidence, including "statements by patients and relatives." FED. R. EVID. 703 advisory committee's

25   note on proposed rule. Thus Reaza, as Cruz's mother, is the type of relative envisioned by Rule 703

26   that is reasonably reliable to provide Pietruszka information regarding Cruz's relevant medical

27   history. As such, information provided by Reaza is sufficient to support Pietruszka's opinions. *See*

28

1   *Smith*, 2018 WL 7500278, at \*4 (finding Pietruszka's opinion sufficiently supported when based on

2   information from decedent's mother regarding decedent's schizophrenia[3]).

3       Second, Defendants point to several contradictory statements made by Pietruszka, and thus

4   argue that Pietruszka's opinions are not sufficiently grounded by evidence. Expert Mot. at 14–15.

5   However, self-contradictory statements go to Pietruszka's credibility, not the sufficiency of

6   evidentiary support, and thus are not appropriate for this Motion. *See City of Pomona*, 750 F.3d at

7   1044 ("Challenges that go to the weight of the evidence are within the province of a fact finder, not a

8   trial court judge. A district court should not make credibility determinations that are reserved for the

9   jury."). Moreover, "[s]haky but admissible evidence is to be attacked by cross-examination, contrary

10  evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564. As such,

11  Pietruszka's opinions do not lack evidentiary support.

12      Because the Court deems Pietruszka qualified to testify and his opinions adequately

13  supported in light of the Court's role as a gatekeeper only, Defendants' Motion to exclude

14  Pietruszka's opinions is DENIED.

15                  **MOTION FOR SUMMARY JUDGMENT**

16  I.   **Applicable Law**

17       **A.  Motion for Summary Judgment**

18      Summary judgment should be granted if "the movant shows that there is no genuine dispute

19  as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P.

20  56(a). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists &*

21  *Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*,

22  477 U.S. 242, 248 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could

23  return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

24

25  _____

26  [3] To the extent that the Defendants are also arguing as an evidentiary matter that Reaza's assertions regarding
    her son's medical history should be excluded as inadmissible hearsay or because she failed to produce

27  medical records to corroborate her assertions, the Court overrules those objections at this time, without
    prejudice to the defendants raising them at an appropriate point prior to trial. For purposes of this question—

28  whether Pietruska's opinions lack evidentiary support, it is sufficient that an expert's opinions need not be
    based solely on admissible evidence.

1    Under Rule 56(a), a court also has authority to grant *partial* summary judgment, or

2    "judgment on less than the entire case." 10B Charles Alan Wright & Arthur R. Miller, *Federal*

3    *Practice and Procedure* § 2737 (4th ed. 2022) (citing FED. R. CIV. P. 56(a)). Under Rule 56(g), a

4    court that "does not grant all the relief requested by the motion . . . may enter an order stating any

5    material fact . . . that is not genuinely in dispute and treating the fact as established in the case." FED.

6    R. CIV. P. 56(g).

7    A court must view the facts and draw inferences in the manner most favorable to the non-

8    moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1992); *Chevron Corp. v. Pennzoil*

9    *Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). The moving party bears the initial burden of

10   demonstrating the absence of a genuine issue of material fact for trial, but it need not disprove the

11   other party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the non-moving party

12   bears the burden of proving a claim or defense, the moving party can meet its burden by pointing

13   out that the non-moving party has failed to present any genuine issue of material fact as to an

14   essential element of its case. *See Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990). If the

15   moving party meets its burden, the burden shifts to the opposing party to set out specific material

16   facts showing a genuine issue for trial. *See Anderson*, 477 U.S. at 248–49. A party cannot create a

17   genuine issue of material fact simply by making assertions in its legal papers. *S.A. Empresa de*

18   *Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982).

19   Rather, there must be specific, admissible evidence identifying the basis for the dispute. *See id.* "If a

20   party fails to properly support an assertion of fact or fails to properly address another party's

21   assertion of fact . . . the court may . . . consider the fact undisputed." FED. R. CIV. P. 56(e)(2). The

22   Court need not "comb the record" looking for other evidence; it is only required to consider

23   evidence set forth in the moving and opposing papers and the portions of the record cited therein.

24   FED. R. CIV. P. 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001).

25   The Supreme Court has held that "[t]he mere existence of a scintilla of evidence . . . will be

26   insufficient; there must be evidence on which the jury could reasonably find for [the opposing

27   party]." *Anderson*, 477 U.S. at 252.

28   / / /

1  **II.    <u>Discussion</u>**

2      **A.  Findings of Fact**[4]

3      The Court finds that the following material facts are established for trial under FED. R. CIV.

4  P. 56(a) and FED. R. CIV. P. 56(g).

5      The RCSD provides its deputies training based on the California Peace Officer Standards and

6  Training ("POST") learning domains related to use of force, including informing deputies of

7  subsequent changes to the POST learning domains. Def. SUF ¶ 122. RCSD trains its deputies that

8  when detaining an individual, they should lay the individual on their stomach and instruct the

9  individual to place their hands behind their back to secure them in a prone restraint. *Id.* ¶ 124.

10  According to RCSD's research, it determined that prone restraint by itself does not cause positional

11  asphyxia and is the optimal position to control a resistive subject, and thus RCSD trains its deputies

12  that prone restraint is the safest position for a restrained subject. *Id.* ¶ 123.[5] Additionally, RCSD

13  trains its deputies to use a distraction punch when it is objectively reasonable under the totality of the

14  circumstances. *Id.* ¶ 125.[6] This training states that a punch to the head is not deadly force. *Id.* ¶ 126.

15  _____

16  [4] The facts set forth below are taken from the parties' respective statements of facts. Def. SUF; Plff. SUF
    Opp'n; Plff. Supp. SUF Opp'n; Defendants' Response to Plaintiffs' Statement of Genuine Material Facts in
17  Dispute in Opposition to Defendants' Motion for Summary Judgment, ECF No. 107-1 ("Def. Reply SUF").
    To the extent that any statements of fact are omitted, the Court concludes they are not material to the
18  disposition of this Motion.
    [5] Plaintiffs claim that California POST "recognizes positional asphyxia, and says that . . . it could restrict
19  somebody's breathing, and the training is that what follows from that is to put [the subject] in a recovery
    position." ECF No. 111, Ex. H ("Noble Missing Page Dep. Tr.") at 83:17–21. Plaintiffs further offer
20  concessions from the Deputy Defendants that the County failed to train them on the risks of positional
    asphyxia, such as pressing down on a subject's back, as well as the need to place a prone individual in the
21  recovery position to better facilitate their breathing, and that punches to certain areas of the body, such as the
    head, would likely cause serious injury and may constitute deadly force. *See* ECF No. 98-2, Ex. C ("Roach
22  Dep. Tr.") at 42:13-16, 43:9-19, 45:9-14; 45:16-46:16; ECF No. 98-2, Ex. D ("Lucifora Dep. Tr.") at 89:3–6,
    90:7–20, 91:6–25; 92:12–93:21; ECF No. 98-2, Ex. E ("Gillison Dep. Tr.") at 120:21–24, 121:2–25, 122:4–
23  23; ECF No. 98-2, Ex. F ("Halbeisen Dep. Tr.") at 135:16–21, 137:3–15, 138:21–25; ECF No. 98-2, Ex. I
    ("Noble Dep. Tr.") at 174:5–19, 175:2–8; 176:13–16. Additionally, Plaintiffs' expert states that when an
24  individual kneels on the back of a prone individual, breathing becomes difficult. ECF No. 98-2, Ex. J
    ("Pietruszka Dep. Tr.") at 191:21–23. Thus, while the results of RCSD's research and content are undisputed,
25  Plaintiffs dispute whether maintaining a restrained subject in the prone position and punching their head is the
    safest procedure.
26  [6] Plaintiffs dispute whether RCSD trains officers on how to determine objective reasonableness. Plaintiffs
27  further contend that the County failed to train the Deputy Defendants that punches to certain areas of the
    body, such as the head, would likely cause serious injury and may constitute deadly force. Roach Dep. Tr. at

28

1    RCSD also trains its deputies that it is appropriate to use a leg hobble when it is objectively

2    reasonable under the totality of circumstances. *Id.* ¶ 127. A hobble is a leather strap that wraps

3    around a subject's legs to reduce their ability to kick or flee. *Id.* ¶ 96.

4        Cruz was known to RCSD deputies as having a history of methamphetamine use after his

5    family members called the police about Cruz's behavior approximately five different times. *Id.* ¶¶ 1–

6    2.[7] The police previously arrested Cruz on at least four occasions and issued a Section 5150 hold on

7    at least three occasions. *Id.* ¶¶ 6–7.

8        On the early morning of October 7, 2019, Reaza called 911 regarding a domestic disturbance

9    caused by Cruz (the "Incident"). *Id.* ¶¶ 8–9. Reaza told 911 operators that she believed Cruz was

10   under the influence of drugs. *Id.* ¶ 10. Indeed, Cruz ingested methamphetamine within twenty-four

11   hours of the Incident. *Id.* ¶ 132. Cruz's niece, Sandy Acuna, also called 911 and told operators Cruz

12   was yelling, banging on the wall, and "acting crazy." *Id.* ¶¶ 11–12.[8]

13       Defendants Roach and Lucifora responded to the 911 call and arrived at Reaza's residence.

14   *Id.* ¶ 14. Roach and Lucifora had several previous contacts with Cruz prior to the Incident. *Id.* ¶¶ 3–

15   4. When Roach and Lucifora arrived, Reaza told them that she wanted Cruz arrested and removed

16   from her property because she saw Cruz smoking something out of a glass pipe, hitting walls, and

17   acting erratically while her family was inside. *Id.* ¶¶ 16–17. Reaza gave the officers permission to

18   enter her home. *Id.* ¶ 21. When Roach and Lucifora entered Reaza's home, Cruz made repeated

19   statements about killing himself. *Id.* ¶ 27. Based on the information provided by Reaza and observed

20

21

22

23

24   _____

25   45:16–46:16; Lucifora Dep. Tr. at 92:12–93:21; Gillison Dep. Tr. at 122:4–23; Halbeisen Dep. Tr. at 138:21–
     25; Noble Dep. Tr. at 174:5–19, 175:2–8; 176:13–16.

26   [7] Plaintiffs dispute whether Cruz's family members knew what substances Cruz used.  However, Sandy
     Acuna concedes that she believed Cruz used methamphetamine.  *See* ECF No. 98-2, Ex. B ("Acuna Dep.

27   Tr.") at 134:7–14.
     [8] Plaintiffs dispute whether Acuna stated Cruz was "acting crazy."  However, a transcript of the 911 call

28   confirms Acuna made this statement.  *See* ECF No. 95-3, Ex. G ("911 Daily Dispatch Register of Actions") at
     326.

by the deputies, Roach and Lucifora believed Cruz was under the influence of a controlled substance

and having a medical health crisis. *Id.* ¶¶ 19–20.[9]

Upon noticing Defendants Roach and Lucifora, Cruz jumped up and ran from the deputies

towards the living room, where family members, including small children, were present. *Id.* ¶ 28.

Roach ordered Cruz to stop, but he did not comply. *Id.* ¶ 29. Instead, Cruz tripped on a hole near the

door and fell to the ground, landing on his right side and laying in the supine position. *Id.* ¶¶ 30–31.

At the time Cruz fell, Roach and Lucifora believed they had probable cause to detain Cruz for

medical purposes and investigate whether he was under the influence of a controlled substance. *Id.* ¶

32.[10] Roach observed an object he believed to be a knife or weapon in Cruz's right hand, so he

placed his left foot on Cruz's right forearm to control the potential danger. *Id.* ¶¶ 34–35. Roach then

realized the object was a glass pipe and placed his right knee on Cruz's chest to prevent Cruz from

using the pipe as a weapon. *Id.* ¶¶ 36–38. Roach and Lucifora commanded Cruz to drop the glass

pipe three times. *Id.* ¶ 39. Once Cruz dropped the glass pipe, Roach removed his left foot from

Cruz's right forearm and attempted to move Cruz to the prone position for handcuffing purposes. *Id.*

¶¶ 40–41. However, Cruz resisted Roach and Lucifora's repeated commands to roll onto his stomach

by pulling away from the deputies' grasp and flailing around on the ground. *Id.* ¶¶ 42–44.

Eventually, Lucifora placed a single handcuff on Cruz's right wrist and tried rolling Cruz onto his

stomach for handcuffing. *Id.* ¶ 47. Approximately six minutes later, Roach and Lucifora rolled Cruz

onto his stomach into the prone position, but Cruz bucked, kicked, and flailed, with only one of his

hands cuffed. *Id.* ¶¶ 48–49.[11] Roach then pulled Cruz's left arm from under his chest and placed a

---

[9] Defendants claim that Roach and Lucifora believed Cruz was a possible danger to himself and others.
Lucifora states that he believed Cruz was under the influence of a controlled substance or having a mental
health crisis but does not state he believed Cruz was a danger to himself and others. Lucifora Dep. Tr. at
99:15–23.

[10] Plaintiffs dispute when Roach and Lucifora believed they had probable cause to detain and arrest Cruz.
Lucifora claims he believed he had probable cause to detain Cruz when he entered Reaza's home and had
probable cause to arrest Cruz once he later made contact with Cruz. Lucifora Dep. Tr. at 254:9–255:16.
Roach confirms that when Cruz fell, Roach believed he had probable cause to arrest Cruz for resisting arrest
and to detain Cruz for being a danger to himself and others. Roach Dep. Tr. at 61:1–19.

[11] Plaintiffs do not dispute that Cruz reacted in this manner. However, Plaintiffs dispute the reasons for
Cruz's reactions, arguing that Cruz moved this way because he could not breathe, not because he resisted
detention. *See* ECF No. 98-2, Ex. G ("Audio Transcription of the Body Worn Camera Video") at 153:25,
154:21, 156:1; *see* Acuna Dep. Tr. at 71:6–23.

second set of handcuffs on Cruz's left arm, and both officers linked the two pairs of handcuffs together behind Cruz's back. *Id.* ¶¶ 52–53. [12] Neither Roach nor Lucifora placed any of their knees on Cruz after he was prone. *Id.* ¶¶ 54–55.

While handcuffed, Cruz continued to buck and roll his body, kicking, pulling from the deputies' grasp, saying he wanted to kill himself and that he could not breathe. *Id.* ¶¶ 57–58, 106. [13] Roach called for American Medical Response ("AMR") to come to the scene as is standard procedure when a detainee is believed to be under the influence of methamphetamine. *Id.* ¶¶ 60–61. Other than seeing that Cruz might be intoxicated, Roach and Lucifora did not observe any significant medical problems at this time. *Id.* ¶ 62. [14] Lucifora kneeled next to Cruz and controlled Cruz's limbs with his hands while Roach kneeled and grasped Cruz's left arm with both hands. *Id.* ¶¶ 66–67. At this point, seven minutes passed during the Incident. *Id.* ¶ 71. [15]

Shortly thereafter, fellow Deputies Gillison and Halbeisen arrived on the scene. *Id.* ¶ 65. Gillison and Halbeisen took over Cruz's detention from Roach and Lucifora (all four are referred to collectively as the "Deputy Defendants"). *Id.* ¶¶ 68–69. Nonetheless, Cruz continued to kick, buck, and push off the ground with his rear cuffed hands. *Id.* ¶ 70. [16] Halbeisen then placed his left knee on Cruz's mid-back while trying to hold Cruz's rear cuffed hands in the prone position. *Id.* ¶¶ 72, 74. [17]

---

[12] Both parties agree that Roach and Lucifora's use of force applied to Cruz prior to handcuffing him was consistent with standard police practices.  Plff. SUF Opp'n ¶ 64.

[13] Plaintiffs do not dispute that Cruz reacted in this manner.  However, Plaintiffs dispute the reasons for Cruz's reactions, arguing that Cruz moved this way because he could not breathe, not because he resisted detention.  *See* Audio Transcription of the Body Worn Camera Video at 153:25, 154:21, 156:1; Acuna Dep. Tr. at 71:6–23.

[14] Although Plaintiffs dispute whether it was a medical problem to keep Cruz prone, *see* Noble Dep. Tr. at 181:11–18, they do not dispute whether the deputies observed any medical issues.

[15] Defendants suggest that Cruz "struggled" against the deputies for seven minutes.  However, Plaintiffs dispute whether Cruz struggled, arguing that Cruz acted this way because he was dying and trying to find a position to breathe.  *See* Audio Transcription of the Body Worn Camera Video at 153:25, 154:21, 156:1; Acuna Dep. Tr. at 71:6–23.  Still, neither party disputes the amount of time that passed.

[16] Plaintiffs do not dispute that Cruz reacted in this manner.  However, Plaintiffs dispute the reasons for Cruz's reactions, arguing that Cruz moved this way because he could not breathe, not because he resisted detention.  *See* Audio Transcription of the Body Worn Camera Video at 153:25, 154:21, 156:1; Acuna Dep. Tr. at 71:6-23.

[17] It is disputed how long Halbeisen's knee was on Cruz's back.  Although Defendants claim that Halbeisen kept his knee on Cruz no longer than ten seconds, Halbeisen Dep. Tr. at 70:5-10, Halbeisen concedes that this was one of at least twenty different intervals within a four-minute window where his knee was on Cruz's back.  *Id.* at 69:20–24.

Gillison also placed his right knee on Cruz's left shoulder blade intermittently for approximately two minutes. *Id.* ¶¶ 75–76, 78.[18] Gillison also punched Cruz several times, including in the midback area and the right side of his face. *Id.* ¶¶ 79, 81.[19] Roach and Lucifora then resumed detaining Cruz when Roach told Gillison to stop punching Cruz, to which Gillison complied. *Id.* ¶¶ 82–83, 85.[20] Gillison then pressed the butt-end of his police baton down on Cruz's shoulder blade for several seconds but stopped when he realized it was ineffective at gaining Cruz's compliance. *Id.* ¶¶ 90, 92.[21] Roach tried to control Cruz's legs with his hands, then temporarily went outside to check if the AMR ambulance arrived and returned shortly after to resume controlling Cruz's legs. *Id.* ¶¶ 86–89.

Because Cruz continued flailing his legs, bucking, and trying to push off the ground, the deputies decided to place Cruz's legs in a hobble. *Id.* ¶ 95.[22] Roach and Lucifora applied the hobble, which was never connected to Cruz's handcuffs, and then ceased contact with Cruz. *Id.* ¶¶ 98–100.[23] Halbeisen controlled Cruz's left arm with his hands and applied a knee on the middle section of

---

[18] Plaintiffs argue that Gillison's knee was on Cruz's back for three minutes, but their evidence does not dispute Gillison's account of the events. *Compare* Gillison Dep. Tr. at 128:13-20, *with* Gillison Dep. Tr. at 100:1-101:15.

[19] The parties dispute how many punches Gillison applied. Plaintiffs claim Gillison punched Cruz five or six times, including several times in the head. Acuna Dep. Tr. at 29:16-19; Audio Transcription of the Body Worn Camera Video at 152:18-22. Defendants argue that Gillison punched Cruz three or four times total, two or three to the back and one to the face. Roach Dep. Tr. at 78:8–12; Gillison Dep. Tr. at 103:20–104:18.

[20] It is disputed whether Gillison stopped punching Cruz after hearing Roach or because he believed the punches were ineffective. Roach claims that Gillison did not hear him. Roach Dep. Tr. at 81:24–82:12. However, Plaintiffs contend that the audio from the body worn camera clearly picks up Roach telling Gillison "Hey. Hey. Hey. Hey" to stop punching Cruz, and thus Gillison must have heard him because he stopped shortly thereafter. Audio Transcription of the Body Worn Camera Video at 151:22.

[21] Plaintiffs dispute whether Cruz failed to comply, arguing that Cruz's response was a reaction to his inability to breathe. *See* Audio Transcription of the Body Worn Camera Video at 153:25, 154:21, 156:1; Acuna Dep. Tr. at 71:6-23.

[22] Plaintiffs do not dispute that Cruz reacted in this manner. However, Plaintiffs dispute the reasons for Cruz's reactions, arguing that Cruz moved this way because he could not breathe, not because he resisted detention. *See* Audio Transcription of the Body Worn Camera Video at 153:25, 154:21, 156:1; Acuna Dep. Tr. at 71:6-23.

[23] Plaintiffs do not dispute that Roach and Lucifora ceased contact with Cruz at this point. However, Plaintiffs contend that Gillison continued to kneel down on Cruz after applying the hobble. *See* ECF No. 98-3, Ex. M ("Body Worn Camera of Deputy Roach & Lucifora") at 4:40:49-4:42:43. It is difficult to determine from the body worn camera whether Plaintiffs' contention is valid. Nonetheless, the Court considers this fact in dispute. *See Diebold, Inc.*, 369 U.S. at 655 (holding that inferences from the underlying facts contained in evidence must be drawn in light most favorable to the party opposing summary judgment).

1    Cruz's back. *Id.* ¶ 103. At this point, nine minutes passed from the Deputy Defendants' initial

2    contact with Cruz. *Id.* ¶ 101.[24]

3            After the hobble was applied, Cruz continued to kick, buck, yell, and pull free from

4    Halbeisen's grasp. *Id.* ¶¶ 104–05, 108.[25] Cruz repeatedly stated "I can't breathe" throughout the

5    detention. *Id.* ¶ 106.[26] Almost four minutes after hobbling Cruz, Gillison noticed that Cruz had a

6    reddish-brown liquid coming out of his mouth. *Id.* ¶ 109. Cruz then stopped moving and yelling. *Id.*

7    ¶ 110.[27] Halbeisen rolled Cruz onto his side to check his pulse. *Id.* ¶ 112. When Halbeisen realized

8    Cruz was not breathing, he moved Cruz onto his back from the prone position to supine and began

9    CPR chest compressions. *Id.* ¶ 115. While Halbeisen applied the chest compressions, Lucifora

10   removed the hobble from Cruz's legs, and CalFire paramedic personnel arrived to provide medical

11   assistance. *Id.* ¶¶ 116–17. CalFire and AMR paramedics took over CPR on Cruz, at which point no

12   RCSD deputies had any further contact with Cruz. *Id.* ¶¶ 118–19. After thirty minutes of treatment,

13   the paramedics transported Cruz to the Riverside Community Hospital. *Id.* ¶¶ 120–21. At 6:14 a.m.,

14   the Riverside Community Hospital pronounced Cruz dead. *Id.* ¶ 121. Cruz's manner of death was

15

16

17   _____

18   [24] Defendants claim Cruz resisted for nine minutes.  Plaintiffs do not dispute the amount of time that passed.
     However, Plaintiffs dispute Defendants' characterization of Cruz as resisting, arguing that Cruz's movements
19   were a result of his inability to breathe.  *See* Audio Transcription of the Body Worn Camera Video at 153:25,
     154:21, 156:1; Acuna Dep. Tr. at 71:6-23.
20   [25] Plaintiffs do not dispute that Cruz reacted in this manner.  However, Plaintiffs dispute the reasons for
     Cruz's reactions, arguing that Cruz moved this way because he could not breathe, not because he resisted
21   detention.  *See* Audio Transcription of the Body Worn Camera Video at 153:25, 154:21, 156:1; Acuna Dep.
     Tr. at 71:6-23.  Plaintiffs also argue that once the hobble was applied, Cruz's condition diminished.  *See* Body
22   Worn Camera of Deputy Roach & Lucifora at 4:39:44-4:42:33.  It is difficult to determine from the body
     worn camera whether Plaintiffs' contention is valid.  Nonetheless, the Court considers this fact in dispute.
23   *See Diebold, Inc.*, 369 U.S. at 655 (holding that inferences from the underlying facts contained in evidence
     must be drawn in light most favorable to the party opposing summary judgment).
24   [26] The parties dispute whether the deputies heard Cruz's statements regarding his inability to breathe.
     Plaintiffs offer an audio transcript of one of the deputies' body worn camera where Cruz repeatedly states "I
25   can't breathe" and "you broke my neck." Audio Transcription of the Body Worn Camera Video at 153:25,
     154:21, 156:1.  Defendants claim that they only heard Cruz state that he was dying, otherwise his comments
26   were unintelligible or inaudible.  *See* Roach Dep. Tr. at 70:19-71:22, 120:23-121:7; Lucifora Dep. Tr. at
     287:24-289:11.
27   [27] Defendants argue that Cruz abruptly stopped moving and yelling.  Roach Dep. Tr.  at 98: 10-17, 120: 13-
     22.  Plaintiffs contend that Cruz's condition gradually deteriorated once the hobble was applied.  Body Worn
28   Camera of Deputy Roach & Lucifora at 4:39:44-4:42:33.

officially listed by RCSD as a homicide, meaning another person was present with Cruz at the time of death, regardless of the level of involvement of that person. *Id.* ¶ 136.

**B. Whether the Deputy Defendants' use of force was excessive is a genuinely disputed fact.**

The Deputy Defendants first argue that they are entitled to judgment on Plaintiffs' Section 1983 claim for excessive force because (1) the use of force was objectively reasonable, (2) was not the proximate cause of Cruz's death, and (3) even if unreasonable, the Deputy Defendants are entitled to qualified immunity. Mot. at 21–26. Because there is no dispute in this case regarding the use of force prior to the placement of the handcuffs on Cruz,[28] the parties' arguments and this Court's analysis focus on the following alleged uses of force by the Deputy Defendants: maintaining Cruz in a prone position, using knees on Cruz's back, punching Cruz's head and back, using a police baton on Cruz's person, and using hobble restraints on Cruz.

i. Whether the Deputy Defendants' conduct was objectively reasonable is a genuinely disputed fact.

In evaluating a Fourth Amendment excessive force claim, the Court must evaluate "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). To determine whether an officer's actions were objectively reasonable, the Court considers: "(1) the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted, (2) the government's interest in the use of force, and (3) the balance between the gravity of the intrusion on the individual and the government's need for that intrusion." *Williamson v. City of National City*, 23 F.4th 1146, 1151 (9th Cir. 2022). Nonetheless, the Court "must judge the reasonableness of a particular use of force from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. In any event, the "heart" of the *Graham* inquiry is the need for force.

---

[28] *See* MSJ Opp'n at 21; Plff. SUF Opp'n ¶ 64.

*Liston v. County of Riverside*, 120 F.3d 965, 976 (1997) (quoting *Alexander v. City & County of San Francisco*, 29 F.3d 1355, 1367 (9th Cir. 1994)).

### a.   Type and Amount of Force

As discussed, this Court's analysis shall focus on the following alleged uses of force by the Deputy Defendants after they handcuffed Cruz: maintaining Cruz in a prone position, using knees on Cruz's back, punching Cruz's head and back, using a police baton on Cruz's person, and using hobble restraints on Cruz.

### 1.   Maintaining Cruz in a Prone Position

It is undisputed that the Deputy Defendants maintained Cruz in a prone position throughout the encounter. There is "well-known police guidance recommending that officers get a subject off his stomach as soon as he is handcuffed because of [the risk of suffocation]." *Lombardo v. City of St. Louis*, 141 S. Ct. 2239, 2241 (2021) (per curiam). Further, it is unreasonable to kneel on the back of a prone detainee that complains of their inability to breathe. *See Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1062 (9th Cir. 2003); *see also Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004) ("[P]utting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force.").

As discussed below, one issue that precludes summary judgment in this case is the genuine issue of material fact with respect to whether and how Cruz was resisting officers. The proper characterization of maintaining Cruz in a prone position depends in part upon whether and how he was actively resisting. Viewing this issue in the light most favorable to the nonmoving parties, however—who contend that Cruz was not actively resisting, but only attempting to breathe—this Court finds it appropriate to classify this use of force as significant.

### 2.   Use of Deputies' Knees on Cruz's Back

It is undisputed that Defendants Halbeisen and Gillison placed their knees on Cruz's back. Plff. SUF Opp'n ¶¶ 72, 75. Where knees were placed, for how long, and with what amount of weight all determine how this use of force should be characterized, and each of these facts are in dispute. Viewing this issue in the light most favorable to the nonmoving parties, however—who contend that the deputies placed substantial weight on Cruz's back for a substantial period of time—this Court finds it appropriate to classify this use of force as severe.

### 3. Punching Cruz's Head and Back

It is undisputed that the Defendant deputy Gillison punched Cruz several times. *Id.* ¶¶ 79, 81. How many times Gillison punched Cruz and where he punched him and for what purpose are all substantially disputed. Punching is at the very least properly characterized as intermediate force given that it is "capable of inflicting significant pain and causing serious injury."[29] *Young v. County of Los Angeles*, 655 F.3d 1156, 1161–62 (9th Cir. 2011) (characterizing pepper spray and baton blows as intermediate because they meet this criteria); *See also Nelson v. City of Davis*, 685 F.3d 867, 878 (9th Cir. 2012) ("We have recognized that 'physical blows or cuts' often constitute a more substantial application of force than categories of force that do not involve a physical impact to the body." (quoting *Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994))); *Bryan v. MacPherson*, 630 F.3d 805, 825 (9th Cir. 2010) (when attempting to characterize non-lethal use of a taser, looking to the "physiological effects, the high levels of pain, and the foreseeable risk of physical injury"). Moreover, it seems that any blow directed at the head is necessarily even more significant. *See Young*, 655 F.3d at 1162 (explaining how police training treats baton strikes to the head as opposed to other baton strikes).

---

[29] In the view of some courts, "impact blows by punching or kicking are considered 'significant force,'" and while punches are "broadly characterized as non-lethal levels of force," they may, in some circumstances, "be employed in a manner that creates a substantial risk of death or serious bodily injury." *See Garlick v. County of Kern*, 167 F. Supp. 3d 1117, 1147 (E.D. Cal. 2016).

Accordingly, viewing this issue in the light most favorable to the nonmoving parties—who contend that the deputies punched Cruz five or six times, including in the head, and that one deputy even had to stop another deputy from continuing to punch Cruz—this Court finds it appropriate to classify this use of force as intermediate, if not significant.

### 4.   Use of Police Baton

It is undisputed that a police baton was used on Cruz during the encounter, namely that Deputy Defendant Gillison pressed the butt-end of his baton on Cruz's shoulder blade for two to three seconds. Plff. SUF Opp'n ¶¶ 90, 92.  Baton strikes are generally considered intermediate force, and such blows are "capable of inflicting significant pain and causing serious injury. As such, [an officer's use of a baton is] regarded as 'intermediate force' that, while less severe than deadly force, nonetheless present[s] a significant intrusion upon an individual's liberty interest." *Young*, 655 F.3d at 1161. It does not appear that the contention is that a baton strike was directed at Cruz, however, but that a baton was pressed into his back. And Defendants concede that this was an attempt to inflict pain, Gillison Dep. Tr. at 125:3–4, although it is disputed whether this was a legitimate method of pain compliance because Cruz was resisting, or excessive because he was not.

Accordingly, viewing this issue in the light most favorable to the nonmoving parties—who contend that the deputies pressed a baton into Cruz's back, specifically on his shoulder blade, while he was prone and not actively resisting—this Court finds it appropriate to classify this use of force as less significant than intermediate.

### 5.   Use of Hobble Restraints

Lastly, it is undisputed that the Deputy Defendants placed hobble restraints on Cruz. Plff. SUF Opp'n ¶ 95. Although there appears to be no binding authority on how use of such restraints should be characterized, the Ninth Circuit has held that "in some situations, the need to maintain control of a person who physically struggled while being taken into custody might reasonably call for the use of hobble restraints." *Blankenhorn v. City of Orange*, 485 F.3d 463, 479 (9th Cir. 2007).

The use of hobble restraints where not justified by a physical struggle would appear to be at least an intermediate level of force.

Here, viewing the evidence in the light most favorable to the non-moving party, a reasonable jury could find that the type and amount of force used by Deputy Defendants was intermediate or medium. For instance, Gillison applied several types of intermediate force when he punched Cruz numerous times, including in the head, and applied the butt of his baton to Cruz's shoulder blade, all while Cruz remained handcuffed and unarmed in the prone position. Additionally, Gillison and Halbeisen placed their knees on Cruz's back for several minutes in different intervals despite Cruz's pleas that he could not breathe. *See Drummond*, 343 F.3d at 1056– 57 ("Under similar circumstances, in what has come to be known as 'compression asphyxia,' prone and handcuffed individuals in an agitated state have suffocated under the weight of restraining officers."). Further, none of the deputies removed Cruz from the prone position to prevent the risk of suffocation. Although a hobble restraint is not *per se* unreasonable, a genuine dispute of material fact exists as to whether Cruz resisted his detention and thus required the hobble, discussed further below. As such, the Court finds that a reasonable jury could conclude that the type and amount of force exhibited by Deputy Defendants was intermediate, if not greater.

b.   State's Interest

Next, "[u]nder *Graham*, [the Court] evaluate[s] the state's interest at stake by considering '(1) how severe the crime at issue was, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight.'" *Rice v. Morehouse*, 989 F.3d 1112, 1121 (9th Cir. 2021) (quoting *Mattos v. Agarano*, 661 F.3d 433, 443 (9th Cir. 2011) (en banc)). Among these considerations, the "most important" is the second factor—whether the suspect posed an immediate threat to officers. *Isayeva v. Sacramento Sherriff's Dep't*, 872 F.3d 938, 947 (9th Cir. 2017). These factors are non-exhaustive, and the Court examines the totality of the circumstances, including "the

availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed." *Tabares v. City of Huntington Beach*, 988 F.3d 1119, 1126 (9th Cir. 2021) (quoting *Glenn v. Washington County*, 673 F.3d 864, 872 (9th Cir. 2011)); *see Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001) ("[W]here it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining, under *Graham*, the reasonableness of the force employed.").

Here, determining the State's interest in forcibly removing Cruz from Reaza's home is a question of fact properly reserved for the jury. In terms of the severity of Cruz's crimes, Reaza called 911 because Cruz created a domestic disturbance when he argued with his children, punched walls inside Reaza's residence, and was under the influence of a controlled substance. However, when Roach and Lucifora arrived, Reaza told the deputies that she wanted Cruz arrested only for being under the influence of a controlled substance. Body Worn Camera of Deputy Roach & Lucifora at 4:25:42. It is a misdemeanor for a subject to be under the influence of a controlled substance. CAL. HEALTH & SAFETY CODE § 11550. Thus, the severity of Cruz's crime was a nonviolent misdemeanor. While "the commission of a misdemeanor offense is not to be taken lightly, it militates against finding the force used to effect an arrest reasonable where the suspect was also nonviolent and posed no threat to the safety of the officers or others." *Bryan*, 630 F.3d at 828 (citations omitted).

Whether Cruz posed an immediate threat to Defendant deputies and resisted arrest are interrelated questions of material fact genuinely in dispute, and thus properly reserved for the jury. With respect to the presence of a threat, Cruz did not level any verbal threats against Defendant deputies during the incident. Cruz was also ultimately unarmed.  Reaza further informed Roach and Lucifora that there were no weapons in the house.  Body Worn Camera of Deputy Roach & Lucifora at 4:24:03.  Still, Defendants argue that post-handcuffing, the threat they faced was Cruz's

kicking, flailing, and bucking, which they assert also amounted to resisting arrest, as discussed below.

There are numerous genuine disputes of material facts concerning whether Cruz resisted deputies, what the nature of the resistance was, whether he was ever under control by the deputies, and whether he threatened the deputies. *See* Pl. SUF Opp. ¶¶ 74, 78, 83, 90, 95.  Plaintiffs counter Defendants' assertions regarding Cruz's alleged kicking, flailing, and bucking by asserting that Cruz's reactions were consistent with an individual struggling to breathe and fighting for their life, not one fighting or resisting arrest.  Plaintiffs further proffer evidence of one deputy's body worn camera that picks up Cruz repeatedly stating "I can't breathe" throughout his detention.  Audio Transcription of Body Worn Camera Video at 153:25, 154:21, 156:1.  Indeed, "the struggles of a prone suspect may be due to oxygen deficiency, rather than a desire to disobey officers' commands." *Lombardo*, 141 S. Ct. at 2241; *see also Greer v. City of Hayward*, 229 F. Supp. 3d 1091, 1105 (N.D. Cal. 2017) (holding that a genuine issue of material fact reserved for a jury existed where parties disputed whether decedent resisted arrest or struggled to breathe while held face down by officers). Like in *Greer*, genuine issues of material fact exist regarding whether Cruz posed an immediate threat to Deputy Defendants and resisted arrest once handcuffed.

Moreover, the undisputed evidence shows that officers were aware that Cruz was emotionally disturbed, and governing law establishes that when dealing with an emotionally disturbed individual, a severe use of force may be unnecessary and therefore unlawful. For example, throughout the Incident, Cruz repeatedly states that he wants to kill himself and die. *See* Body Worn Camera of Deputy Roach & Lucifora at 4:28:55. At one point, Lucifora describes Cruz as "delirious." *Id.* at 4:33:16. Another individual describes Cruz as "fucked up in the head." *Id.* at 4:37-57. Further, Roach had experience with Cruz's mental health issues because he previously placed Cruz in a § 5150 hold. Roach Dep. Tr. at 14:2–15:14.

When detaining "an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest . . . increasing the use of force, in some circumstances at least, exacerbate[s] the situation." *Deorle*, 272 F.3d at 1282–83. "Even when an emotionally disturbed individual is 'acting out' and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual." *Id.* at 1283. As such, this factor cuts against the State's interest in using force against Cruz.

Thus, taking the evidence together and viewing it in the light most favorable to Plaintiffs, a reasonable jury could find that the State's interest in forcibly removing Cruz from Reaza's home was minimal.

c.   Balance of Interests

Considering all the circumstances, a reasonable jury could conclude that the Deputy Defendants' use of force was excessive. The severity of Cruz's crime was a nonviolent misdemeanor. Post-handcuffing, Deputy Defendants punched an unarmed Cruz in the head and back several times, applied a baton and knees to his back, hobbled his legs, and failed to remove him from the prone position for several minutes. This was the officers' response to Cruz kicking and flailing his legs, a reaction Cruz arguably had because he could not breathe. The result of the Incident left Cruz dead.

At bottom, "[b]ecause the [excessive force] inquiry is inherently fact specific, the determination whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases." *Green v. City & County of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014) (citations omitted); *see also Smith v. City of Hemet*, 394 F.3d 589, 701 (9th Cir. 2005) ("Because [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases

should be granted sparingly."). Although the Supreme Court has stated that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment," *Graham*, 490 U.S. at 396 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)), a jury could find that Cruz was under control except for his inability to breathe and that five to six punches to an emotionally disturbed individual, who is handcuffed, prone, and under control except for his inability to breathe, together with the other uses of force, was objectively unreasonable. As such, "it is evident that the question whether the force used here was reasonable is a matter that cannot be resolved in favor of the defendants on summary judgment." *City of Hemet*, 394 F.3d at 703.

Given that the heart of the *Graham* inquiry is the need for force—an issue that is substantially in dispute at this stage—Defendants are unable to prevail on summary judgment. Therefore, Defendants' Motion is DENIED with respect to the objective reasonableness of the force used and with respect to Plaintiffs' excessive force claim.

    ii.   <u>Whether Deputy Defendants' conduct was the proximate cause of Cruz's death is a genuinely disputed fact.</u>

The Deputy Defendants next argue that their Motion should be granted because their actions in detaining Cruz were not the proximate cause of Cruz's death. Mot. at 24–25.

"In a [Section] 1983 action, the plaintiff must also demonstrate that the defendant's conduct was the actionable cause of the claimed injury. To meet this causation requirement, the plaintiff must establish both causation-in-fact and proximate causation." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008) (citations omitted). "Generally causation is a question of fact for the jury." *Desrosiers v. Flight Int'l of Fla. Inc.*, 156 F.3d 952, 956 (9th Cir. 1998).

In support of their argument, Defendants proffer the deposition of Jolie Rodriguez, a Riverside County medical examiner who performed an autopsy of Cruz and determined that (1) methamphetamine was the sole cause of Cruz's death, and (2) none of the Deputy Defendants'

1    physical contact with Cruz was the proximate cause of his death. *See* ECF No. 95-6, Ex. O

2    ("Rodriguez Dep. Tr.") at 40:6–12, 43:23–44:5. Rodriguez further ruled out positional asphyxia as

3    Cruz's cause of death. *Id.* at 41:18–42:2.

4         Nonetheless, Plaintiffs submit the deposition of Pietruszka, who determined that (1) Cruz

5    was not significantly intoxicated by methamphetamine during the Incident, (2) the level of

6    methamphetamine found in Cruz's blood was consistent with a chronic user of the drug, and (3)

7    Cruz suffered from positional asphyxia when he was handcuffed and hobbled in the prone position

8

9    with weight pushing down on his chest and abdomen. Pietruszka Dep. Tr. at 76:2–7; 81:25–82:6.

10        Furthermore, Pietruszka asserts that Defendants' expert Rodriguez was unaware of Cruz's

11   history with asthma. Pietruszka Dep. Tr. at 192:16–21. In addition, Rodriguez herself concedes she

12   did not have any information about where the officers' bodies were when restraining Cruz, such as

13   kneeling on Cruz. Rodriguez Dep. Tr. at 166:7–17 (ECF No. 98-2, Ex. H).

14        In sum, both parties provide conflicting expert evidence, thereby raising a genuine issue of

15   material fact regarding the proximate cause of Cruz's death. By presenting conflicting expert reports,

16   the parties challenge the credibility and weight that should be given to their opposing expert report.

17

18   However, when ruling on a motion for summary judgment, "[c]redibility determinations, the

19   weighing of the evidence, and the drawing of legitimate inference from the facts are jury functions,

20   not those of a judge." *Anderson*, 477 U.S. at 255; *see Crown Packaging Tech., Inc. v. Ball Metal*

21   *Beverage Container Corp.*, 635 F.3d 1373, 1384 (Fed. Cir. 2011) ("Where there is a material dispute

22

23   as to the credibility and weight that should be afforded to conflicting expert reports, summary

24   judgment is usually inappropriate."). Accordingly, Defendants' Motion is DENIED with respect to

25   the proximate cause of Plaintiffs' excessive force claim.

26        / / /

27        / / /

28        / / /

23

iii.   The Deputy Defendants are not entitled to qualified immunity

The Deputy Defendants next argue that even if a trier of fact could find that their use of force was objectively unreasonable, Plaintiffs' excessive force claim must nonetheless fail because the deputies are entitled to qualified immunity. Mot. at 25–26.

"Qualified immunity shields government officials from liability for civil damages unless their conduct 'violated a clearly established constitutional right.'" *David v. Kaulukukui*, 38 F.4th 792, 799 (9th Cir. 2022) (quoting *Williamson*, 23 F.4th at 1151). "To determine whether an official is entitled to qualified immunity, the court asks '(1) whether the [official's] conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the events at issue." *Id.* (quoting *Williamson*, 23 F.4th at 1151). "To be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Ballentine v. Tucker*, 28 F.4th 54, 64 (9th Cir. 2022) (quoting *Acosta v. City of Costa Mesa*, 718 F.3d 800, 824 (9th Cir. 2013)). "This requires a high degree of specificity." *District of Columbia v. Wesby*, 138 S. Ct. 577 (2018) (citations omitted). "Such specificity is especially important in the Fourth Amendment context." *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015) (per curiam). But "[a] right can be clearly established despite a lack of factually analogous preexisting case law, and officers can be on notice that their conduct is unlawful even in novel factual circumstances." *Ballentine*, 28 F.4th at 66; *see also Ioane v. Hodges*, 939 F.3d 945, 956 (9th Cir. 2018) (a plaintiff "need not identify a prior identical action to conclude that [a] right is clearly established" (citation omitted)). Thus, "[t]he question is not whether an earlier case mirrors the specific facts here. Rather, the relevant question is whether the state of the law at the time gives officials fair warning that their conduct is unconstitutional." *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1064 (9th Cir. 2013) (citation omitted).

Even so, "officers can be on notice that their conduct is unlawful even in novel factual circumstances." *Ford v. City of Yakima*, 706 F.3d 1188, 1195 (9th Cir. 2013), *abrogated by Nieves v.*

*Bartlett*, 139 S. Ct. 1715 (2019). "Where a case involve[s] the kind of mere application of settled law to a new factual permutation,' 'we assume an officer had notice that his conduct was unlawful.'" *Ballantine*, 28 F.4th at 67 (quoting *Ford*, 706 F.3d at 1196 (citation and quotation marks omitted)). "While there need not be a case directly on point, [] existing precedent must have placed the statutory and constitutional question beyond debate." *Ballentine,* 28 F.4th at 64 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). When reviewing existing precedent, the Court "may look at unpublished decisions and the law of other circuits, in addition to Ninth Circuit precedent." *Jessop v. City of Fresno*, 936 F.3d 937, 941 (9th Cir. 2019) (quoting *Prison Legal News v. Lehman*, 397 F.3d 692, 702 (9th Cir. 2005)). In any event, "summary judgment in favor of moving defendants is inappropriate where a genuine issue of material fact prevents the determination of qualified immunity until after trial on the merits." *Liston v. County of Riverside*, 120 F.3d 965, 975 (9th Cir. 1997), *as amended* (Oct. 9, 1997); *Ballantine*, 28 F.4th at 61 ("Summary judgment on qualified immunity is not proper unless the evidence permits only one reasonable conclusion.").

Because a reasonable jury could find that the amount of force applied by the Deputy Defendants to Cruz post-handcuffing was excessive in violation of Cruz's Fourth Amendment rights, as discussed above, the Court must determine whether the Deputy Defendants violated clearly established law. Plaintiffs argue that at the time the Incident occurred in 2019, case law clearly established that forcing a distressed person to remain prone after handcuffing, causing asphyxia, violates the Fourth Amendment. MSJ Opp'n at 26. In support of their argument, Plaintiffs cite several Ninth Circuit cases.

In *Drummond*, defendant officers detained an unarmed, mentally distressed individual during a § 5150 call by handcuffing him in the prone position and applying a hobble restraint. *Drummond*, 343 F.3d at 1054–55. While prone, two officers placed their knees on the subjects back and neck. *Id.* at 1054. Eyewitnesses heard the subject repeatedly tell the officers that he could not breathe. *Id.* Although the district court found that qualified immunity shielded the defendant officers from

liability, the Court of Appeals reversed, holding that "kneeling on the back and neck of a compliant detainee, and pressing the weight of two officers' bodies on him even after he complained that he was choking and in need of air violates clearly established law, and that a reasonable officer would have been aware that such was the case." *Id.* at 1062.

Additionally, in *Abston v. City of Merced*, four defendant officers handcuffed and hobbled the plaintiff in the prone position, with one officer applying his knee to plaintiff's back for over a minute, resulting in the plaintiff's death. 506 F. App'x 650, 652 (9th Cir. 2013).[30] The Ninth Circuit affirmed the district court's denial of defendants' motion for summary judgment on qualified immunity grounds, holding that there was "a genuine issue of material fact as to whether [plaintiff] resisted, and, if so, whether his resistance was anything more than minimal. A reasonable jury could answer either question in the negative, bringing defendants' conduct within *Drummond*." *Id.* at 653.

Similarly, in *Tucker v. Las Vegas Metro. Police Dep't*, the Ninth Circuit affirmed the district court's denial of summary judgment because it was clearly established that a Fourth Amendment violation occurs "where two officers use their body pressure to restrain a delirious, prone, and handcuffed individual who poses no serious safety threat." 470 F. App'x 627, 629 (9th Cir. 2012) (citing *Drummond*, 343 F.3d at 1059–60).[31] Notably, the court found that, unlike the subject in *Drummond*, the plaintiff "continued to resist the officers after handcuffs were applied, but this distinction does not, by itself, suffice to bring the case out of *Drummond*'s orbit." *Id.*

An extensive quotation from *Tucker* is warranted here:

> A jury, after hearing live testimony and cross-examination, might therefore discredit the officers' testimony and conclude that, in light of the degree of danger Keith posed once handcuffed, if any, and other pertinent circumstances (including Keith's apparent physical and mental state at the time), the degree of force used was excessive. Because

[30] *See Jessop*, 936 F.3d at 941 (holding that when determining whether a law is clearly established, the Court "may look at unpublished decisions and the law of other circuits, in addition to Ninth Circuit precedent").

[31] *See Jessop*, 936 F.3d at 941 (holding that when determining whether a law is clearly established, the Court "may look at unpublished decisions and the law of other circuits, in addition to Ninth Circuit precedent").

genuine issues of material fact remain as to both the extent of the force used by the officers and the nature of the threat posed by Keith's handcuffed resistance, we cannot hold that the officers acted reasonably as a matter of law.

*Tucker*, 470 F. App'x at 629 (citations omitted).

In addition, the Ninth Circuit provides the following guidance to courts where the closest—or only—eyewitness is the officer defendant:

> Deadly force cases pose a particularly difficult problem under this regime [of qualified immunity] because the officer defendant is often the only surviving eyewitness. . . . . [T]he court may not simply accept what may be a self-serving account by the police officer. It must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably.

*Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

Here, like in *Drummond*, Cruz was an apparently mentally disturbed individual hobbled, handcuffed, and placed in the prone position by the Deputy Defendants. In this position, Cruz, like the subject in *Drummond*, repeatedly stated he could not breathe. Additionally, as in *Drummond* and *Tucker*, two officers—Halbeisen and Gillison—kneeled on Cruz's back after he was handcuffed in the prone position. Moreover, as in *Abston*, a genuine issue of material fact exists as to whether Cruz resisted his detention. But even if Cruz resisted, this fact, in and of itself, does not bring this case out of *Drummond*'s orbit, as the Ninth Circuit held in *Tucker*. As such, caselaw clearly established that the Deputy Defendants Halbeisen and Gillison's conduct in kneeling on Cruz and the other deputies' conduct throughout the incident, as described above—if Plaintiffs are correct about Cruz's conduct and the deputies' conduct—would have violated the Fourth Amendment.

Put another way—the facts are heavily disputed, and under one set of facts (if, for instance, a jury believed that Cruz had stopped resisting soon after being handcuffed because it found that circumstantial evidence warranted discrediting officer testimony), there is clearly established law on point—continuing to maintain the prone position and apply the knee was unconstitutional. But even

under the facts as adduced by the Deputy Defendants, the cases that have been decided give fair

warning that it constitutes excessive force to engage in the five uses of force enumerated above with

respect to a mentally ill person and/or a person under the influence of a controlled substance, in

contrast to a dangerous, fleeing criminal. And given that the case law clearly establishing that

maintaining the prone position for an individual who was not resisting, mentally ill, and under the

influence of a controlled substance was unconstitutional, a reasonable officer would also have had

fair warning that also punching, using a baton on, and knelling on such a person would also be

unconstitutional. Thus, Defendants' Motion is DENIED with respect to their qualified immunity

defense.

### C. Genuine issues of material fact preclude summary judgment for Defendants regarding Plaintiffs' loss of familial relationship claim.

Defendants next claim that they are entitled to summary judgment on Plaintiffs' Section 1983

claim for loss of a familial relationship because the Deputy Defendants' conduct in restraining Cruz

does not shock the conscience. Mot. at 27–28.

"The Ninth Circuit recognizes that a parent has a constitutionally protected liberty interest

under the Fourteenth Amendment in the companionship and society of her child." *Curnow By &

Through Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991). "Official conduct that

'shocks the conscious' in depriving [a parent] of that interest is cognizable as a violation of due

process." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010). "In determining whether excessive

force shocks the conscience, the court must first ask 'whether the circumstances are such that actual

deliberation [by the officer] is practical." *Hayes v. County of San Diego*, 736 F.3d 1223, 1230 (9th

Cir. 2013) (quoting *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008)). "Where actual

deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the

conscience." *Id.* Where there are "extended opportunities to do better . . . teamed with protracted

failure to even care, indifference is truly shocking." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 853

(1998).  "On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may be found to shock the conscience only if he acts with a purpose to harm unrelated to legitimate law enforcement objectives."  *Hayes*, 736 F.3d at 1230.

Here, Plaintiffs argue that the deliberate indifference standard should apply because the Deputy Defendants had a practical opportunity to deliberate when they decided to keep Cruz in the prone position and apply the hobble. MSJ Opp'n at 23.

The critical analysis of this question is set forth in *County of Sacramento v. Lewis*. 523 U.S. 833 (1998). In *Lewis*, the Supreme Court discusses two ends of the spectrum—a high-speed chase of a (dangerous) criminal on one end, and a normal custodial situation in a prison on the other. 523 U.S. at 851–54. It held that the purpose to harm standard applied for high-speed chases, and the deliberate indifference standard applied for a normal custodial prison context. *Id.* Moreover, in *Nicholson v. City of Los Angeles*, the Ninth Circuit clarified the *Lewis* distinction, holding that the deliberate indifference standard was appropriate to determine whether police officers' conduct shocked the conscience when they shot into a crowd of bystanders because they mistook a suspect's toy gun for a real one. 935 F.3d 685, 694 (9th Cir. 2019); *see also Serrano Robles v. County of Los Angeles*, No. 2:20-cv-06648-ODW (PLAx), 2022 WL 2802980, at *9 (C.D. Cal. July 18, 2022) (holding that the deliberate indifference standard was appropriate to determine whether officers shooting at an armed suspect multiple times while chasing him on foot for several minutes shocked the conscience). Conversely, in *Moreland v. Las Vegas Metropolitan Police Department,* the Court of Appeals held that the purpose to harm standard applied where police officers responded to "the extreme emergency" of a suspect indisputably firing a semiautomatic handgun and refusing to comply with officers' orders to stop, resulting in a "gunfight in progress threaten[ing] the lives of the 50 to 100 people who were trapped in the parking lot." 159 F.3d 365, 372–73 (9th Cir. 1998), *as amended* (Nov. 24, 1998).

The scenario that presented itself to the Deputy Defendants during their encounter with Cruz does not appear to this Court to be akin to a high-speed vehicle chase or an extreme emergency of an active shooter, as in *Moreland*. Moreover, as outlined above, so many of the facts are in dispute. For instance, a jury might find that there was no resistance by Cruz at a certain point in the encounter, only an attempt to breathe, which would make the situation more akin to the other end of the spectrum—where deliberation was possible, and the standard is therefore deliberate indifference.

The Court therefore finds that at this stage the deliberate indifference standard should apply. While it appears undisputed that the Deputy Defendants faced an evolving set of circumstances that took place over a short time period necessitating fast action and snap judgment, the interaction did last nearly 15 minutes, involving multiple officers, some of whom took breaks from active participation, and—if the Plaintiffs are to be believed—all the deputies were familiar with Cruz, his history and the scenario they were walking into, giving them more of a practical opportunity to deliberate. In contrast this was not a scenario where the Deputy Defendants made "repeated split-second decisions about how best to apprehend the fleeing suspect in a manner that w[ould] minimize risk to their own safety and the safety of the general public." *Bingue v. Prunchak*, 512 F.3d 1169, 1176 (9th Cir. 2008); *see Porter*, 546 F.3d at 1139–40 (finding actual deliberation was not practical where a five-minute altercation between the officers and victim evolved quickly, forcing the officers to make repeated split-second decisions).

Accordingly, to determine whether Defendant deputies' conduct shocks the conscience, the deliberate indifference standard is appropriate. Thus, to defeat Defendants' Motion, Plaintiffs must present evidence that the deputies' conduct was deliberately indifferent, namely that they had opportunities to do better teamed with a failure to even care. Here, for example, Plaintiffs proffer evidence that Defendant deputies conferred about whether to apply a hobble and back board to Cruz, and a jury could conclude that they had the opportunity to do better. Deposition of Robert Roach at 71:8–16; Audio Transcription of the Body Worn Camera Video at 152:17, 154:8–9. They also

present evidence that the Defendant deputies ignored Cruz's obvious mental condition, inability to

breathe, and cries for help, which a jury could find showed that they forewent opportunities to do

better and did not even care that Cruz was close to death. In light of this, the Court finds that

summary judgment is inappropriate for Defendants as to Plaintiffs' loss of familial relationship

claim if the deliberate indifference standard is applied.

But even if the standard was "purpose to harm," in which case the Plaintiffs must show that

the Deputy Defendants' actions were unrelated to legitimate law enforcement objectives, the current

state of the facts prevents this Court from granting summary judgment to the Deputy Defendants.

The Ninth Circuit made clear in *Porter v. Osborn* that this Court must look at the totality of

circumstances in assessing purpose-to-harm. *Porter*, 546 F.3d at 1141 ("Nonetheless, there are

several facts relevant to an unlawful purpose to harm that need to be considered on remand—that is,

to assess whether under the totality of the circumstances a jury could infer that Osborn was acting

for purposes other than legitimate law enforcement."). As that court noted, "*[County of Sacramento

v.] Lewis*[, 523 U.S. 833, 853 (1998),] contemplates such 'rare situations where the nature of an

officer's deliberate physical contact is such that a reasonable factfinder would conclude the officer

intended to harm, terrorize or kill.'" *Id.* (quoting *Davis v. Township of Hillside*, 190 F.3d 167, 174

(3d Cir. 1999) (McKee, J., concurring)). On the facts that have been adduced, a reasonable jury

could believe, for instance, that numerous punches were directed at Cruz, and could infer from the

number of punches and other circumstantial evidence that the Deputy Defendants are not to be

believed and in fact harbored a purpose to harm Cruz. *Cf. Scott*, 39 F.3d at 915 (encouraging courts

to look to circumstantial evidence that might discredit officer testimony, in the context of the

qualified immunity inquiry).

Therefore, the Deputy Defendants' Motion is DENIED with respect to Plaintiffs' loss of

familial relationship claim.

### D.  Genuine issues of material facts preclude summary judgment on Plaintiffs' *Monell* claims.

The County next argues that it is entitled to summary judgment on Plaintiffs' *Monell* claims

for (1) unconstitutional custom, practice, or policy and (2) failure to train. Mot. at 28–31.

"A government entity may not be held liable under 42 U.S.C. § 1983, unless a policy,

practice, or custom of the entity can be shown to be a moving force behind a violation of

constitutional rights." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citing *Monell*

*v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 694 (1978)). "In order to establish liability for

governmental entities under *Monell*, a plaintiff must prove '(1) that [the plaintiff] possessed a

constitutional right of which [s]he was deprived; (2) that the municipality had a policy; (3) that this

policy amounts to deliberate indifference to the plaintiff's constitutional right; and, (4) that the policy

is the moving force behind the constitutional violation.'" *Id.* (citation omitted).

A plaintiff may establish *Monell* municipal liability under Section 1983 even where the

municipality does not expressly adopt the alleged policy. *See Webb v. Sloan*, 330 F.3d 1158, 1164

(9th Cir. 2003). There are three alternative ways such liability can attach: (1) "if an employee

commits a constitutional violation pursuant to a longstanding practice or custom;" (2) "when the

person causing the violation has final policymaking authority;" *id.*, and (3) "where the failure to train

amounts to deliberate indifference to the rights of persons with whom the police come into contact."

*City of Canton v. Harris*, 489 U.S. 378, 388 (1989). "[I]t is not enough for a § 1983 plaintiff merely

to identify conduct properly attributable to the municipality." *Bd. of Cnty. Comm'rs v. Brown*, 520

U.S. 397, 404 (1997). Rather, the plaintiff must "demonstrate that, through its deliberate conduct, the

municipality was the 'moving force' behind the injury alleged." *Id.*

Here, Plaintiffs contend that the County is liable under *Monell* because it (1) "had an

unconstitutional policy directing its deputies to keep people prone after the suspect has been

handcuffed and is subdued," and (2) "failed to train its deputies adequately on the risks of positional asphyxia." MSJ Opp'n at 31.

i.   Whether the County's Policy on Prone Restraints is Unconstitutional Is Genuinely in Dispute

A party may establish municipal liability by demonstrating "the constitutional tort was the result of a 'longstanding practice or custom which constitutes the standard operating procedure of the local government entity.'" *Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008) (quoting *Ulrich v. City & County of San Francisco*, 308 F.3d 968, 984–85 (9th Cir. 2002)). The policy "must be a deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Benavidez v. County of San Diego*, 993 F.3d 1134, 1153 (9th Cir. 2021) (citation omitted); *see City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985). Under this theory, "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *Tuttle*, 471 U.S. at 823–24.

Here, Plaintiffs create a genuine issue of material fact of whether the County's policy on prone restraints is unconstitutional for violating the Fourth Amendment prohibition against excessive force. The County confirms that its formal training policy teaches officers that a prone restraint, by itself, does not cause positional asphyxia and is the safest position to maintain a restrained subject. Mot. at 30. However, Plaintiffs offer the deposition of Jeffrey Noble, an expert on police practices, who states that it is standard police practice to place handcuffed and hobbled subjects in the recovery position from the prone position, even if the subject resists. Noble Dep. Tr. at 181:11–18. Noble further claims that California POST training recommends that officers place subjects in the recovery position to prevent difficulties breathing. Noble Dep. Tr. Missing Page at 83:15–21. Moreover,

33

Plaintiffs' pathology expert Pietruszka found that Cruz suffered from positional asphyxia when he was handcuffed and hobbled in the prone position with weight pushing down on his chest and abdomen. Pietruszka Dep. Tr. at 81:25–82:6. Thus, Plaintiffs' evidence challenges the County's policy that the prone restraint is the safest position for a detained individual by showing (1) standard police practice and California POST recommend the recovery position as the safest position for detained individuals, and (2) Cruz arguably died of positional asphyxia while restrained in the prone position. As such, a reasonable jury could conclude that the County's formal policy regarding prone restraints is unconstitutional because it fails to acknowledge the circumstances under which the prone position should not be used or acknowledge the danger associated with the prone position. Accordingly, the County's Motion is DENIED with respect to Plaintiffs' *Monell* claim for an unconstitutional custom, practice, or policy.

> ii.  Whether the County's failure to train was deliberately indifferent is a genuinely disputed fact.

Plaintiffs next argue that the County was deliberately indifferent in failing to train the Deputy Defendants on the risks associated with prone restraints. MSJ Opp'n at 28–31.

"[A] local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of 1983," but "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). To demonstrate such inadequacy, Plaintiffs must show that the County's failure to train "amounts to deliberate indifference to the rights of the persons with whom [untrained employees] come into contact," which is "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his actions." *Id.* (citations omitted). "Deliberate indifference exists where the need for more or different action is so obvious, and the inadequacy [of existing practice] so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be

said to have been deliberately indifferent to the need." *Park v. City and County of Honolulu*, 952 F.3d 1136, 1141 (9th Cir. 2020) (citations omitted). A plaintiff can meet this standard one of two ways. Under the first option, "the unconstitutional consequences of failing to train must be patently obvious and the violation of a protected right must be a highly predictable consequence of the decision not to train." *Kirkpatrick v. County of Washoe*, 843 F.3d 784, 794 (9th Cir. 2016) (citations omitted). Though generally insufficient, a single instance of a constitutional violation may support a finding of patent obviousness. *See Benavidez*, 993 F.3d at 1154. However, these cases are rare. *See Kirkpatrick*, 843 F.3d at 794. "Alternatively, if the policy is not obviously, facially deficient, a plaintiff must ordinarily point to a pattern of prior, similar violations of federally protected rights, of which the relevant policymakers had actual or constructive notice." *Park*, 952 F.3d at 1142. Nonetheless, "[w]hether a local government has displayed a policy of deliberate indifference to the constitutional rights of its citizens is generally a jury question." *Long v. County of Los Angeles*, 442 F.3d 1178, 1190–91 (9th Cir. 2006).

Here, Plaintiffs do not provide any evidence of a pattern of prior, similar violations of Fourth Amendment rights committed by County officers that would place the County on actual or constructive notice of the failures in their training policy. As such, to survive the Motion, Plaintiffs must present evidence creating a triable issue of material fact whether it was patently obvious to County policymakers that a Fourth Amendment violation was a highly predictable outcome of their failure to train police officers in the risks associated with prone restraints, such as positional asphyxia.

To support their claim, Plaintiffs again rely on Noble's statements regarding California POST recommendations and standard police practices on placing prone and restrained subjects in the recovery position. Plaintiffs then provide concessions from the Deputy Defendants that the County does not train officers (1) on the risks of positional asphyxia, (2) that prone subjects should be placed in the recovery position to facilitate better breathing, and (3) that pressing down on a prone subject's

back may cause positional asphyxia. Roach Dep. Tr. at 42:13–16, 43:9–19, 45:9–14; Lucifora Dep. Tr. at 89:3–6, 90:7–20, 91:6–25; Halbeisen Dep. Tr. at 135:16–21, 137:3–15; Gillison Dep. Tr. at 120:21–24, 121:2–25. Thus, taking the evidence in the light most favorable to Plaintiffs for purposes of this Motion, there is a genuine issue of material fact as to whether it is patently obvious that a Fourth Amendment violation is a highly probable consequence of the County's failure to train. Plaintiffs' evidence suggests that the County failed to train the Deputy Defendants both on the recommendations prescribed by California POST and standard police practices related to prone restraints, the recovery position, and positional asphyxia. Moreover, a jury could find it patently obvious that the risk of positional asphyxia increases when pressing down on a prone subject's back. Additionally, a jury could find it patently obvious that a prone detainee complaining of their inability to breathe should be placed in the recovery position. Nonetheless, the County does not train its officers on the risks of prone restraints and positional asphyxia. Thus, given the frequency with which officers interact with and detain individuals, a reasonable jury could conclude that the County's failure to train the Deputy Defendants on the risks associated with prone restraints and positional asphyxia was patently obvious to result in a Fourth Amendment violation of excessive force. *See Harris*, 489 U.S. at 390 n.10 (hypothesizing that deliberate indifference would be patently obvious where municipality knows officers will make arrests but fails to train them on the constitutional limitations of deadly force); *see also Long*, 442 F.3d at 1188–89 (finding deliberate indifference a triable issue of fact where parties presented conflicting evidence disputing whether the county failed to properly train prison medical examiners). As such, the County's Motion is DENIED with respect to Plaintiff's *Monell* claim for failure to train.

**E. Defendants are entitled to summary judgment on Plaintiffs' Ralph Act claim.**

Defendants next argue that summary judgment should be granted in their favor with respect to Plaintiffs' Ralph Act claim because Plaintiffs fail to proffer evidence that racial bias motivated Defendants' actions in detaining Cruz. Mot. at 31. The Ralph Act provides that "[a]ll persons within

[California] have the right to be free from any violence, or intimation by threat of violence, committed against their persons or property" because of race or other protected characteristic. CAL. CIV. CODE § 51.7(b)(1); *see id.* § 51(b). To prevail on a Ralph Act claim, a plaintiff must prove that (1) the defendant threatened or committed violent acts against the plaintiff, (2) the defendant was motivated by their perception of plaintiff's race or other protected characteristic, (3) the plaintiff was harmed, and (4) the defendant's conduct was a substantial factor in causing the plaintiff's harm. *Austin B. v. Escondido Union Sch. Dist.*, 57 Cal. Rptr. 3d 454, 470 (Ct. App. 2007).

Here, Plaintiffs present no evidence that Defendants' actions were motivated by animus of Cruz's race or other protected characteristic. Although Plaintiffs allege in their FAC that the Deputy Defendants' actions were motivated by prejudice and disdain of Hispanic Americans, FAC ¶ 76, Plaintiffs do not support this claim with any evidence. *See Anderson*, 477 U.S. at 256 ("[A] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials in his pleading, but must set forth specific facts showing that there is a genuine issue for trial."). Moreover, Plaintiffs do not address Defendants' arguments in their Opposition. As such, Defendants' Motion is GRANTED with respect to Plaintiffs' Ralph Act claim.

## F.  Genuine issues of material fact preclude summary judgment on Plaintiffs' Bane Act claim.

Defendants next argue that summary judgment is proper with respect to Plaintiffs' Bane Act claim because Plaintiffs present no evidence that Defendants had the specific intent to violate Cruz's constitutional rights. Mot. at 31–32.

"The Bane Act civilly protects individuals from conduct aimed at interfering with rights that are secured by federal or state law, where the interference is carried out by threats, intimations, or coercion." *Reese v. County of Sacramento*, 888 F.3d 1030, 1040 (9th Cir. 2018); CAL. CIV. CODE § 52.1. A Bane Act violation occurs when (1) the defendant interferes with the plaintiff's constitutional or statutory right by threatening or committing violent acts, (2) the plaintiff reasonably

believed that if she exercised her constitutional right, the defendant would commit violence against her, or the defendant injured the plaintiff to prevent her from exercising her constitutional right, (3) the plaintiff was harmed, and (4) the defendant's conduct was a substantial factor in causing the plaintiff's harm. *Austin B.*, 57 Cal. Rptr. 3d  at 471. Moreover, in the context of a Fourth Amendment excessive force claim, the Bane Act requires a showing of "specific intent to violate the arrestee's right to freedom from unreasonable seizure." *Reese*, 888 F.3d at 1043 (citing *Cornell v. City & County of San Francisco*, 225 Cal. Rptr. 3d 356, 382–85 (Ct. App. 2017)). However, "a mere intention to use force that the jury ultimately finds unreasonable—that is, general criminal intent—is insufficient. Rather, the jury must find that the defendants intended not only the force, but its unreasonableness, its character as more than necessary under the circumstances." *Id.* at 1045 (citations omitted). Determining specific intent is a two-part analysis. "The first is a purely legal determination. Is the . . . right at issue clearly delineated and plainly applicable under the circumstances of the case?" *Cornell*, 225 Cal. Rptr. 3d at 386 (quoting *People v. Lashley*, 2 Cal. Rptr. 2d 629, 635 (Ct. App. 1991)). "If the trial judge concludes that it is, then the jury must make the second, factual, determination. Did the defendant commit the act in question with the particular purpose of depriving the citizen victim of his enjoyment of the interests protected by that . . . right?" *Id.*

First, the Fourth Amendment right against excessive force was clearly delineated and plainly applicable under the circumstances of this case, *see Drummond* 343 F.3d at 1054–55, 1062.

Next, given all of the factual disputes concerning the Deputy Defendants' actions that day, a genuine factual dispute remains with respect to whether Defendants had the specific intent to violate Cruz's Fourth Amendment rights. Thus, a reasonable jury could determine that the amount of force

1   used, the nature of the force, and the nature of the dialogue by the Deputy Defendants was

2   circumstantial evidence of this specific intent.[32]

3       As such, Defendants' Motion is DENIED with respect to Plaintiffs' Bane Act claim.

4       **G.  Whether Defendants were negligent is a genuinely disputed fact.**

5       Defendants next argue that they are entitled to summary judgment on Plaintiffs' negligence

6   claim because (1) Roach and Lucifora's pre-force tactical conduct was reasonable, (2) Roach,

7   Lucifora, Gillison, and Halbeisen's seizure-related conduct was reasonable, and (3) the County is not

8   vicariously liable. Mot. at 32–34.

9       Under California negligence law, "a plaintiff must show that the defendant had a duty to use

10  due care, that he breached that duty, and that the breach was the proximate or legal cause of the

11  resulting injury." *Hayes v. County of San Diego*, 305 P.3d 252, 255 (Cal. 2013). Peace officers have

12  a duty to act reasonably when using force. *Id.* The reasonableness of an officer's conduct, including

13  pre-force conduct, is determined under the totality of circumstances. *Id.* at 629, 632. However,

14  "California negligence law overall is broader than federal Fourth Amendment law in excessive force

15  cases." *Tabares*, 988 F.3d at 1128 (quoting *Villegas ex rel. C.V. v. City of Anaheim*, 823 F.3d 1252,

16  1257 n.6 (9th Cir. 2016)). Accordingly, "[a]s long as an officer's conduct falls within the range of

17  conduct that is reasonable under the circumstances, there is no requirement that he or she choose the

18  most reasonable action or the conduct that is the least likely to cause harm and at the same time the

19  most likely to result in the successful apprehension of a violent suspect, in order to avoid liability for

20  negligence." *Hayes*, 305 P.3d at 258 (quoting *Brown v. Ranseiler*, 89 Cal. Rptr. 3d 801, 820 (Ct.

---

[32] Another court in this district has taken a similar approach with respect to this question. In *Vos v. City of Newport Beach*, No. SACV 15000768 JVS (DFMs), 2020 WL 4333656, at *10 (C.D. Cal. June 8, 2020), the court denied defendant officers' summary judgment on Bane Act claim where plaintiffs presented circumstantial evidence of officers' specific intent to deprive plaintiffs of their constitutional rights.

App. 2009)). In any event, "[s]ummary judgment is appropriate when the trial court determines that, viewing the facts most favorably to the plaintiff, no reasonable juror could find negligence." *Id.*

Here, the parties agree that Roach and Lucifora's pre-force conduct, such as commanding Cruz to drop the glass pipe, placing a foot on Cruz's forearm, and grabbing Cruz's arms to handcuff him, was consistent with standard police practices. Plff. SUF Opp'n ¶ 64. As such, no disputes exist regarding the reasonableness of pre-force conduct.

Nonetheless, because genuine issues of material fact exist as to the reasonableness of the Deputy Defendants' seizure-related conduct under the Fourth Amendment excessive force context, summary judgment for the Deputy Defendants is similarly inappropriate on Plaintiffs' negligence claim. Both Fourth Amendment excessive force and state law negligence claims analyze the use of force under the totality of circumstances. Since a reasonable juror could determine that it was unreasonable under the totality of the circumstances—the standard for negligence—to punch an unarmed and handcuffed Cruz in the head and back several times, apply a baton and knees to his back, hobble his legs, and fail to remove Cruz from the prone position for several minutes, Defendants cannot prevail on summary judgment with respect to Plaintiffs' negligence claim. *See S.R. Nehad v. Browder*, 929 F.3d 1125, 1142 (9th Cir. 2019) (reversing district court's grant of summary judgment for defendant officer on negligence claim where objective reasonableness of officer's use of force was a disputed issue of fact).

Similarly, a reasonable juror could conclude that the County is vicariously liable for Cruz's death. "A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would . . . have given rise to a cause of action against that employee or his personal representative." CAL. GOV'T CODE § 815.2. Thus, if a jury finds that the Deputy Defendants are liable for excessive use of force in detaining Cruz, the County may be vicariously liable for their actions.

As such, Defendants' Motion is DENIED as to Plaintiffs' negligence claim.

1

## CONCLUSION

2          In light of the foregoing, the Court hereby ORDERS as follows:

3      1.  The Motion to Exclude Marvin Pietruszka's opinions is DENIED;

4      2.  The Court's Findings of Fact are ESTABLISHED for trial;

5      3.  The Motion for Summary Judgment or, in the Alternative, Motion for Partial Summary

6          Judgment, is GRANTED IN PART and DENIED IN PART.

7

8          IT IS SO ORDERED.

9

10     Dated: October 26, 2022                    _____

11                                           MAAME EᵂUSI-MENSAH FRIMPONG

12                                                United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28